# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

STANLEY and CONNIE C., Individually )
and as Next Friends of M.C., a minor, )
   Plaintiffs,    )
         )
  v.       )  CAUSE NO: 1:07-CV-169-PRC
         )
M.S.D. OF SOUTHWEST ALLEN )
COUNTY SCHOOLS and GREEN-WEST )
ALLEN SPECIAL EDUCATION )
COOPERATIVE,    )
   Defendants.   )

## OPINION AND ORDER

This matter is before the Court on (1) Plaintiffs' Motion for Summary Judgment [DE 114],

filed on May 15, 2008, by Plaintiffs Stanley and Connie C., Individually and as Next Friends of

M.C., a minor (collectively "the Parents"); and (2) Defendants' Motion for Summary Judgment [DE

117], filed on May 15, 2008, by Defendants MSD of Southwest Allen County Schools and Smith-

Green West Allen Special Education Cooperative (collectively "SACS" or "the School"). The

Parents have brought this action under the Individuals with Disabilities Education Act ("IDEA"),

appealing the outcome of the administrative due process hearing that addressed the provision of

special education to their daughter M.C. during the 2004-05 and 2005-06 school years, which was

largely favorable to SACS. As set forth in this Order, the Court denies the Parents' Motion for

Summary Judgment, denies in part as moot SACS' Motion for Summary Judgment as to attorney

fees, and grants the remainder of SACS' Motion for Summary Judgment.

# FACTUAL BACKGROUND

The Court summarizes the factual underpinnings of this dispute, incorporating additional details as relevant in the course of the opinion.[1]

## A. The Student–M.C.

M.C. is the fifteen-year-old, adopted daughter of Stanley and Connie C. Her mother describes her as a beautiful girl with a good sense of humor. She has typical adolescent interests such as popular music and fashion, and she loves to dance. Despite her challenges, M.C. has learned how to manipulate a music iPod and cellular telephone adeptly.

M.C. has multiple disabilities resulting from a stroke she suffered at the age of three months. She has speech disorders of dysarthria (weakness of the muscles) and apraxia (difficulty in motor planning). These disorders make oral movements and swallowing difficult and result in drooling and reduced speech intelligibility. M.C. is also diagnosed with cerebral palsy that affects her left-side movement and visual field and that impairs the use of her left arm. In addition, M.C. has visual motor and visual information processing delays that impact her academic performance. These vision problems result in a short visual attention span, visual confusion, visual fatigue, and interference with reading comprehension.

M.C. reads books at a third to fifth grade level, counts money to purchase items, and uses a calculator. She tells time to the half hour and can compose a paragraph. She uses compensatory

---

[1] These facts are compiled from the Statements of Material Facts, the Statements of Genuine Issues, and the briefs submitted by the parties in support of and in opposition to the cross motions for summary judgment. In accordance with Local Rule 56.1, facts that were not specifically contested by the opposing party are included only to the extent they are supported by admissible evidence of record. *See E.U. v. Valparaiso Cmty. Schs.*, Civ No. 2:07cv238, 2008 WL 2626786, at *2 (N.D. Ind. June 27, 2008). The Court disregards any facts that are not properly supported by an accurate citation to the record or any statements in the Statements of Material Facts and Statement of Genuine Issues that contain conclusory allegations, unsupported characterizations, or pure legal argument.

strategies, such as using her auditory skills to rehearse and keep in memory information she is recording on paper.

M.C. is eligible for special education as a student with a communication disorder, a visual impairment, and a mental impairment. According to Jennifer Barnes, the school psychologist ("School Psychologist") in July 2005, M.C.'s academic profile was commensurate with her cognitive profile in that her reading and writing were better developed and consistent with borderline disability while her math concepts and written computation were reflective of a moderate disability. The School Psychologist also noted that M.C. showed strength in her ability to process and reason with words; in contrast, visual, nonverbal reasoning skills ranged from below the average to the moderate disability range. In testing completed in summer 2006 by Dr. Fisher, a neuropsychologist hired by the Parents, M.C. scored in the average range on a variety of tests, including, but not limited to, auditory processing, phonemic awareness, listening comprehension, and reading vocabulary. SACS' expert, Dr. Couvillion, testified that these tests were scored accurately.

M.C.'s father testified at the administrative hearing that M.C. is sociable and wants friendships but does not have friends due to her drooling and language issues. M.C. reports that a bad thing in her life is that "[n]o boy likes me." AR 2442. Although M.C. is interested in social activities, she is never invited to a peer's house, a sleep over, movies, or parties. M.C.'s mother said that people are repelled when M.C. hugs them and gets them wet with her drool. M.C.'s drooling falls on her papers, homework, and reading materials, and her drooling makes other students avoid her. Prior to the years at issue, when M.C. was in fifth grade, the elementary school would not allow M.C. to eat in the school cafeteria because of her drooling.

The Parents' experts opined that M.C. requires intensive academic programming to learn and that when M.C. does not receive intensive therapy and direct instruction, she is at risk for regression in previously learned skills and functions. Frequent drill and practice of new skills and previously mastered concepts allows M.C. to build her repertoire of academic skills. In the summer of 2005, one of her teachers at SACS indicated that M.C. needs concepts broken into small pieces to understand academic material, and teachers described her use of and need for one-on-one help to complete assignments, communicate, and relay her knowledge. Dr. Fisher testified at the hearing that, when teaching M.C., concepts need to be broken into small components and each small component must be repeated until mastered. Dr. Fisher testified that small group learning is not effective for M.C. and that M.C. can only learn with one-on-one instruction.

## B. The Experts

The Parents hired two expert witnesses–Dr. Fisher and Dr. Savage, and relied on a letter submitted by Michael Smith, M.D., who has been M.C.'s neurologist since 1996.

Barbara Fisher, Ph.D., a pediatric neuropsychologist, did a neuropsychological evaluation of M.C. in May and July 2006 at the Parents' expense and spent six days with M.C., testing and observing her. Ronald Savage, Ed.D, is a certified brain injury specialist through the Brain Injury Association of America, is the editor of the Brain Injury Professional Journal, has consulted with institutions specializing in brain injury, such as Bancroft Neurohealth in New Jersey, has chaired the National Task Force on Children and Adolescents with Brain Injury, and consults with George Washington University's brain injury program. He has worked with thousands of brain injured students for over thirty years and published a study of 36,000 brain injured children on which he based his recommendations for M.C. Dr. Savage not only reviewed all of M.C.'s medical and

educational records, but he also spent a full day with M.C. and met with the director of the Fort Wayne Center for Learning ("FWCL"), the director of rehabilitation services at Lutheran Hospital, and Dr. Fisher.

SACS also hired two expert witnesses–Dr. Stauffer and Dr. Couvillion. Amy Stauffer, M.D., a pediatric neurologist, submitted a one-page report in the form of a letter dated November 17, 2006, but was not called to testify. Steven Couvillion, Ph.D., a pediatric neuropsychologist, was hired to review documents, write a report, and testify on behalf of SACS. As for Dr. Couvillion's expertise in brain injury, his curriculum vitae lists a presentation on head injury in 1999 for the Brain Injury Association of Indiana and indicates that he was a board member of that same organization beginning in 2004 for an unidentified period of time. He testified that in his current group practice, he conducts evaluations, works with families of children with a variety of conditions, including brain injury, and consults with the acute brain injury rehab unit at Methodist Hospital. He is certified by the American Board of Pediatric Neuropsychology. Dr. Couvillion never saw M.C., and he did not talk with M.C.'s parents, private providers, or anyone at FWCL. He reviewed records and talked to the School Psychologist and to an unidentified teacher for one hour.[2]

### C. Fort Wayne Center for Learning

During the relevant time period, the 2004-05 and 2005-06 school years, M.C. was educated, in part, at FWCL, a not-for-profit center located in Fort Wayne, Indiana, that provides specialized remedial instruction and developmental and remedial intensive therapy for children with disabilities as well as general education and gifted students who are struggling at school. The instructional methodology at FWCL is multi-sensory, explicit, and adapted for each student, and instructors

---

[2] The Parents note that the record is not clear as to the identity of the teacher. In their brief, SACS identifies the teacher as the Teacher of Record.

present concepts and information in an organized, structured, and systematic manner. The overall approach to teaching takes into account a student's sensory processing, language processing, and cognitive processing.

Olive Swenson, the Director of FWCL, previously worked for Lindamood-Bell for over ten years, has traveled around the country and to Australia training others in the Lindamood-Bell programs, and has operated two facilities for teaching students with academic difficulties. Prior to coming to FWCL, she was the director of Integrated Learning Systems ("ILS"), a private center in Indianapolis. Lindamood-Bell is a research-based developmental and remedial reading instruction program that focuses on phonemic awareness, decoding, fluency, vocabulary, and comprehension. A visualizing-verbalizing technique is used in teaching comprehension. LiPS, another Lindamood-Bell program, focuses on phonemic awareness. M.C.'s mother testified that LiPS was recognized by the National Institute of Health and Child Development in 2000 as a crucial component of reading instruction.

For M.C., FWCL instruction was intensive, remedial, one-on-one, individualized, explicit, progressive, and systematic and used sensory-cognitive processing based methods. With M.C., FWCL used Lindamood-Bell programs, including the Lindamood-Bell Phoneme Sequencing Program, Visualizing and Verbalizing for reading and math, Drawing with Language for visual-motor and spatial processing, the Academic Performance Management Program for teaching organization, the Seeing Stars Symbol Imagery Program for reading, and the LiPS program to facilitate M.C.'s reading, comprehension, and vocabulary development. FWCL begins each task with an informal assessment to determine M.C.'s present level of performance and teaches M.C. at the level she demonstrates. FWCL provides M.C. instruction not only in academic skills, but also

on perseverance, work product, timeliness, and following directions. FWCL uses Indiana State Standards to assess M.C.'s performance and work production. M.C.'s progress is also measured by her consistency, stability, and independence in performing learned skills. At FWCL, everything is broken down and then gradually built back up until M.C. can demonstrate a specific skill. While at FWCL during the years at issue, M.C. made progress in a variety of areas, including writing, decoding, reading, math, and social skills.

The instructors at FWCL are not required to be licensed teachers nor are they required to have degrees in education (or special education), although more than half of the instructors at FWCL are licensed teachers and all have a college education. The only required training at FWCL is presented by Swenson; training is provided for four hours every Friday. The instructors are trained to use the specialized programs and strategies set forth above. Swenson is not a licensed teacher, and although she has a bachelor's degree, she has no degree in education. FWCL is not licensed or approved by any official body.

### D. Relevant Educational & Administrative Procedural Chronology

*1. The Early Years*

M.C. attended Whispering Meadows, an elementary school in SACS for second grade–the 2000-01 school year. At that time, M.C. was unable to speak and so she vocalizations, sign language, and gestures to communicate, and she had an interpreter. She was unable to write, spell, read, or do mathematics above a kindergarten or first grade level. At that time, M.C. received physical therapy, occupational therapy, speech therapy, vision services, and adapted physical education at SACS. She received instruction in the general education second grade classroom.

During M.C.'s third and fourth grade years, her parents paid for her to attend ILS in Indianapolis and paid for speech, vision, occupational, and physical therapies. At the time, ILS was a private center, directed by Swenson, that provided instruction based on various methodologies, including the Lindamood-Bell methodology, to students with difficulties in reading, comprehension, spelling, writing, visuomotor processing, and language. ILS now provides consultation and training to schools. When she left ILS after two years, M.C. had made approximately two years progress in reading, as she could read at a second grade level.

M.C. returned to Whispering Meadows School for fifth grade in August 2003. In fifth grade, SACS attempted to duplicate M.C.'s instruction at ILS, but M.C.'s mother testified that it was unsuccessful and M.C. was distracted by other students. She further testified that SACS did not provide the processing-based instruction that M.C. needs to make progress. M.C.'s parents complained to SACS that M.C.'s individualized education program ("IEP") lacked measurable goals, academic objectives, and meaningful progress monitoring and complained about the lack of coordination among regular and special education staff. Unhappy with SACS' program, the Parents returned M.C. to ILS in March 2004 to complete fifth grade at their expense. In Summer 2004, Swenson became executive director of FWCL to develop programs there. The Parents represent that, during the course of briefing the instant motions, Swenson has returned to ILS.

2. *The 2004 Settlement Agreement*

After the 2003-04 school year, the Parents requested a due process hearing against SACS. On August 4, 2004, the parties entered into a settlement agreement ("Settlement Agreement") resolving disputes that led to the due process hearing request. *See* AR 2820. In exchange for M.C.'s parents withdrawing the pending hearing request and releasing SACS from liability for events prior

to the 2004-05 school year, SACS promised to pay for up to fifteen hours per week of M.C.'s instruction at FWCL for the 2004-05 and 2005-06 school years. The Settlement Agreement addressed certain other provisions of M.C.'s education for the 2004-05 school year, the summer of 2005, and the 2005-06 school year. SACS was to conduct additional psychological evaluations in the summer of 2005 and 2006, and SACS agreed to use the same assessments that were used in the July 2004 assessments again in 2005 and 2006. The terms of the Settlement Agreement were to be incorporated into the IEP. SACS was to communicate at least weekly with the Parents via email as to materials being used with M.C., any assignments due, homework, upcoming tests, and progress on her goals and objectives. The Settlement Agreement did not address the provision of related services.

*3. Academic Year 2004-05*

During the 2004-05 school year, M.C. attended FWCL from 8:00 a.m. to noon and attended SACS' Woodside Middle School in the afternoon for one, ninety-minute class at the end of the regular school day. On alternate Fridays, M.C. went to Indianapolis for therapies. On August 18, 2004, the parties met to develop M.C.'s IEP for the 2004-05 school year. The Settlement Agreement was referenced in the case conference summary. The parties executed an agreed-upon IEP for social studies and science for the 2004-05 school year, which indicated that M.C. should receive an accommodation of one-to-one instruction in her general education classes.

At Woodside, M.C.'s IEP initially placed her in a resource special education classroom, which contained three or four students, a teacher, and an aide. On September 30, 2004, SACS prepared an addendum to M.C.'s IEP, such that M.C. would be included in general education on certain days of the week and, on opposite days, would review in the special education classroom the

general education course work.  The IEP addendum provides that "[M.C.]'s mother would like her to attend general education social studies class with support of an aide."  AR 2836.[3]  M.C.'s father inquired whether M.C. could benefit from a general education classroom.  SACS agreed to review the placement at mid term to determine if it was successful.  Under this model, M.C. took science one semester and social studies the other semester.  Ann Plasterer, an aide who is not a certified teacher, retaught M.C. social studies and science one-on-one in the special education room.  M.C. received services at SACS from a teacher specializing in Mild Disabilities during the 2004-05 and 2005-06 school years.

At FWCL, the intensive program consisted of instruction to address various objectives in reading, spelling, writing, and math.  FWCL also worked to increase M.C.'s stamina, perseverance, performance tempo and rate, and attention.

On November 15, 2004, a case conference meeting was held with SACS to review M.C.'s progress.  A written evaluation in reading, math, and writing completed by FWCL was shared with SACS, as well as information concerning M.C.'s progress in speech and comprehension at FWCL.  An IEP addendum was completed and provided, in part, that "[M.C.] will be excused from school every other Friday to go to Indy by parents' choice to attend physical therapy and vision therapy."

---

[3]  The Parents argue in their reply in support of summary judgment that it was not, as SACS suggests in its briefing, "at Plaintiffs' urging" that M.C. was taught in the general education classroom.  Pl. Reply, p. 3.  The Court has not adopted SACS' characterization and has instead cited the actual language of the IEP addendum.  The case conference notes, cited by the Parents, also reflect that the Parents requested the general education placement:

Connie asked if what is happening now is the best way to keep M.C. up on ISTEP concepts.  Skip asked if she could benefit from a general ed class considering her problems.  The emphasis of this year was to be on intense learning only was part of the initial IEP.[sic] Parents are asking for part of her 1.5 hours to be spent in the social studies class for concepts and whatever social skills to be learned.

AR 1741.  The "recommendations" in the Case Conference Summary Report memorialize the adoption of this request. *See* AR 1742.

AR 1748.  FWCL also reported M.C.'s progress in a January 2005 six-week report and in a May 2005 report covering the period of January to May.

*4.  Summer 2005*

During summer 2005, SACS paid for M.C. to attend FWCL for four weeks pursuant to the Settlement Agreement.  The Parents provided M.C. with therapies over the summer.  SACS did not provide M.C. with any school or private therapies during the summer of 2005.

*5.  Academic Year 2005-06*

a)  August 19, 2005 IEP

During the 2005-06 school year, M.C. attended Woodside for a full day and attended FWCL after school for eight to ten hours per week.  On August 8, 2005, and prior to the case conference at which M.C.'s 2005-06 IEP was to be developed, the SACS staff designed a full-day program for M.C. at Woodside and proposed it to the Parents.  M.C.'s mother agreed to the placement and enrolled M.C. for a full day at Woodside, believing that SACS would continue to pay for FWCL instruction for M.C.

A case conference was held on August 19, 2005, the day before school started, to develop M.C.'s 2005-06 IEP, and the parties executed an agreed-upon IEP.  Present at the meeting were Kristie White, M.C.'s Teacher of Record ("TOR"); the School Psychologist; a general education teacher; Cheryl Carter, a mild disabilities teacher and M.C.'s Teacher of Service ("TOS"); M.C.'s mother; and Jackie Gruesbeck, the director of special education ("Director of Special Education").  The notes of the August 19, 2005 case conference committee meeting demonstrate that the Parents still wanted M.C. to be at FWCL for some part of the day and that M.C.'s mother wanted M.C. to have both science and social studies all year long.  The school team determined that M.C. would

attend Woodside for a full day, but M.C.'s mother asked to reconvene to determine which educational services would be provided by Woodside and which would be provided by FWCL. The case conference committee meeting notes written by the Director of Special Education provide that M.C.'s mother "feels that Woodside is the best school that M.C. has attended." AR 2941. M.C.'s TOR testified that she felt the Parents wanted a less restrictive environment because of the move to the general education classroom and the end of re-teaching on opposite days. SACS held another case conference on August 23, 2005, to discuss M.C.'s goals and plans for the year.

During the 2005-06 school year, M.C.'s TOR spent ninety minutes every other day (one block class period in an eight-block schedule) working with M.C. on her IEP goals. SACS taught M.C. reading and mathematics in a small group setting in the special education classroom, and M.C. continued to participate in social studies and science in the general education classroom. M.C.'s mother requested that she have social studies and science all year; this meant that her study hall period would need to cover both topics. During this school year, M.C. was supported by a one-to-one assistant, Rebecca Niles, who held a bachelor's degree but was not licensed to teach in Indiana. In addition to M.C.'s core academic classes, SACS addressed numerous other matters, including but not limited to "functional" mathematics, "functional" language arts, general computing skills, various self-help concerns (e.g. traversing the school, riding the bus, opening a locker first using a key and then a combination, dressing for physical education, and resolving social disputes), occupational therapy for keyboarding, and speech and vision programs as recommended by M.C.'s private providers.

b) SACS' due process hearing request

On August 29, 2005, the Director of Special Education sent an email to M.C.'s mother expressing her pleasure that M.C. would be attending Woodside for a full day and informing the Parents that the funding for FWCL would cease, reasoning that the basis for the original agreement for payment was to "provide a full educational experience which will now be accomplished at Woodside." AR 1819. The same day, M.C.'s mother wrote that, if M.C. could not handle a full day at Woodside and instruction at FWCL, M.C.'s time at Woodside must be cut back. She also wrote that the Parents continued to expect M.C. to attend FWCL every day and that agreement to a full-day program at Woodside did not abrogate SACS' obligation to continue to pay for additional services for M.C. at FWCL pursuant to the Settlement Agreement.

Additional communications were exchanged, and, eventually, SACS requested a due process hearing against the Parents, attempting to avoid its obligation to pay for FWCL under the Settlement Agreement. SACS claimed that the Parents had "unilaterally enrolled" M.C. full time at SACS. On December 12, 2005, the IHO found in favor of M.C.'s parents, denying SACS' request to discontinue paying for up to fifteen hours a week of services through FWCL as originally set forth in the Settlement Agreement.[4] As a result, SACS continued to pay for up to fifteen hours per week of instruction at FWCL for the 2005-06 school year.

c) January 20, 2006 case conference committee meeting

A case conference committee meeting was held on January 20, 2006, to "discuss M.C.'s educational day." AR 1852. Both Parents attended the meeting. SACS' meeting summary provided that "[M.C.] is very happy here at Woodside. She enjoys the social part of middle school. Mom

---

[4] The Court hereby takes judicial notice of the IHO's December 12, 2005 Order from Hearing 1551.6, attached as Exhibit A to Plaintiffs' Motion for Summary Judgment. *See* Fed. R. Evid. 201.

mentioned that Woodside is doing a very good job with [M.C.]." *Id*. M.C.'s mother stated that she originally wanted M.C. to do a half day at Woodside and a half day at FWCL but that she also wanted M.C. to have social studies and science, which was proposed in such a way by SACS that M.C. needed to do a full day at Woodside to have both. She stated that she believed that her original purpose for M.C. for that year was *not* to send M.C. to Woodside all day and that in an ideal world, she did not like the idea that M.C. would attend school until 5:00 p.m. However, she stated that M.C. "is handling it and seems to be doing fine." AR 2986. M.C.'s mother says she signed the 2005-06 IEP in an attempt to avoid further litigation with SACS. Other excerpts of the meeting are set forth in the relevant portions of the Analysis below.

In response to numerous issues raised at the case conference, M.C.'s father wrote a "Written Opinion." Therein, he noted that M.C.'s mother also noted at the meeting that M.C. is equally happy at FWCL. The Parents complained about the lack of progress in language arts and math at SACS, stating that only ILS and FWCL had proven progress in these areas, that M.C. did not have specific goals and benchmarks at SACS, that SACS was not coordinating efforts with FWCL, and that SACS was not requiring M.C. to write legibly. They noted that M.C.'s therapies were at their sole expense. They also disagreed with SACS' claim that M.C. had made no progress at FWCL. The Parents wrote that SACS' "professed concern about [M.C.'s] mental energies seem more driven by the objective to get at some theory by which a hearing officer can be convinced to alleviate the financial obligation of SACS schools to educate this child." AR 1858.

d) March 15, 2006 case conference committee meeting

On March 15, 2006, SACS called a meeting to respond to the Written Opinion and to "review and discuss options for M.C.'s school day and the remainder of the school year." AR 1878.

Both parents attended the meeting. There was no discussion of the Written Opinion. When questioned by M.C.'s mother about why M.C.'s schedule was being discussed at that time in the year, the Director of Special Education explained that the Settlement Agreement called for a school day, not an extended school day.

On March 24, 2006, the Parents wrote a letter to the Director of Special Education expressing concern about SACS' desire to change M.C.'s schedule and that M.C. was not making progress at SACS. The Parents felt that the case conference committee was not working effectively for M.C. and was being used to try to accomplish SACS' goal of reducing the amount of money spent on M.C. The Parents also asked SACS for a case conference to discuss the 2006-07 school year.

e) May 17, 2006 case conference committee meeting

On May 17, 2006, SACS called a case conference committee meeting for the purpose of determining what testing of M.C. SACS would perform and to discuss extended school year services. Both parents attended. SACS proposed a general ISTEP remediation class for M.C.'s extended school year services, whereas M.C.'s mother requested that SACS accept FWCL's extended school year services. In response, SACS wrote a new proposal.

*6. First Due Process Hearing Request*

On June 5, 2006, the Parents requested a due process hearing regarding M.C.'s educational placement and services during the 2004-05 and 2005-06 school years. This is the administrative proceeding underlying the instant lawsuit.

*7. Summer 2006*

On June 16, 2006, the Independent Hearing Officer ("IHO") ordered that SACS pay for fifteen hours at FWCL for four weeks during the summer of 2006.

*8. Second Due Process Hearing Request & Unilateral Placement*

No case conference committee meeting was held for 2006-2007, and SACS did not develop an IEP and new goals for M.C. for the 2006-2007 school year. On September 14, 2006, the Parents asked the IHO to add the issue of "whether the school failed to devise an appropriate and timely IEP for [M.C.] for the 2006-07 school year." AR 3894. On September 27, 2006, the IHO denied the request and limited the Article 7 due process hearing to the provision of special education and related services to M.C. during the 2004-05 school year, the summer of 2005, and the 2005-06 school year.

On September 29, 2006, counsel for the Parents sent SACS' attorney a ten-day unilateral placement notice, and the Parents removed M.C. from the public school and unilaterally placed her at FWCL for instruction and at Lutheran Hospital for therapies.

*9. October 18, 2006 Case Conference Committee Meeting–Behavioral Intervention Plan*

At the May 17, 2006 case conference committee meeting, SACS offered to perform a functional behavioral assessment ("FBA") for attention and drooling, and M.C.'s parents gave permission for the FBA. SACS' Functional Behavior Screening form includes a query as to "how disruptive or dangerous is the problem behavior." Concerning drooling, the FBA, dated May 30, 2006, indicates that ignoring, redirection, and corrective feedback are interventions that school staff had tried with M.C. to decrease drooling and that all had low effectiveness. On October 5, 2006, SACS informed M.C.'s parents that the school had completed M.C.'s FBA and requested a case conference to review the FBA and develop a Behavioral Intervention Plan ("BIP"). On October 18, 2006, SACS held a case conference committee meeting to review behavior data from May 2006 and to draft a behavior plan for M.C. for drooling and attention based on the observations made in May

2006. However, M.C. had been removed from Woodside, and SACS never implemented the BIP.[5]

*10. Article 7 Due Process Hearing*

Following numerous extensions of the hearing date, on October 21, 2006, the IHO issued a final Order on Prehearing Conference, which affirmed nineteen issues to be considered, as agreed by the parties:

During the 2004-2005 and 2005-2006 School Years, did the School–

1. Fail to use scientifically based, peer reviewed methods of instruction when implementing the goals and objectives contained in the Student IEP(s)?
2. Fail to appropriately and timely conduct a FBA?
3. Fail to devise an appropriate BIP based on the principles of positive behavioral supports?
4. Fail to provide speech therapy as required by the Student?
5. Fail to provide occupational therapy as required by the Student?
6. Fail to provide vision therapy as required by the Student?
7. Fail to provide self-help skills training as required by the Student?
8. Fail to provide for ESY services as required by the Student?
9. Fail to provide measurable goals and objectives in each area of identified need as recorded in the Student's IEP?
10. Fail to provide ISTEP remediation as required by the Student?
11. Fail to provide counseling services as required by the Student?
12. Fail to provide social skills training as required by the Student?
13. Fail to provide required or necessary educational services for the Student in the LRE?
14. Fail to provide progress reports to the Parents as required by the Student's IEP(s) or Article 7?
15. Fail to ensure that its'[sic] staff was appropriately certified, licensed or trained to provide the Student those services as contained in the Student's IEP?
16. Violate the "stay-put" provisions of Article 7 or IDEIA by withholding payments to the Fort Wayne Center for Learning?
17. Fail to evaluate the Student within the timelines established by Article 7 or a previous settlement agreement?

---

[5] In support of certain facts, the Parents cite a School Function Assessment ("SFA"). In their reply in support of summary judgment, the Parents acknowledge that the SFA was filled out by M.C.'s mother in fall 2006 to assist the Parents' experts. Although it is part of the administrative record, the SFA was not raised by either party during the course of the administrative proceedings. Accordingly, the Court will give the cited portions of the SFA the weight it is due as the observations and opinions of M.C.'s mother.

18. Fail to conduct mandated state-wide assessment(s) of the Student; specifically, either ISTEP or ISTAR as required by Article 7 or the Students IEP(s)?

19. Fail to reimburse the Parents for the costs of transportation as required by previously written agreement or Article 7.

AR 3896-97. Issues 10 and 18 were dismissed on December 2, 2006.

A five-day evidentiary hearing with testimony from numerous witnesses was held on November 27, 28, 29, and December 4, and 5, 2006. On January 31, 2007, the presiding IHO rendered a 79-page decision resolving 18 of the 19 issues raised by the Parents in favor of SACS. With regard to issue number 9, whether "[d]uring the 2004-2005 and 2005-2006 school years, did the school fail to provide measurable goals and objectives in each area of identified need as recorded in [M.C.'s] IEP," AR 3943, the IHO found a technical violation constituting a procedural error but concluded that it did not impede M.C.'s right to a free appropriate public education ("FAPE"), did not deprive the Parents of an opportunity to participate in the decision making process regarding the provision of a FAPE, and did not cause M.C. a deprivation of educational benefit. AR 3945.

Nevertheless, the IHO ordered SACS to conduct a case conference committee meeting within fifteen calendar days of the date of the Order to review and revise M.C.'s then-current IEP. The IHO further ordered that M.C. receive special education and related services in the public school, individual speech therapy services by the school's speech therapist a minimum of twice a week for a minimum of thirty minutes each session, occupational therapy services by or under the supervision of the school's occupational therapist, and an informal evaluation regarding her social skills strengths and weaknesses to form the basis for interventions developed by the case conference committee.

He ordered the case conference committee to review data to determine whether vision therapy is required as a related service and, if so, by whom. The IHO ordered SACS to consult with

Dr. Couvillion for the purpose of designing and implementing a specific strategy to ameliorate, to the degree possible, M.C.'s drooling. He ordered SACS to establish goals and objectives for personal hygiene and self-help skills to be determined by the case conference committee; to ensure that specific, measurable goals and objectives are included in M.C.'s IEP and that they include performance based terms, conditions of performance, and criteria for measurement; to review M.C.'s progress toward meeting the goals twice each grading period by the TOR to be provided to the Parents in writing within five calendar days; to design M.C.'s academic instruction on a functional curriculum to facilitate independent living skills; and to invite the Parents to any meeting that addresses the addition, removal, or modification of goals, objectives, or other changes to the IEP. The IHO ruled that SACS has no further obligation to provide reimbursement for privately provided educational or related services.

## 11. *Appeal to the BSEA*

On March 2, 2007, the Parents appealed the IHO's decision to Indiana's three-member Board of Special Education Appeals ("BSEA"). The BSEA was comprised of three individuals–one permanent member of the BSEA, one long-time attorney, and one professor of special education from Indiana University. The Parents did not seek to submit any new evidence to the BSEA. In their appeal, the Parents sought a review and finding that SACS

> failed to: (1) utilize scientifically based instruction; (2) complete an appropriate functional behavior assessment and develop a behavior intervention plan; (3) provide appropriate related services; (4) develop an IEP with measurable goals and objectives so that M.C. may receive a [FAPE]; (5) provide meaningful progress reports; (6) provide a neuropsychological evaluation in compliance with the August, 2004 settlement agreement and Article 7 of the Indiana Code; (7) appropriately consider the testimony of expert witnesses presented by Petitioners, and; (8) provide an appropriate educational placement for M.C.

AR 4975. After a lengthy oral argument, the BSEA rendered a 48-page written decision on June 14, 2007, largely affirming the IHO's Order. The resulting evidentiary record is now contained in approximately 20 volumes and spans over 6,000 pages.

The BSEA affirmed the IHO's decision with specific modifications. The BSEA removed finding of fact No. 11 that M.C.'s father had authored the Settlement Agreement as irrelevant; amended finding of fact No. 33 to describe "drooling behavior" rather than "drooling;" struck from finding of fact No. 40 as irrelevant the phrase "The Student's parents are well educated. The father is an attorney. The Mother is a college graduate;" amended finding of fact No. 130 to modify the phrase "[the Parents] demanded that the Student be forced to use cursive handwriting instead" to "[the Parents] requested the Student be instructed to use cursive handwriting instead;" disagreed with the IHO's limitation of a BIP to those behaviors of a student being considered for suspension, expulsion, or placement in an alternative setting, explaining that a BIP is necessary any time an eligible student demonstrates untoward behavior that adversely affects educational performance, which could include safety issues without regard to disciplinary matters; and amended conclusion of law No. 4 to reflect that speech therapy is a special education service rather than a related service. AR 6328-32. Regarding the IHO's orders, the BSEA reworded Order No. 1(A) and (D) and removed the requirement that social skills instruction be based on "commercially published" curricula; modified Order No. 3 to require SACS to consult with a pediatric neuropsychologist, rather than specifically Dr. Couvillion; and struck the last sentence of Order No. 3 that ordered a program "for the duration of the Student's public school experiences" as too expansive. AR 6332-33. The remaining challenged findings of fact and conclusions of law were sustained.

## E.  Annual Testing

The School Psychologist administered the same tests to M.C. pursuant to the Settlement Agreement in the summers of 2004, 2005, and 2006, and each year, she issued a psychoeducational report.  She testified that many of M.C.'s scores were constant, which indicates constancy in her performance.  At the January 20, 2006 case conference, she explained that if a standard score is stabilized, then learning had to have taken place.  During the 2005 testing, M.C. rocked, did not attend, complained of being tired, yawned, stretched, bounced in her seat, drooled, looked around the room, constantly watched the clock, pointed to answers without looking, and gave answers quickly to be done with the test.

In the 2004 evaluation, the School Psychologist recommended direct academic instruction for M.C. outside the general education classroom, a distraction-free area, and a systematic math program offering mastery of basic skills, a consistent approach, frequent drill, and practice reinforcement activities.  In 2005, the School Psychologist recommended a program to teach specific reading comprehension skills, and she recommended an assistive technology evaluation for M.C. In 2006, she recommended that material be presented at M.C.'s instructional level but that this could be accomplished in the classroom.  She recommended that M.C. continue to receive educational strategies that develop her vocabulary skills when reading.  In her hearing testimony, the School Psychologist agreed that M.C.'s unique set of thinking and reasoning abilities makes her overall intellectual functioning difficult to summarize by a single score.

## F. Private Therapies and Related Services

*1. Occupational Therapy*

M.C. received occupational therapy services from SACS during the 2000-01 school year, and the School's February 2001 evaluation indicated the need for "intensive intervention in the areas of visual-perceptual and fine-motor skills" as well as classroom accommodations. AR 1526. During the 2003-04 school year, the year prior to the two years at issue, M.C. received consultative occupational therapy and consultative speech therapy from SACS. During the 2004-05 school year, SACS did not provide occupational therapy services for M.C., but during the 2005-06 school year, M.C. received consultative, school-based occupational therapy. During the 2004-05 and 2005-06 school years, neither SACS' special education director nor any of her employees authored a document to provide related services to M.C.

The July 2004 school psychoeducational evaluation documented in a summary of "educational data" in the "record review" that "[r]elated areas of recommended service include occupational therapy on a weekly basis at a direct/consult level and consultation services from the visually impaired specialist on a weekly basis." AR 2803. M.C.'s 2004-05 IEP does not contain any provision regarding related services.

In her July 2004 report, SACS' occupational therapist, Diane Jones ("Occupational Therapist"), recommended consultative occupational therapy services for M.C. The Occupational Therapist did not attend M.C.'s case conference, and M.C.'s IEP for the 2004-05 school year did not include the recommended consultative occupational therapy services. The IEP for that year did not contain goals for M.C. in any of the areas recommended by the occupational therapist in her July 2004 evaluation. In June 2005, the Occupational Therapist evaluated M.C. and again recommended

only consultative occupational therapy services. The June 27, 2005 occupational therapy evaluation provides: "[M.C.]'s performance with cognitive/behavioral tasks continues to be within the range of performance of same grade peers for functional communication; following social conventions; compliance with adult directives and school rules; positive interaction; behavior regulation; and safety." AR 2870. An occupational therapist did not attend M.C.'s case conference, and M.C.'s 2005-06 IEP includes only occupational therapy consultation regarding typing skills for thirty minutes per week for the first ten weeks of school.

The June 2006 occupational therapy evaluation indicated that M.C. needs independence in the cafeteria, to maintain attention to task, to work on personal care and hygiene, social awareness regarding her drooling, and to write neater and learn keyboarding skills. These same needs were recognized in the 2004 and 2005 evaluations. This is the first time that keyboarding was recommended in an occupational therapy evaluation.

*2. Speech Therapy*

Anita Tom, M.C.'s private speech pathologist, provided M.C. with private speech therapy from as early as 1998.

SACS knew that M.C. had deficits in her speech, including difficulty with speech production and enunciation. M.C. received speech therapy from SACS during the 2000-01 school year, and the school speech therapist recommended that M.C. continue to receive speech services to address receptive and expressive language delays. M.C. received consultative speech therapy services from SACS in 2003, and M.C.'s mother requested that the school and private speech pathologists work together on M.C.'s speech and drooling. During the years at issue, M.C.'s general education teachers at SACS indicated that M.C. wanted to relate to her classmates, but was unable to make

23

herself understood.  They also reported that M.C. had difficulty communicating during small group discussions although she enjoyed working in small groups.  No school speech therapist attended either of M.C.'s case conferences for the 2004-05 and 2005-06 school years, and no IEP goals for speech were written for either school year.  SACS did not recommend a speech therapy evaluation, conducted no speech evaluations, and provided no speech therapy to M.C. during those two school years.

*3.  Services for Social Skills*

No school social worker attended either of M.C.'s case conference committee meetings for the 2004-05 and 2005-06 school years and no IEP goals for social skills were written in either year.

*4.  Vision Therapy*

Vision therapy was provided to M.C. at the Parents' expense by Dr. Van Hoy.  Dr. Fisher and Dr. Savage both testified that vision therapy is necessary to address the visual difficulties that interfere with M.C.'s ability to learn.

M.C.'s visual disorders affect her ability to keep her place when reading text and affect her note-taking during lecture and from a blackboard.  According to the School Psychologist, M.C.'s weakness in spatial-perceptual reasoning may cause her to confuse visual symbols on a page and fail to attend to visual details.  In 2002, in a letter to the Director of Special Education, M.C.'s mother requested that SACS integrate what their privately paid optometrist recommended.  She also indicated in the same letter that "we have not and do not anticipate requesting the school district . . . provide funding for vision therapy."  AR 1588.[6]  Since that time, SACS has not evaluated M.C.

_____

[6] SACS asks the Court to either disregard the Parents' assertions regarding prior school years, or in the alternative, reconsider the Court's prior ruling denying SACS' motion to supplement the administrative record with an email from 2003 related to the issue of private versus school-based therapies.  *See* February 13, 2008 Order, docket entry 89.  The Court denies both requests.  The Court agrees that this matter concerns the 2004-05 and 2005-06 school years

for specific visual impairments. No teacher of the visually impaired attended M.C.'s case conferences for the 2004-05 or 2005-06 school years, no goals for M.C.'s visual difficulties were written in either IEP, and SACS did not provide M.C. with vision services during either the 2004-05 or 2005-06 school years.

*5. Unilateral Placement*

Beginning in October 2006, when M.C. was removed from the public school by the Parents, M.C. receives physical, occupational, and speech language therapy at Lutheran Hospital, Division of Outpatient Rehabilitation. M.C. receives physical therapy five days per week for 30 to 60 minutes per day, occupational therapy five days per week for 45 to 60 minutes per day, and speech language therapy five days per week for 45 to 60 minutes each day.[7] The goals of the private speech and language services are to control drooling and increase conversational articulation skills. The goals of M.C.'s private occupational therapy are to improve M.C.'s fine motor skills such as cutting, writing, and manipulating clothes fasteners and her activities of daily living, such as grooming, navigating the community, and sensory integration. Goals of physical therapy include improving ambulation, strength, and gross motor skills. The private therapies also assist M.C. with educational

---

only. Both parties have attempted with mixed success–both during the administrative proceedings and before this Court–to rely on documents, events, or representations from years prior to the two at issue. Although the IHO excluded from the administrative record other evidence from academic years prior to the two years at issue in this case, the instant 2002 letter cited by the Parents was not excluded, and the BSEA did not exclude it on appeal. As a result, the letter forms part of the record underlying the administrative decision and thus informs this Court's review of that decision. Nevertheless, the Court affords the letter the weight it is due in light of its date and the other relevant evidence of record.

[7] In their Statement of Material Facts and their brief offered in support of their Motion for Summary Judgment and in their Statement of Genuine Issues and brief in support of their response to SACS' Motion for Summary Judgment, the Parents incorrectly represented that M.C. had been receiving these intensive therapies at Lutheran Hospital during the 2004-05 and 2005-06 school years. The Parents acknowledge in their reply brief that M.C. did not begin the intensive therapy at Lutheran Hospital until fall 2006. The impact of this misunderstanding is most reflected in the Parents' arguments that SACS' experts supported this intensive therapy when in fact they supported the level of services M.C. had been receiving during the years at issue. *See infra* Part A.2.

and life skills.  Lutheran Hospital therapists follow a standard behavior plan for M.C. in the outpatient setting.

## PROCEDURAL HISTORY

The Parents filed a Complaint in this case on July 12, 2007, appealing both the IHO's and BSEA's decisions.  On August 2, 2007, SACS filed an Answer and Affirmative Defenses.  On August 29, 2007, the Parents placed the administrative record with the Clerk's office.

The Parents filed a Motion to Supplement the Administrative Record on September 5, 2007, which SACS opposed.  On December 14, 2007, the Court granted the Parents leave only to supplement the administrative record with M.C.'s 2006 eighth-grade ISTEP and the United States Department of Education's publication: "Identifying and Implementing Educational Practices Supported by Rigorous Evidence: A User Friendly Guide," dated December 2003.[8]  However, the Court ordered additional briefing on the Parents' request to supplement the record with the transcripts of the January 20, 2006 and May 17, 2006 case conference committee meetings.  On January 28, 2008, the Court granted the Parents leave to supplement the administrative record with the audiotapes and full transcripts, limiting the Parents in their use of the transcripts and audiotapes to the specific inconsistencies and omissions they had identified and to demonstrating the absence of specific alleged quotations from SACS' summary notes of the January conference.

On December 10, 2007, the Parents filed an Amended Complaint with leave of Court, alleging that the IHO applied the incorrect standard of a FAPE, misapplied the procedural requirements of a FAPE, applied the incorrect standard for functional behavior assessments and

---

[8] The Court denied the Parents' request to supplement the record with the March 2007 Individualized Education Program proposed by the School District subsequent to the hearing before the IHO; the audiotape and full transcript of the March 15, 2006 case conference; a prescription for occupational therapy that the Parents had provided to the school at the school's request; materials related to Project Read; and M.C.'s writing samples.

behavior planning pursuant to the IDEA, and incorrectly blamed the Parents for SACS' failure to provide related services. They also allege that the IHO's interpretation of Indiana regulations violates federal law; the record does not support the IHO's determination that SACS used peer reviewed, scientifically based methodologies to educate M.C.; the record does not support the IHO's credibility determinations; and the IHO ignored SACS' violations of the IDEA and a FAPE. The Parents further allege that the BSEA's ruling wrongly upheld the IHO's order. SACS filed a Motion to Strike portions of the Amended Complaint on December 20, 2007, which the Court denied.

A Motion to Enforce Stay-Put Placement was filed by the Parents on December 4, 2007, which SACS opposed and the Court denied.

On December 20, 2007, SACS filed an Answer to the Amended Complaint and Affirmative Defenses. On January 3, 2008, the Parents filed a Motion to Strike Affirmative Defenses Pursuant to Federal Rule of Civil Procedure 12(f), which the Court denied.

On January 9, 2008, SACS filed a Motion to Supplement Administrative Record, which the Parents opposed and the Court denied. On March 3, 2008, the Parents filed a Second Motion to Supplement the Administrative Record, opposed by SACS, which the Court denied.

On May 15, 2008, the parties filed the instant cross motions for summary judgment  The parties filed their respective response briefs on June 16, 2008.[9] The Parents filed a Reply in support of their motion for summary judgment on July 1, 2008, and SACS filed a Reply in support of their

---

[9] On June 13, 2008, the Parents filed a Motion to Strike Portions of Defendants' Brief in Support of Its Motion for Summary Judgment. The Court granted the motion, striking SACS' brief but granting SACS leave to file a reformatted brief, which was filed on August 11, 2008.

motion for summary judgment on July 7, 2008.[10]  For most of the briefs, the parties were granted leave to file oversize briefs.

At all relevant times throughout the administrative and court proceedings, both the Parents and SACS have been represented by counsel.  The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case.  Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## THE STANDARD OF JUDICIAL REVIEW

In a case brought under the IDEA, the burden of proof is on the party challenging the outcome of the state administrative proceedings.  *See Alex R. v. Forrestville Valley Cmty. Unit Sch. Dist. No. 221*, 375 F.3d 603, 611 (7th Cir. 2004) (citing *Heather S. v. Wisconsin*, 125 F.3d 1045, 1052 (7th Cir. 1997)); *Patricia P. v. Bd. of Educ.*, 203 F.3d 462, 466-67 (7th Cir. 2000).[11]  In determining whether the burden has been met, a reviewing court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines appropriate."  20 U.S.C. § 1415(i)(2)(C) (2008).

When reviewing a motion for summary judgment under the IDEA, which is the procedural vehicle for asking a court to decide the case based on the administrative record, the Court does not apply the traditional summary judgment standard, yet the statutory directive to rule based on the

---

[10]  On July 8, 2008, the Parents filed a Motion to Strike Defendants' Reply Brief as untimely, which the Court denied.

[11]  Similarly, the burden of proof in the underlying administrative due process hearing is on the party challenging the educational placement.  *See Bd. of Educ. v. Ross*, 486 F.3d 267, 270-71 (7th Cir. 2007) (citing *Schaffer v. Weast*, 546 U.S. 49, 51 (2005)).

"preponderance of the evidence" also removes the Court from the usual familiar territory of judicial review of administrative decisions. *See Todd v. Duneland Sch. Corp.*, 299 F.3d 899, 904 (7th Cir. 2002); *Evanston Cmty. Consol. Sch. Dist. No. 65 v. Michael M.*, 356 F.3d 798, 802 (7th Cir. 2004). Nevertheless, the Court is not to hear the evidence *de novo*. In *Board of Education v. Rowley*, 458 U.S. 176, 206 (1982), the Supreme Court established that, under the statute, courts must give "due weight" to the administrative decision. *See Bd. of Educ. v. Ross*, 486 F.3d 267, 270 (7th Cir. 2007). However, the Supreme Court held that the statute is not "an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206; *see also Butler v. Evans*, 225 F.3d 887, 892 (7th Cir. 2000); *Patricia P.*, 203 F.3d at 466.

Under the "due weight" standard, if the district court has taken additional evidence not presented to the hearing officer, the degree of deference varies according to the significance of the evidence taken, such that the more the court relies on additional evidence, the less it is required to defer to the hearing officer. *Alex R.*, 375 F.3d at 612 ("At one end of the continuum, where the district court does not take new evidence and relies solely on the administrative record, it owes considerable deference to the hearing officer, and may set aside the administrative record only if it is 'strongly convinced that the order is erroneous.'") (quoting *Sch. Dist. of Wis. Dells v. Z.S.*, 295 F.3d 671, 675 (7th Cir. 2002)). In this case, although the Court has allowed the Parents to supplement the record with three new additional documents, their use and import are not extensive, and the Court will note that evidence as it arises and adjust the level of review accordingly. Overall, the Court gives considerable deference to the administrative decision. On purely legal issues, the

Court owes no deference to the hearing officer. *See Dale M ex rel. Alice M. v. Bd. of Educ.*, 237 F.3d 813, 817 (7th Cir. 2001).

Under the IDEA, the BSEA's decision is the final reviewable decision of the administrative proceedings. If the decisions of the BSEA and the IHO conflict, the Court must defer to the final decision of the state authorities, which is the BSEA. *Todd*, 299 F.3d at 904 (citing *Bd. of Educ. of LaGrange Sch. Dist. v. Ill. State Bd. of Educ.*, 184 F.3d 912, 914-15 (7th Cir. 1999)).

## THE IDEA

In 2004, Congress amended the IDEA with the Individuals with Disabilities Education Improvement Act of 2004 ("IDEIA"), 20 U.S.C. § 1400 *et seq*., which took effect on July 1, 2005, and may be referred to as the IDEA. *See* 20 U.S.C. § 1400(a). Accordingly, the provisions of the IDEA prior to the amendments apply to M.C.'s education for the 2004-05 school year, and the amended IDEA applies to the 2005-06 school year.[12]

The IDEA guarantees a free and appropriate public education ("FAPE") to every disabled child who attends a public school that receives public funds. 20 U.S.C. §§ 1400(d)(1)(A), 1412(a)(1). To assure that children with disabilities receive a FAPE, the IDEA requires that school districts cooperate with a student's parents to create an individualized education program ("IEP"), which is a written statement for that disabled child comprised of specific, statutorily designated components. *See* 20 U.S.C. §§ 1401(11), 1414(d) (2004) (current version at 20 U.S.C. §§ 1401(14), 1414(d) (2008)).

For an education to be "appropriate" under the IDEA, the program set forth in the IEP (1) must be developed in compliance with the procedural safeguards set forth in the IDEA and (2) in

---

[12] All statutory and regulatory citations are to the current version unless otherwise indicated when necessary to identify the versions in effect during 2004-05 and 2005-06 school years at issue.

its substance must be "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 206-07.

Regarding the procedural prong, the IDEA sets forth a number of specific procedural safeguards for children with disabilities and their parents with respect to the provision of a FAPE. *See* 20 U.S.C. § 1415(b). Although the Supreme Court in *Rowley* emphasized the importance Congress attached to the IDEA's procedural safeguards, "[p]rocedural flaws do not automatically require a finding of a denial of a FAPE." *Ross*, 486 F.3d at 276.[13] The Seventh Circuit has held that only those procedural flaws that result in loss of educational opportunity can be held to deny a student a FAPE. *See Hjortness ex rel. Hjortness v. Neenah Joint Sch. Dist.*, 507 F.3d 1060, 1065 (7th Cir. 2007) (citing *Ross*, 486 F.3d at 276); *Heather S.*, 125 F.3d at 1059. The reenacted IDEA clarifies that, for procedural violations, an IHO may find that a child did not receive a FAPE only if the procedural inadequacies "(I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii) (effective July 1, 2005).[14]

Under the substantive prong, the requirement that the IEP be reasonably calculated to confer educational benefit is met when the IEP is "likely to produce progress, not regression or trivial

---

[13] The Supreme Court reasoned that

the congressional emphasis upon full participation of concerned parties throughout the development of the IEP . . . demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.

*Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982).

[14] In their brief in support of summary judgment, the Parents incorrectly assert that, "[i]f this Court finds that Defendants violated *either* the procedural requirements of IDEA *or* failed to provide M.C. meaningful educational benefit necessary to promote her self sufficiency, M.C.'s IDEA rights to a FAPE have been violated and M.C. is entitled to relief." Pl. Br., p. 4 (emphasis added).

educational advancement," and the "requisite degree of reasonable, likely progress varies, depending on the student's abilities." *Alex R.*, 375 F.3d at 615 (citations omitted); *see also Ross*, 486 F.3d at 270 (citing *Rowley*, 458 U.S. at 207); *A.S. v. Madison Metro. Sch. Dist.*, 477 F. Supp. 2d 969, 979 (W.D. Wis. 2007) ("The standard in this Circuit is whether the IEP is reasonably calculated to provide educational benefits to the student."); *Z.F. v. South Harrison Cmty. Sch. Corp.*, No. 404CV0073DFHWGH, 2005 WL 2373729, at *10 (S.D. Ind. Sept. 1, 2005) (stating that the IEP must be likely to produce progress, not regression or trivial educational advancement). The Supreme Court in *Rowley* stated that the public education must at least be "meaningful." 458 U.S. at 192; *see also Polk v. Cent. Susquehanna Intermediate Unit 16*, 853 F.2d 171, 182 (3rd Cir. 1988) (analyzing the legislative history and holding that "benefit" is more than a *de minimis* standard);[15] *Nein v. Greater Clark Sch. Corp.*, 95 F. Supp. 2d 961, 975 (S.D. Ind. 2000) (finding that the IDEA requires "meaningful education benefit"). However, the IDEA does not require that the child be educated "to her highest potential." *Bd. of Educ. of Murphysboro v. Ill. State Bd. of Educ.*, 41 F.3d 1162, 1166 (7th Cir. 1994). In reauthorizing the IDEA in 2004, Congress found that the education of children with disabilities can be made more effective by having high expectations for them and by "ensuring their access to the general education curriculum in the regular classroom" in order for them to meet developmental goals and to be prepared to lead productive and independent adult lives to the maximum extent possible. *See* 20 U.S.C. § 1400(c)(5)(A).

---

[15] In their summary judgment brief, the Parents incorrectly attribute to *Polk* a standard of "significant benefit" rather than the "significant learning" and "meaningful benefit" set forth in the case. *See* Pl. Br., p. 3; *see also Polk*, 853 F.2d at 181-93.

## ANALYSIS

In their motion, the Parents argue that summary judgment should be granted in their favor because the IHO and the BSEA failed to find that M.C. was denied a FAPE and failed to order the Parents' desired private educational placement for M.C. The alleged deficiencies in the administrative decision relate to the standard for a FAPE, measurable goals, apportioning the responsibility for providing a FAPE, the provision of related services, a functional behavior assessment and a behavior intervention plan, scientifically based methodologies, the interpretation of Indiana and federal law, credibility determinations, meaningful parental participation, whether the 2006-07 school year is at issue, and unilateral placement. The Parents seek a Court order implementing their unilateral placement of M.C. at FWCL for academics and Lutheran Hospital for intensive therapies and granting reimbursement for this private placement beginning in October 2006.

In contrast, SACS argues for summary judgment in its favor, contending that the Parents cannot meet their burden of proving by a preponderance of the evidence that the educational program they helped to develop and that M.C. received during the 2004-05 and 2005-06 school years denied M.C. a FAPE and that the Parents' long-standing choice to obtain related services from private providers rather than SACS resulted in a violation of the IDEA. SACS addresses each count of the Parents' Amended Complaint, argues the propriety of the IHO's order as modified by the BSEA, and attempts to prove that a FAPE was consistently provided to M.C.

As both parties have fully briefed all issues set forth in the Amended Complaint, the Court addresses the cross motions for summary judgment jointly, considering each argument in turn.[16]

---

[16] All issues and arguments raised by the parties but not addressed within this Order have been expressly considered and determined not to be dispositive of the issues on appeal before this Court.

### A.  Credibility Determinations

As a preliminary matter, the Parents contend that the IHO made a variety of credibility findings unsupported by the evidence of record.  *See* Am. Compl., Count VII.  Although the BSEA's decision is the final reviewable decision of the administrative proceedings, a reviewing court "must give considerable weight to any credibility determinations made by the first hearing officer."  *Dale M.*, 237 F.3d at 816 (citing *Heather S.*, 125 F.3d at 1053-54) (discussing a case in which the reviewing agency reversed the hearing officer).  An IHO's credibility findings do not deserve due weight if non-testimonial, extrinsic evidence in the record justifies a contrary conclusion or if the record read in its entirety compels a contrary conclusion.  *See Carlisle Area Sch. v. Scott P.*, 62 F.3d 528, 529 (3d Cir. 1995), *cert. denied* 517 U.S. 1135 (1996), *cited in Heather S.*, 125 F.3d at 1054.

*1.  The Parents' Education*

In his decision, the IHO noted that M.C.'s father is an attorney at law and made a finding that "[M.C.'s] parents are well educated."  AR 3909.  The BSEA struck the finding as irrelevant, reasoning that "[n]either IDEA nor Article 7 places greater responsibilities upon parents based upon their educational or professional background."  AR 6329.  Recognizing this holding, the Parents nevertheless contend that the BSEA failed to provide any relief for the IHO's error, arguing that the IHO's view of them as educated colored his entire decision.  The Court finds that no additional relief from the BSEA was necessary as the BSEA found that the Parents "were actively involved in the [case conference committee] process, were supported by private practitioners in the process, and there were agreed-upon IEPs in place for the school years in question."  AR 6329.  Similarly, throughout his decision, the IHO espoused this general principle of the Parents' informed participation in the IEP process.  As set out in Part E.4 below, the record supports the administrative

determination that, without considering their level of education, the Parents were active participants in M.C.'s IEP process, often guiding the direction of her educational programs.

## 2. *The Expert Witnesses*

Perhaps their most relied-on credibility challenge, the Parents argue that the IHO erred by discounting the testimony of the Parents' experts who met with M.C. and crediting the testimony of those of SACS who did not. SACS responds that, given the questionable substance of and circumstances surrounding their testimony at the hearing, the IHO properly discounted the weight of the Parents' experts. There is no question in this case that all four experts–Dr. Savage, Dr. Fisher, Dr. Couvillion, and Dr. Stauffer–hold the proper degrees and licensure in their respective fields.

### a) Dr. Savage

The Parents argue that the Court should credit the expertise of Dr. Savage, their expert, because he has a Ph.D. in education and is an expert in brain injury. He has conducted major studies in brain injury, one of which found that brain-injured children with intensive occupational, physical, or speech therapy improved functioning, and he opined that intense therapy could also work for vision. He testified that if her overall functioning can be improved, M.C. will have a better opportunity to improve her learning. The Parents emphasize that Dr. Savage met and spent time with M.C. and met with her private providers.

However, the weight given by the IHO to Dr. Savage's testimony was affected by a violation of the separation of witnesses order at the hearing. Early in the administrative process, the Parents requested a separation of witnesses order, which the IHO granted. Dr. Fisher, the Parents' expert, testified for the entire first day of the administrative hearing. Before Dr. Fisher began testifying, but out of her presence, the IHO reminded the parties on two separate occasions that there was a

"separation of witnesses" at the hearing. He did not repeat the admonition to Dr. Fisher personally.

On the second day of the hearing, the IHO made this same admonition four more times related to

other witnesses. On the third day of the hearing, the Parents called Dr. Savage to the stand, and the

following exchange occurred during questioning by counsel for SACS:

> Q: How is it you became aware of what [Dr. Fisher's] testimony was on Monday?
> A: I talked with her.
> Q: You talked with Dr. Fisher after she testified?
> A: Yeah.
> Q: After she testified?
> A: Yeah.

AR 718. The IHO responded that this was "very highly inappropriate," cleared the room, and called

an hour and a half recess. *Id*. Upon returning, both sides were permitted to address the issue. SACS

asked that both experts' reports be excluded from the IHO's consideration. Ultimately, the IHO did

not exclude the reports or the testimony, but instead provided the following holding:

> What I will state for the record, is that realizing the state of affairs that exist as verified by the witness's own testimony, that in my reviewing the record of this matter, as well as the documents attributable to both parties, will be reviewed and given the appropriate weight that I think they deserve.

AR 726.

The Parents are correct that the IHO inaccurately stated in his findings that he had personally

advised Dr. Fisher of the separation of witnesses order. However, the order was made at the

Parents' request, and they were responsible for advising their expert witnesses of the order. In

Indiana, once a separation of witnesses has been ordered, "what to do about a violation of the order

is a question which is to be resolved by a study of affected interests and their fair accommodation"

by the trial court, whose decision is reviewed for an abuse of discretion. *Clark v. State*, 480 N.E.2d

555, 558 (Ind. 1985). Even where a clear violation of the separation order is shown, the trial court

may permit the violating witness to testify, particularly where there is no evidence of collusion by the party calling the witness. *Baysinger v. State*, 436 N.E.2d 96, 100 (Ind. Ct. App. 1982); *see also Wireman v. State*, 432 N.E.2d 1343, 1349 (Ind. 1982), *cert. denied* 459 U.S. 992; *Ray v. State*, 838 N.E.2d 480, 486 (Ind. Ct. App. 2005). It has been held to be prejudicial error to refuse to permit a witness who violates a separation of witnesses order to testify when the party calling the witness is not at fault for the violation. *Brannum v. State*, 366 N.E.2d 1180, 1184 (Ind. 1977). Yet, more recently, the Indiana Supreme Court upheld the total exclusion of a witness when "no one ever told [the witness] not to talk about her testimony" but the party acknowledged "that it was his responsibility to advise his witnesses not to talk about the case and to explain the separation order." *Joyner v. State*, 736 N.E.2d 232, 244 (Ind. 2000).[17] In this case, the IHO was squarely within his discretion when he explicitly declined to exclude the testimony of Dr. Fisher and Dr. Savage but rather gave the testimony proper weight in light of all the circumstances as he rendered his decision. The IHO's credibility determination will not be disturbed.

In further support of greater weight for Dr. Savage's opinions, the Parents also reason that Dr. Savage testified consistently with his written report that M.C. needs direct instruction, intensive therapies, social skills instruction, and life skills programming, and, therefore, he should be deemed credible. This argument goes to the substantive merits of certain claims, the analysis of which implicates not only Dr. Savage's credibility but also the value the IHO afforded the opinions of SACS' experts and the other evidence of record in relation to those issues. In the context of each

---

[17] The section of the Indiana Practice Series Trial Handbook for Lawyers cited by the Parents for their argument that it is the court's responsibility to advise a witness of a separation of witness order addresses only what a *motion* requesting a separation of witnesses order should provide, not the role of the Court. *See* 6 Ind. Prac. § 16:12.

such claim, the Court will determine whether the administrative decision is entitled to due weight based on the whole record, including the testimony and written report of Dr. Savage.

Next, the Parents claim that in Finding #84, the IHO "criticized" Dr. Savage for not speaking with school personnel before making his conclusions. Finding #84 provides: "Dr. Savage's testimony and written report were based on . . . what had been provided to him by the Student and those employed by the Student." AR 3918. There is no criticism in this finding; it is an accurate and neutral statement of the materials relied on by Dr. Savage.

Finally, the Parents note that Dr. Savage testified that he did not go to Woodside because he was told he could go to Woodside but could not talk with anyone. SACS has a written policy that prohibits independent consultants from observing classrooms in order to preserve the integrity of the classroom; however, SACS made an exception in this case and agreed to allow the Parents' expert to observe in the public school classroom but not to speak with school personnel. Dr. Savage's September 3, 2006 report confirms, "Dates to interview school staff were offered but never realized." AR 2143.

b) Dr. Fisher's testimony

SACS contends that the IHO properly discounted the weight given to the testimony of Dr. Fisher and thus to the Parents' preferred placements recommended by Dr. Fisher because she testified "incompetently." Def. Resp., p. 42; *see also* Def. Br., p. 20. Dr. Fisher testified that whoever teaches M.C. would "need to have knowledge in brain behavior relationships" and would "need to be a specialist" and that she recommended that M.C. be taught at FWCL because she was "certain the director [of FWCL] has [such] knowledge" and assumed that she had a teaching degree. AR 245-49. The next day, Swenson, the Director of FWCL, took the stand and testified that she has

no education in regard to brain injuries and no training in regard to teaching brain-injured children and does not have a teaching degree or an Indiana teacher's license. Although the Parents note that Dr. *Savage* was not concerned that Swenson has no teaching degree in light of her training and because the direct instruction at FWCL is consistent with his recommendations, they do not identify any such statement of Dr. Fisher. It was reasonable to discount the credibility of Dr. Fisher's opinion related to the appropriateness of FWCL.

c) SACS' experts

To shift the balance in favor of their experts, the Parents attempt to question the credibility of SACS' witnesses and experts. First, the Parents suggest that the School Psychologist referenced Dr. Fisher's testimony while testifying at the hearing. Although the School Psychologist used the word "testifies" in relation to a statement by Dr. Fisher, the context reveals that she is referencing Dr. Fisher's written report, not her hearing testimony. *See* AR 1239:10-14. Notably, no objection was made at the hearing nor was there any discussion regarding a violation of the separation of witnesses order based on the School Psychologist's testimony.

The Parents next note that Dr. Stauffer, the pediatric neurologist who wrote a letter for SACS, did not meet with M.C. or talk to anyone at the school and did not testify. The Parents are correct; Dr. Stauffer prepared her report after "reviewing the information on [M.C.]'s case." AR 3659. Again, this argument goes to the weight of Dr. Stauffer's written opinion when compared with the other evidence and opinions on each given issue. The Parents also contend that Dr. Stauffer's "letter indicates that she supports services M.C.'s parents desire and that she was unaware of school services." Pl. Resp., p. 17 (citing AR 3659). This is incorrect. Dr. Stauffer opined that M.C. "should continue to receive the special services that had enabled her to function as well as she

39

does, but [is] not convinced that it [is] necessary to remove her from the school environment." AR 3659. Dr. Stauffer was referring to the private therapies M.C. had been receiving during the years at issue and earlier. Dr. Stauffer could not have been referencing the Parents' preferred program as M.C. did not begin receiving intensive therapies at Lutheran Hospital in combination with academics at FWCL until she was removed from SACS in fall 2006.

The Parents make a number of arguments regarding Dr. Couvillion, the neuropsychologist who testified on behalf of SACS. First, the Parents criticize the IHO for failing to fault Dr. Couvillion for not seeing M.C., noting that in contrast with Dr. Savage, Dr. Couvillion never met with M.C. and never talked to her parents or private providers. Therefore, they argue that his opinion deserves less weight because he only reviewed records provided by SACS and only spoke to the School Psychologist (who only worked with M.C. to test her) and an unidentified SACS teacher and because it is not clear whether he wrote his report before or after speaking to anyone other than SACS' attorney. First, the last argument is not supported by the record; Dr. Savage testified that he believed he talked with school personnel before writing his report, although he was not sure. As with Dr. Savage, the IHO accurately and neutrally identified the sources relied on by Dr. Couvillion, stating that he had obtained his information via "review of the Student's records." AR 3929. The Parents have not identified any specific information their hired experts were able to gather regarding M.C. that Dr. Couvillion was not privy to through his examination of the records and his discussion with SACS personnel.[18]

---

[18] The Parents inaccurately cite *West Windsor-Plainsboro Regional School District v. J.S.*, No. CIV 04-3459(SRC), 2005 WL 2897494 (D.N.J. Oct. 31, 2005), for the holding that the district court overturned an ALJ's findings that were based on conclusions of experts who had never personally met the student. In fact, the court held the opposite; the court overturned an ALJ's findings that were based on conclusions of experts whom he had given greater credit because they *had* personally met the student. If anything, this case holds that parents' experts who have met with the student, but who have also been hired to support a litigation position, are not necessarily entitled to any greater

SACS also admits the Parents' criticism (made in a footnote) that Dr. Couvillion conferred with the School Psychologist prior to the hearing, but the Parents have identified no evidence that he spoke with her about her hearing testimony and no objections were made at the hearing. The Parents further criticize Dr. Couvillion for speaking in generalities about persons with brain injuries; although true, he directly tied those generalities to M.C. At the hearing, counsel for the Parents thoroughly questioned Dr. Couvillion and highlighted perceived weaknesses in his testimony, such as that he has never had any experience with someone who learned to speak nine years after a stroke as did M.C.

Finally, the Parents argue that Dr. Couvillion's testimony is internally inconsistent because he claimed M.C. could only make limited gains yet he opined that she should be with peers to learn complex socialization skills. The Parents have conflated two distinct subjects, and their argument is contradicted by Dr. Couvillion's actual testimony. Dr. Couvillion concluded that M.C. could only "make a limited amount of gain" following intensive therapies; he was not addressing socialization. AR 1337. He also testified that he acknowledged that M.C. would not pick up social skills at the same rate as her peers, but firmly believed that she could receive significant benefit from interacting

---

deference than experts for the school who have not met with the student, absent specific evidence demonstrating that meeting the student gave the parents' experts some insight not otherwise available from the records.

In *J.S.*, the ALJ had given substantial deference to the parents' experts' opinions that the student should be placed in a residential facility, finding that they knew the student better than the school's experts based on intensive, one-on-one evaluations. *Id.* at *14. The district court disagreed, reasoning that, with the exception of one, none of the experts had treated or met with the student prior to the parents bringing the case against the school. Even as to the one expert who had been treating the student for approximately a year, the court identified facts showing that the expert supported the residential facility placement not based on personal observations of the student but rather based on discussions with the student's father. *See id.* at *15. The court was "unable to discern support from the facts . . . for the ALJ's assessment that the expert opinions offered by the witnesses . . . were the result of a 'full faced picture of [the student]' that had eluded the District's experts in their evaluations of [the student]." *Id.* As a result, the court found that the parents were not entitled to reimbursement for the costs of unilateral placement in a residential facility.

with them. He testified: "interaction learning would be very important for her to reach the level which is possible." AR 1343.

The Parents also assert that the IHO applied a double standard as to the deadlines for expert disclosures because the Parents were required to disclose their experts two months before the hearing (so that SACS could retain an expert based on the Parents' expert report) but SACS' expert report was not disclosed to the Parents until five days before the hearing. Under Indiana law, an IHO can permit discovery. *See* Ind. Code § 4-21.5-3-22. Although the practice varies from case to case given the circumstances, it is not unusual for the party with the burden of proof to disclose experts first in order for the opposing party's experts to respond to those opinions. Moreover, it appears that the Parents did not argue to the IHO that they needed additional time to review SACS' expert reports prior to the hearing, and they have not identified any prejudice they suffered.

Finally, the Parents argue that the IHO's opinion was colored by Dr. Couvillion's hearing testimony that he is a pediatric "neurologist" when in fact he is a pediatric "neuropsychologist" because the IHO identified Dr. Couvillion as a neurologist in his written order. The BSEA acknowledged this error and corrected the order. Nevertheless, the Parents argue that the BSEA did not consider the impact of the error on the IHO's findings, conclusions, and order. Although SACS suggests in its response that the incorrect testimony is likely a transcription error, the Court finds that the error is irrelevant because the record clearly identifies Dr. Couvillion as a neuropsychologist. He repeatedly stated his proper title as a pediatric neuropsychologist throughout the remainder of his testimony. *See* AR 1317 (two times), 1318, 1351, 1398. His curriculum vitae identifies him as a pediatric neuropsychologist. *See* AR 3485-94. His testimony following the statement that he is a neurologist briefly addresses M.C.'s neurological condition based on the

reports of M.C.'s neurologist and objective medical tests, and he then moved to testimony regarding the results of her neuropsychological testing. The Parents have not offered any examples of Dr. Couvillion's testimony that would not be consistent with the realm of expertise of a pediatric neuropsychologist.

Although the Parents attempt to discredit SACS' experts, they have not done so. At most, the Parents have made arguments going to the weight of each expert's testimony, arguments that were made to the IHO. Overall, it appears that the IHO found the opinions of SACS' experts more credible that the Parents' experts. The IHO's weighing of credibility and expert testimony will not be disturbed.

*3. Other Issues*

All other credibility arguments such as the alleged blame assigned by the IHO to M.C.'s parents for the agreed-upon IEPs, whether SACS made an offer of related services to the Parents, and whether the IEPs offered through SACS for the two years at issue were appropriate will be addressed in the context of the substantive arguments.

## B. Substantive Requirement of a FAPE

In Count I of the Amended Complaint and Section III of their summary judgment brief, the Parents argue that the "IHO applied the incorrect FAPE standard by failing to recognize M.C.'s progress [at FWCL] and by failing to order a program that would provide her meaningful educational benefit." Pl. Br., p. 8. When distilled, the argument is not that the IHO applied the incorrect standard but rather that the Parents disagree with his application of the standard to the facts of this case. However, rather than identifying evidence that M.C. did not receive meaningful benefit from her education under the 2004-05 and 2005-06 IEPs through SACS, the Parents focus on the

benefits M.C. gained through FWCL. The Parents contend that the IHO failed to recognize M.C.'s progress at FWCL, that the IHO erroneously credited SACS' experts over the Parents', and that the social benefit of education in the public school is not enough to outweigh the benefits of intensive therapy. They conclude that the IHO should have ordered the program of education through FWCL and intensive therapies through Lutheran Hospital proposed by Dr. Savage with the goal of providing M.C. with meaningful benefit toward further education, employment, and independent living.

*1. The IHO's Applied Standard of a FAPE*

As an initial matter, the IHO applied the correct standard of a FAPE. First, he acknowledged the Parents' efforts to demonstrate that their proposed placement at FWCL and Lutheran Hospital is superior to the education provided by SACS but correctly held that the question is not which program (the Parents' proposed program or SACS') offers a superior level of service. He then explained that there is a strong preference for educating a student in the least restrictive environment ("LRE") and that SACS is only required "to provide a level of services that provide the student an education which results in meaning[ful] benefit, not maximum benefit." AR 3949. The IHO recognized that the Parents chose to utilize private related services, that the Parents had requested placement in a general education classroom in the 2004-05 school year, and that the goals and objectives for those general education courses were aligned with state standards.

The IHO concluded that the Parents "failed to show that the special education and related services provided [M.C.] in the public school, as reflected on agreed upon IEP's for the 2004-05 and 2005-06 school years were not appropriate, nor was it demonstrated that these services failed to provide [M.C.] with benefit." AR 3950. He recognized SACS' moderate procedural deficiencies

(discussed in Part E below) but found that "the School was able to demonstrate that [M.C.] made reasonable gains on the majority of the goals and objectives listed in her IEP for the school years under consideration." *Id*. He detailed the extensive parental involvement in the development of M.C.'s IEPs. Finally, he concluded that SACS "demonstrated through testimony and documents submitted to the IHO in this matter, that [M.C.] received educational benefit, gains, and in some instances, considerable educational benefit from her individualized educational program, especially so when considering the limited time the School was allowed to work with [M.C.] during the 2004-2005 school year." AR 3951.

*2. Meaningful Benefit–The Parents' Burden*

The Parents carry the burden of demonstrating that the IHO's determination regarding a FAPE is not entitled to due weight, or in other words, that M.C. did not make progress in or receive educational benefit from the public school. The Parents have not met this burden. In 2004-05, M.C. attended public school for ninety minutes a day and spent the remainder of her time at FWCL. In contrast, during 2005-06, M.C. spent the entire school day at the public school for all areas of academic instruction. Although the Parents contend that the gains M.C. made during those two academic years "are largely, if not solely, attributable" to the instruction she received at FWCL, Pl. Br., p. 6., neither the evidence cited by the Parents nor the evidence of record supports the claim.[19]

The Parents first cite a variety of evidence regarding general gains M.C. made during the two years at issue. They cite the finding of Dr. Fisher that, although M.C.'s brain injury impaired much of the functioning of her brain, M.C. can function within average ranges, which is significant

---

[19] Throughout this argument, the Parents reference gains M.C. made at ILS, a program run by Olive Swenson in Indianapolis that M.C. attended prior to the years at issue and that M.C. did not attend during the years at issue. Although M.C.'s mother states that ILS and FWCL use the same programs, there is no other evidence of record regarding ILS.

because it indicates that M.C. has the potential to be taught. They cite facts that during the two years at issue, M.C. made gains in language arts, math, story writing, visual processing, speech, and independence and attempt to attribute the gains to the time she spent at FWCL. Although some of these gains may be attributable to FWCL or M.C.'s private therapies, the evidence cited by the Parents in paragraphs 52-57 of their Statement of Material Facts ascribing the gains to FWCL is either tenuous, relates to the 2005-06 school year when M.C. spent a full academic day at SACS, or does not support the alleged fact. Importantly, no evidence is offered that the gains were *not* in fact attributable to SACS or that she did not make gains at SACS.

Paragraphs 52 and 53 address progress in math and story construction. The Parents cite evidence from the School Psychologist that M.C. made progress during the 2004-05 year in math conceptualization skills and conversational language skills, which were taught only at FWCL and in private therapies during that year. However, SACS reported on M.C.'s 2005-06 IEP that the July 2005 testing, which was to evaluate progress made in the private educational placement in 2004-05, showed that M.C. had made little to no gain. *See* AR 2927. The Parents next cite the School Psychologist's note in the 2006 evaluation following the 2005-06 year that M.C. improved in the area of story construction as M.C. could, with a picture prompt, generate a story that includes a clear beginning, a straightforward plot and conclusion, and a relationship between characters in the story; they cite evidence that FWCL instructed M.C. in writing during both years. M.C. also had language arts at Woodside. The Parents also note that M.C.'s language arts and math ISTEP scores improved from sixth (2004) to seventh grade (2005), when those subjects were only addressed at FWCL. However, M.C. again improved her language arts and math ISTEP scores from seventh (2005) to

eighth grade (2006) following the year in which she spent a full day at SACS and attended FWCL for only eight to ten hours a week after school.[20]

Paragraph 54 cites the School Psychologist's 2006 report (drafted in the summer following the year M.C. spent a full day at SACS) in which she notes improvement in M.C.'s behavioral approach to visual material in that M.C. made initial attempts to observe and analyze information before responding. To connect this progress to FWCL, the Parents cite the FWCL September 2004 first semester plan to work on perseverance, work product, and following directions and a January 19, 2006 Comprehension Standards Assessment Record from FWCL explaining that the standard of "identifying answers in a text" is addressed each time she misses a comprehension/vocab answer by requiring her to go back to the text to identify the correct answer, which she could do fifty percent of the time without facilitation.

Paragraph 55 again cites the 2006 report, noting that when performing the Block Design Subtest, M.C. had an improved ability to observe a pattern and to repeat the pattern with manipulative materials that M.C. had not demonstrated in the 2004 and 2005 assessments, even though there was no measurable difference in her scale score. The Parents then cite evidence that M.C. worked with manipulatives at FWCL, such as a numberline for math.

Paragraph 56 cites facts from the 2005 assessment that the School Psychologist observed M.C. to be more flexible and detailed in her conversational language expression in contrast with the previous 2004 assessment, during which M.C. had a tendency to perseverate several statements

_____

[20] On the Language Arts portion of the ISTEP, the grading scale ranges from 175 to 770. M.C. scored 341 in 2004, 347 in 2005, and 423 in 2006 on the Language Arts test. On the Mathematics portion of the ISTEP, the grading scale ranges from 200 to 870. M.C. scored 220 in 2004, 240 in 2005, and 260 in 2006 on the Mathematics portion of the test. She did not pass any of the tests.

or ideas, and that the School Psychologist observed that M.C. showed greater depth and volume in her language skills. The Parents then cite the "FWCL Intensive Program for [M.C.] School year 2004-05," but nothing in the document references conversation skills. *See* AR 2847-48. The Parents state that M.C. worked on conversation skills in private therapy in 2004-05, but the cited evidence is testimony from Ms. Ailor, the director of outpatient rehabilitation at Lutheran Hospital, discussing the goals of the intensive therapy M.C. began receiving at Lutheran Hospital in October 2006. *See* AR 309.

Finally, paragraph 57 cites the 2006 report for the School Psychologist's observation that during the Leiter International Performance Scale-Revised (a test designed to assess cognitive functions in children and adolescents) testing in 2006, M.C. demonstrated some initial willingness to be independent in her testing, another improvement. She observed this independence in relation to M.C.'s behavioral approach to visual material in that M.C. "made initial attempts to observe and analyze the information prior to responding" but that "[a]s the material increased in complexity and detail [M.C.] did require examiner prompting." AR 3094. To correlate this improvement with FWCL, the Parents cite a January 16, 2006 overview of M.C.'s FWCL instruction drafted by Swenson, which provides that "Instructor's[sic] measure [M.C.'s] progress by the level of consistency, stability and independence of use of learned skills." AR 2338-40.

In the last paragraph of Part X of their motion, arguing that their unilateral placement is appropriate,[21] the Parents attempt to show that SACS did not prepare appropriate IEPs for 2004-05 and 2005-06 based on a variety of procedural deficiencies. In Part E below, the Court addresses all of the procedural errors, finding that they did not result in a denial of a FAPE.

---

[21] The Parents' unilateral placement argument is addressed fully in Part H, *infra*.

In contrast, in addition to noting that the Parents have not met their burden of demonstrating that M.C. did not receive meaningful educational benefit at Woodside, SACS offers evidence that M.C. made progress while educated primarily by SACS during the 2005-06 school year. As discussed in detail in Part E below, M.C. made noticeable social gains during the 2005-06 school year. M.C. improved her Language Arts ISTEP score from 2005 to 2006 by a greater margin than from 2004 to 2005 and improved her Mathematics ISTEP score from 2005 to 2006 by the same margin as from 2004 to 2005, although she still did not pass any subjects.[22] When comparing M.C.'s Indiana Standards Tool for Alternate Reporting tests ("ISTAR") from 2004 and 2006, M.C. progressed in all areas, although again, she progressed very little. *See* AR 3824-42. M.C. took the NSEA, a standardized achievement test, at the beginning and end of the 2005-06 school year, and the results showed that she experienced significant growth in the area of reading but that she was inconsistent and regressed in language usage and mathematics. *See* AR 3108. In the 2006 psychoeducational evaluation, M.C.'s Test of Written Language showed growth in story construction. AR 3099. At the hearing, M.C.'s TOR provided an example of when M.C. surprised her with her academic performance because M.C. "knew the answers" and "scored very well on the test," likely a 'B', without any help. AR 986. Regarding M.C.'s progress, the School Psychologist testified:

> Q:    Did [M.C.] meet with success through her course of study in the '05-'06 school year?
> A:    The question is, did [M.C.] meet with success?
> Q:    Did she make progress?
> A:    I think she did, yes.

AR 1271.

---

[22] *See supra* n. 20 for M.C.'s ISTEP scores.

The Parents have not met their burden of demonstrating that M.C. did not receive meaningful benefit from SACS during the 2004-05 and 2005-06 school years or that her IEPs for those years were not appropriate.

### 3. Expert Credibility–Intensive Therapy v. Socialization

The Parents argue that the IHO improperly applied the meaningful benefit standard when he did not order intensive therapy after finding that M.C. would only make minimal progress with intensive therapy and instead focused on the importance of socialization in the public school. They make a credibility argument that he should have adopted the educational plan recommended by Dr. Savage and the recommendations of Dr. Fisher favoring the Parents' proposed program.

As the Parents observe, the development of an IEP is an individual determination based on the particular needs of the student. While the Parents cite a case in which intensive therapy was found to be required for a FAPE, *see Cleveland Heights-University Heights City School District v. Boss*, 144 F.3d 391 (6th Cir. 1998), and SACS cites a case in which a highly restrictive environment of four to five hours a day, five days a week with a clinician was found to be inappropriate, *see Rafferty v. Cranston Public School Community*, 315 F.3d 21 (1st Cir. 2002), the issue before this Court is the individualized requirements of a FAPE for M.C.

Given the testimony of the experts set forth in the following paragraphs, the IHO's articulation of all of the expert opinions in his decision, the IHO's additional reliance on the testimony of Ms. Ailor, Ms. Tom, the School Psychologist, and M.C.'s mother, and the deference given to the IHO's credibility determinations (see Part A above), the Court finds that due weight should be given to the IHO's reliance on the opinions of SACS' experts and his determination that the importance of socialization for M.C. in the public school was not outweighed by the limited

gains she would make with intensive therapies and education in significantly more isolated settings.[23]

a) The Parents' experts

Dr. Savage evaluated M.C. and wrote an educational plan for her on September 3, 2006, recommending that M.C. receive a program consisting of (a) daily speech, occupational, vision, and physical therapy, (b) behavioral consultation for drooling, (c) direct academic instruction in reading, math, writing, academic management skills, pre-vocational skills, life skills, social skills, and behavior skills using direct instruction methodologies such as Respond-to-intervention, Lindamood-Bell, or Wilson Reading, and (d) a weekly social skills group. He recommended that persons working with M.C. collaborate at least quarterly. Dr. Savage also indicated that M.C. requires a year round program (minimum 11 months) that includes extended school year services. The goal of M.C.'s parents and of Dr. Savage's educational plan is to make M.C. as independent as possible. Dr. Savage testified that the intensive related services of speech, occupational, and physical therapy that M.C. receives at Lutheran Hospital are consistent with his recommendations. Likewise, Dr. Fisher testified that the math instruction at FWCL and the intensive therapy at Lutheran Hospital incorporate her recommendations and strategies.

Dr. Savage opined that, for brain injured students, the therapeutic needs of each individual student vary, that the premise that a brain injured student has only a golden window of opportunity in which to make gains is "old thought," and that the brain develops different pathways and compensatory systems. Dr. Savage stated that SACS did not and does not provide the services M.C. requires and was not and is not an appropriate placement for M.C. in lieu of FWCL. Dr. Savage also

---

[23] The IHO found that the current placement by the Parents at FWCL and Lutheran Hospital results in an "extreme degree of separation of [M.C.] from any meaningful contact or interaction with non-disabled peers." AR 3917.

opined that SACS has not provided content that matches M.C.'s needs, has not provided the intensive related services that she requires, and has not provided specific and direct instruction to build up her foundation and knowledge base. Dr. Savage opined that valuable time has been lost with M.C. and that she should not be mainstreamed at the expense of forgoing intensive therapy and academic instruction, life instruction, and social skills development.

In her testing of M.C., Dr. Fisher was surprised because M.C.'s scores in some areas were higher than Dr. Fisher would have predicted and commented that, although M.C. has some clear deficits, she also has some clear strengths. In her report, Dr. Fisher noted that, given the pervasive and early impact of M.C.'s stroke, the fact that M.C. has learned to read, write, and speak is a feat in itself and that M.C. has developed far more than is predicted for her injury. Dr. Fisher observed that M.C. had the least difficulty with letters, which she felt was further testimony to M.C.'s learning of sounds that had been painstakingly and intensively taught to her using manipulatives and by building concept upon concept. The main point of Dr. Fisher's testing results is that M.C. is capable of learning more. Her scores do not "flatline" as in mental retardation; some areas of learning have been positively impacted by recent intensive training. AR 96. In agreement with Dr. Savage, Dr. Fisher recommended that M.C. receive continual, intense instruction throughout the year; social skills instruction; and continuous, intensive daily physical, speech, and occupational therapy. Dr. Fisher opined that M.C. has made significant progress in the past with a consistent, intensive program combining systematic instruction and intensive therapies and that her program at SACS was not sufficiently intensive and consistent. Dr. Fisher does not agree with Dr. Couvillion that intensive programs cannot yield long-term progress. Both Dr. Fisher and Dr. Savage opined that a

neuropsychological evaluation of M.C. is important to understand how M.C.'s brain works and allow the evaluator to form a plan for teaching her.

Dr. Smith, M.C.'s neurologist since 1996, recommended as early as September 2002 that M.C. continue to receive the intensive, specialized services that M.C. was receiving at ILS. He recommended intensive specialized therapies again on August 29, 2006. He also noted in relation to her previous regression that, because her seizures were successfully being treated, "I believe that she will again begin to make significant gains if extensive therapies are now introduced." AR 2141.

b) SACS' experts

Dr. Stauffer opined that M.C. should continue to receive the special services that have enabled her to function as well as she does but was not convinced that it is necessary to remove her from the school environment. Dr. Stauffer was referring to the related services that M.C. had been receiving during the 2004-05 and 2005-06 school years and earlier; she was not referring to the intensive therapy proposed by the Parents at Lutheran Hospital. She suggested that assistive technology might be helpful for M.C. for academics and language. Dr. Stauffer noted that it appears that M.C. is benefitting from the social interaction in her current school situation in that it is a significant motivator. Dr. Stauffer opined that the benefits of the "opportunity to learn, socially and knowledge-wise, from her peers" "needs to be balanced with those of a more therapeutically intensive but also more socially isolated educational placement." AR 3659. She suggested that therapy be provided outside of school if the therapies she is receiving at school are felt to be less than she needs.

Dr. Couvillion testified that the best time for remediation is within 12 to 24 months after the brain injury and that, after this, remediation and learning can occur but become much more limited.

He indicated that M.C. would make only limited gain with intense occupational therapy given her injuries and the amount of time since the initial injury. Dr. Couvillon testified that, if M.C.'s brain is stable, regression would be a surprise, but also that she would probably regress some without continued academic instruction, as "[m]ost children do." AR 1388.

Noting that M.C. is an adolescent–a time when it is important for individuals to learn social responses, he testified that hers are impaired. However, he was struck that other students in the classroom setting were willing to interact with her. He testified that socialization is important at that age and that to take that away "during the adolescent period in a child who already has impairments, you have a big risk of losing the ability to make whatever gains she could have made." AR 1341. He also testified that M.C. can learn social skills from her peers by being around them and modeling their behavior but that she will not pick up social skills at the rate that they pick them up since social skills can become very complex. Dr. Couvillion agreed with Dr. Stauffer that M.C. may still improve with the kind of intensive support that is being proposed, but "[a]t this late date, the improvement is not likely to be of the degree that would outweigh the problems that may be created by removing her from her peer relationships, peer environment, and motivating factors." AR 1352 (Dr. Couvillion's testimony) (quoting AR 3659 (Dr. Stauffer's report)). He felt that "she would benefit from social interactions." AR 1349. Dr. Couvillion opined in his report that "removing [M.C.] from social and emotional interaction with her peers would be a detriment to her." AR 3676. M.C.'s TOR noted the positive impact of other students on M.C.'s academic performance when doing group work related to writing.

In his report, Dr. Couvillion indicated that M.C.'s parents have sought appropriate medical and rehabilitation services for M.C. from the date of her adoption to present. Dr. Couvillion testified

that he disagreed with the private occupational therapy M.C. was receiving based on the attempt to have her brain-based difficulties remediated through intensive therapy. However, he admitted that M.C.'s occupational therapist had established good, specific, and appropriate low-level goals. He testified regarding the three hours of therapy a day that M.C. is receiving at Lutheran Hospital: "I am not aware of anyone in the State of Indiana who would say 14 years after this type of debilitating injury, that very intensive types of therapies of this sort for multiple hours a week, um, would be beneficial beyond perhaps some, um, minor gains." AR 1339. He also wrote in his report: "To deprive [M.C.] of her social interactions for unproven and un-researched 'intensive therapies' 14 years following her destructive stroke does not comply with good research or clinical rehabilitation techniques." AR 3685. Dr. Couvillion testified that the therapy was not only "extreme" but "experimental." AR 1339. Dr. Couvillion's comments were based upon his experience and generalities; M.C. began to speak at age nine, and Dr. Couvillion did not have experience with anyone with brain injury beginning to speak this late after the injury.

c) Other evidence

In testifying about the therapies at Lutheran Hospital, Lori Ailor, the Director of Outpatient Rehabilitation Services at Lutheran Hospital, testified that the proposal was "extreme" and "not the norm in this community" and that "[i]t's something that is not well utilized in this community." AR 308. Ailor believes that the level of therapies M.C. receives are appropriate because she believes that M.C. requires intensive, regular therapies to improve and maintain skills; she testified that M.C. will continue to make gains from occupational, physical, and speech language therapies if received on a daily basis.

Anita Tom, M.C.'s private speech therapist, testified that M.C. made "tremendous progress" in intensive therapy with Tom in June 2004, for six hours a day, six days a week, for three weeks. AR 511. From June 2004 through April 2006, M.C. received speech therapy once a week for two hours from Tom, which Tom described as "infrequent therapy." In April 2006, M.C. completed another intensive speech therapy program for six hours a day for six days. Following that intense therapy, a decision was made to stop providing services once a week because Tom felt that M.C. was not benefitting from the infrequent therapy. However, Tom also testified that she felt there was value in the infrequent meetings leading up to April 2006.

According to SACS' summary notes of the January 20, 2006 case conference committee meeting, the school counselor said, "I hardly saw [M.C.] last year because she was only here for one block. Of course I see her this year all day and I see a different person; she seems more like a seventh grader. She's interacting with kids at lunch, coming in my office complaining about somebody from choir like 75% of the other students in class. We talk about how she can handle this or other problems; I really see a different [M.C.] this year. She was more mopey last year. I think she loves it here." AR 2987. The notes also reflect that the School Psychologist said that "one of the things that was important that I saw she can be a part of her peer group, be accepted within that peer group . . . . This is a talent she can take beyond this building and HHS and into the working world." AR 2987. The School Psychologist testified that if you remove M.C. from her peer group, later "trying to reintegrate back into these [social] groups . . . would be very difficult" and M.C. would "inherently lose some interaction, peer relationships that she had established." AR 1253.

Carter, M.C.'s special education teacher, used Project Read in a group setting; M.C. is easily distracted in the classroom and needs constant reminders to stay on task and Dr. Fisher opined that

small group learning is not effective for M.C.  The Parents note that M.C. did not master many of her IEP goals.

Regarding mathematics, M.C.'s October 2006 ISTAR assessment indicates that she had not mastered addition facts for totals up to ten and had not mastered using zero in addition or subtraction problems.  Although the Parents compare this assessment with the levels of math SACS was teaching M.C., the very math that FWCL was teaching M.C. was covered by the unsuccessful assessment.[24]  In January 2006, M.C.'s SACS math instructor stated that M.C. had made no progress in math at Woodside.  In M.C.'s math progress report for March 2006, her teacher states that she "moved" to three and four digit numbers with carrying and regrouping and that she is successful with constant one-on-one instruction but when on her own, she does not consistently use touch points.  At FWCL, during the first half of the 2005-06 school year, M.C. focused on strengthening her addition facts up to 20, and she also worked daily on counting money and determining if she had enough money to buy an item.  In April 2006, M.C. worked at FWCL on mixing addition and subtraction problems and did not begin double digit addition until May 2006.  If anything, the modest gains M.C. made in either year supports the IHO's determination that M.C. is only likely to achieve modest gains.

Also during the 2005-06 school year, FWCL focused on strengthening M.C.'s visual spatial skills, writing skills, and decoding skills.  FWCL required M.C. to write neatly.  The writing samples offered by the Parents of M.C.'s work at SACS were not as neat as the samples offered from M.C.'s

---

[24]  M.C.'s SACS communication book indicates that SACS was teaching her more complicated math.  In November and December 2005 and January and February 2006, SACS was working with M.C. on addition with regrouping, subtraction with regrouping, three-digit subtraction with regrouping, and three-digit addition with regrouping.  In February and May 2006, SACS was teaching subtraction with borrowing and four-digit subtraction.  In January 2006, M.C.'s SACS math instructor reported that M.C. could not do any of these math problems without one-on-one assistance from her aide and that she was inconsistent in addition and subtraction.

work at FWCL.  M.C.'s reading log from FWCL for the 2005-06 school year indicates that she read books at a third to fifth grade reading level.  FWCL prepared a weekly instruction plan and progress report that indicated the challenges M.C. presented, the strategies and techniques FWCL used to overcome the challenges, and a summation of weekly progress.  FWCL also collected data regarding M.C.'s behavior.  M.C. had socialization opportunities at FWCL.  She was often found "hanging out" in the break room with the other students and laughing.  She had three friends at FWCL that she looked forward to seeing and talked to them about "important teenage topics" on breaks.  In January 2006, M.C. would talk to FWCL instructors about how students at SACS made fun of her drooling and poor articulation.  She found acceptance from her friends at FWCL.  M.C. appeared very excited and happy to be at FWCL and expressed great concern about not being able to attend FWCL.

Part E.2 below sets out the significant documentary and testimonial evidence regarding the importance of socialization to M.C. and the socialization that occurred at SACS.

d)  Conclusion

The Parents assert that the IHO should have focused on post-school activities rather than being concerned solely with M.C.'s social enjoyment now, arguing that the IEP should be tailored for the goal of self-sufficiency, citing *Deal v. Hamilton County Board of Education*, 392 F.3d 840, 860-66 (6th Cir. 2004) (citing what is now codified at 20 U.S.C. §§ 1400(c)(5)(E), 1400(d)(1)(A)).  Similarly, in their reply brief, the Parents reason, without citation, that this Court should order the placement that will most appropriately address M.C.'s weaknesses, not her strengths.  The evidence of record supporting the IHO's findings and conclusions indicates that M.C. will be prepared for post-school activities to the extent reasonably possible in the social context of the public school

rather than in the isolated proposed placement with limited progress. Other than credibility determinations that this Court will not overturn, the Parents have not identified any evidence that M.C.'s education with SACS, including socialization, did not provide meaningful education toward the goal of self-sufficiency. The Court is sympathetic that M.C.'s parents seek only the best for their daughter and that they believe the private placements they have chosen provide her an education to maximize her potential. However, the Parents have not demonstrated that SACS did not provide M.C. with an appropriate education. Accordingly, the IHO's decision that SACS provided M.C. with an appropriate education will not be disturbed.

### C. IHO's Interpretation of Indiana Contract Law

In Count V of the Amended Complaint and in their Motion for Summary Judgment, the Parents argue that the IHO misinterpreted Indiana's consent regulations and misapplied federal law by interpreting an "agreed upon IEP" as a contract that binds parents to the terms they signed and prevents them from later challenging the IEP. The Parents argue that the written consent required for the implementation of an IEP does not constitute agreement as to the goals, services, and other provisions therein. Given that they were required to sign the IEP in order for it to be implemented, the Parents assert that they were in a practical dilemma of signing and implementing the IEP or refusing to sign and litigating.[25] In opposition, SACS clarifies that it has never argued that the Parents are barred from contesting the propriety of the IEPs because they signed them.

---

[25] In support of this contract argument, the Parents cite *Board of Education of Montgomery County v. Brett Y.*, 155 F.3d 557 (4th Cir. 1998), for the holding that parents are not required to sign IEPs because then a parent could refuse to sign an IEP and effectively prevent a school from providing an education. Pl. Br., p. 11-12. In footnote 9 on page 12 of their brief, the Parents argue that the IHO in this case incorrectly stated that a school cannot provide services to a student without the informed, written consent of the parents. SACS responds to this argument in footnote 10 on page 12 of its response. The Court declines to enter the footnote fray as the requirement of parental consent is not at issue.

The Court also finds that it is unnecessary to address the case law cited by the parties related to whether an IEP is a contract and whether contract defenses apply to IDEA disputes.

During the years at issue, the Indiana special education regulations defined an "agreed-upon" IEP as an IEP developed by the case conference committee and implemented with the written consent of the parents. 511 Ind. Admin. Code 7-27-5(g) (2004).[26] A public school district was required to obtain written consent from a parent when the district proposed any one of six actions related to the determination of special educational and related services, including the initial determination of the student's eligibility, the initial IEP, a revised IEP involving a change of placement, or the termination of the student's eligibility. *Id*. at 7-27-5(d) (2004).[27] The district could not use a parent's refusal to consent to one service or activity to deny the parent or student any other service, benefit, or activity of the school. *Id*. at 7-27-5(f) (2004).[28] A party can request a hearing for any dispute regarding the provision of a FAPE. *Id*. at 7-30-3(a)(4) (2004) (current version at 511 Ind. Admin. Code 7-45-3(a)(3) (2008)).[29]

As a practical matter, the IHO did not use the word "contract," did not hold that the IEP was a contract under Indiana common law, did not cite any Indiana case law, and did not mention any of the administrative regulations invoked by the Parents here on appeal. Therefore, taking the Parents' argument at face value, there was no explicit contract interpretation by the IHO. Nor did the IHO preclude the Parents from fully challenging the 2004-05 and 2005-06 agreed-upon IEPs throughout the hearing process. The Parents raised nineteen issues before the IHO, many of which

---

[26] The term "agreed-upon IEP" is not found in the current version of the regulations.

[27] The current version of the regulations only requires that written consent be obtained "before the initial provision of special education and related services to the student." 511 Ind. Admin. Code 7-42-7(f) (2008).

[28] This provision is not in the current version of the regulations. *But see* 511 Ind. Admin. Code 7-42-7(i) (2008) (providing that, if the parents refuse or fail to consent to the initial services, the school may not initiate a due process hearing to compel consent but also must not be considered in violation of the requirement to provide a FAPE).

[29] The regulations also provided that certain limitations on school accountability for lack of student achievement did not limit the parental right to invoke due process procedures. 511 Ind. Admin. Code 7-27-8(c) (2004).

are again raised before this Court. The IHO made explicit rulings on the substantive issue that M.C. was not denied a FAPE because she had received meaningful benefit from the IEPs.

The Parents identify three findings of fact to suggest that the IHO construed the IEPs as binding contracts: (1) that they are well educated, (2) that they signed the IEPs, and (3) that they "got what [they] asked for." Pl. Br., p. 11 (citing AR 3909, 3918, 3921-22). The first was resolved by the BSEA, which redacted the language from the IHO's finding of fact referring to the level of M.C.'s parents' education. Second, the IHO's finding that the Parents signed the IEPs was in the context of Dr. Savage's testimony that M.C.'s 2004 IEP goals were inappropriate even though they were goals that the Parents had insisted on during a time when their hope for M.C. had been graduation from high school and passing the ISTEP.[30]

Finally, the IHO found that the Parents "got what [they] asked for." AR 3951. Although perhaps not the most erudite, the language in context does not have a vindictive tone but rather summarizes the active role the Parents played in the development of M.C.'s IEPs and points out that many of the aspects of the IEPs about which they now complain were either done at their request or without their opposition.[31] In his conclusions of law, the IHO found that it was "well established that [M.C.] received her educational services through an array of educational arrangements, public and private. Each such arrangement was at the insistence of [M.C.'s] parents and was agreed to as

---

[30] In paragraph #82, describing Dr. Savage's testimony that several of M.C.'s 2004 IEP goals were inappropriate, the IHO found that they were the "same goals that the parents insisted be included in [M.C.'s] IEP as the Parents were insisting on [M.C.] being enrolled in coursework that led to graduation from high school and passing Indiana's high stakes qualification examination, the ISTEP. This IEP was signed by the Parents as being in agreement with both the LREE and the goals and objectives recorded therein." AR 3918.

[31] In paragraph #103, the IHO found that "[a]t each meeting of the CCC throughout the time frame relative to this matter in which [M.C.'s] IEP was developed or modified, [M.C.'s mother] participated and provided input regarding the goals and objectives to be taught. In every case the parental input was considered, and most frequently took precedence. In simple terms, she got what she asked for." AR 3922.

attested by their signature on each of the IEPs constructed during the 2004-2005 and 2005-2006 school years." AR 3951.  In the lengthy paragraph proceeding the above-quoted language, the IHO acknowledged that the IEPs in question were mutually "agreed upon," that the basis for the IEPs was the 2004 Settlement Agreement, that the Parents were actively involved in M.C.'s academic placement and the provision of related services, and that SACS had incorporated the majority of the Parents' requests into those IEPs.  *See* AR 3950-51.  In other words, the IHO found that the Parents were active participants in the IEP process such that the resulting IEPs were an accurate representation of the educational program advocated by the Parents.

Other than disputing the weight given to the evidence that M.C.'s parents were actively involved with the IEP development process (addressed in Part D below), the Parents have not established that they were prevented from contesting the IEPs on the merits.

### D.  Shifting the Responsibility of FAPE to M.C.'s Parents–
### the Parents' Rejection of Related Services Through SACS in Favor of Private Providers

In Count IV of the Amended Complaint, the Parents allege that the IHO incorrectly blamed them for SACS' failure to provide M.C. with related services and improperly shifted to them the responsibility of providing M.C. with a FAPE by holding them responsible for M.C.'s IEPs.  They argue that the IHO blamed them for a "litany of transgressions" and that the IHO found that SACS had been relieved of developing goals for related services at the insistence of the Parents.  As perhaps one of the most fundamental contentions in this litigation, the Parents assert that the IHO's holding that SACS offered the Parents related services for M.C. for the 2004-05 and 2005-06 school years but that the Parents rejected those services is not supported by the evidence of record.  The Court addresses each argument in turn.

*1. Shifting "Responsibility"*

First, the Parents allege that "the IHO expressly held M.C.'s 'parents *primarily responsible for the formulation and content of M.C.'s IEPs.*'" Pl. Br., p. 8 (citing AR 3951) (emphasis added). However, the full excerpt, following a description of M.C.'s placement in public and private programs, provides: "[M.C.'s] parents provided input, and on multiple occasions were *primarily responsible for the formulation and content of M.C.'s IEPs* and amendments thereto during the two year period under consideration. [M.C.'s] parents negotiated most strongly for the educational placements they preferred at each meeting of the case conference committee meeting. In each event, the School acquiesced to their demands regarding the LRE for [M.C.]." AR 3951. Read in context, the IHO did not hold that the Parents bore the responsibility for ensuring that M.C. received a FAPE; rather, the IHO acknowledged that historically the Parents were active in the IEP development process and that SACS took into account the Parents' requests, many of which were implemented through the IEPs. A review of the various case conference committee meeting reports suggests a cooperative, comprehensive process to develop M.C.'s IEPs.

The Parents again note that the IHO described the Parents as a well educated attorney and a college graduate. As has already been addressed above in Part C, the BSEA redacted this factual finding. However, in the context of this argument, the Court also finds that the IHO's primary focus on the Parents' participation in the IEP process was not related to their education but rather to their extensive involvement.

*2. Litany of Transgressions*

The Parents then list, without analysis, a number of "transgressions" the IHO allegedly attributed to the Parents–"failing to complete assessments, rejecting IEP revisions, and failing to

request vision therapy, counseling services, social skills training and transportation reimbursements"–as well as rejecting related services offered by SACS, which is addressed in the next section. Pl. Br., p. 8 (citing generally AR 3909, 3924, 3926, 3941, 3946, 3948, 3951). The Parents also assert that the IHO "went so far as to 'relieve the school of developing goals for related services by mandate from M.C. parents.'" Pl. Br., 9 (citing AR 3944). Each of these contentions is addressed in turn based on these citations to the record.

In finding of fact #39 (AR 3909), the IHO found that "[t]transportation provided to [M.C.] by [M.C.'s] parents was voluntary. The School agreed to provide any necessary transportation to [M.C.] between home, school, and private school settings. [M.C.'s] parents have not presented the School with a written request for reimbursement for transportation services." AR 3909. The IHO is not assigning "blame" but rather neutrally stating a fact that M.C.'s parents did not present the School with a written request for reimbursement for transportation services.[32]

In finding of fact #110 (AR 3924), the IHO found that SACS did not conduct a formal FBA until the end of the 2005-06 year, in part, because M.C.'s behaviors were addressed through goals and objectives in the IEPs at the Parents' request. As an example, the IHO noted that the Parents did not wish to fill out certain evaluation forms but then later gave permission to conduct an FBA and develop a BIP. This is a neutral statement of the facts supported by the record and does not assign blame.

In finding of fact #121 (AR 3926), the IHO found that "[d]uring [sic] hearing the appropriateness of the assignments made in general education social studies and science classes was discussed. When it was explained to [M.C.'s] mother that the assignments would prove to be too

---

[32] *See infra* Part G for a discussion of the Parents' related claim that SACS breached the Settlement Agreement by failing to provide transportation.

difficult for [M.C.], [M.C.'s] mother requested that the assignments not be modified." AR 3926.

It appears that the Parents are characterizing this finding as blaming the Parents for rejecting IEP

revisions. However, it is a neutral statement of fact supported by the record. It goes to the issue of

the Parents advocating a less restrictive environment during the years at issue as compared with the

highly restrictive placement they now seek. Similarly, M.C.'s mother also requested more social

studies and science work for M.C. at the January 20, 2006 case conference committee meeting:

| [TOR]: | But she still has homework that comes home. |
|---|---|
| [Mother]: | Yeah. I would say that I think the school has done a very good job of assisting her with her schoolwork and its not overload. Um, you know, I think . . . I want, want, to ask you to do a little bit more here today. But, you know, with what she has in terms of science and social studies, um, but, yeah, its not overload and I think the school is doing a very good job of helping her. |
| [Dir.]: | But you want them to do a little more? |
| [Mother]: | Yeah, but I didn't know if we were at that point? |

Pl. Mot. to Supp. Adm. Rec., Exh. C, p. 15.

Next, the Parents list the IHO's legal holdings that SACS did not fail to provide vision

therapy, counseling services, social skills training, *see* AR 3941, 3946, 3948 (vision, counseling, and

social skills respectively), for each of which the IHO notes that the Parents failed to request those

services. For vision therapy, the IHO's holding relies on a previous finding that M.C.'s parents

chose to utilize private vision services in lieu of vision services offered by SACS. As set forth in

Part D.3 below, the Court finds that the Parents chose to use outside vision services in lieu of SACS'

services and, therefore, the IHO's statement that the Parents did not request vision services from

SACS is a statement of fact supported by the record. For counseling services, the IHO correctly

found that there was no evidence presented to suggest that M.C. was in need of the related service

of counseling, and in so finding, noted that there was also no evidence that either M.C. or her parents

requested counseling services anytime during the 2004-05 or 2005-06 school years. For social skills training, the IHO held that SACS did not fail to provide social skills training, finding that M.C. was highly motivated to interact with peers, teachers, and significant others; that the biggest obstacle to continued development of her social interactions was her drooling, which was being addressed by SACS; that additional areas of personal social growth such as personal hygiene were targets for further intervention; and that, in conclusion, there were no instances in which the Parents requested the inclusion of additional goals or objectives regarding social skills training. This statement does not "blame" the Parents but rather states a neutral fact supported by the record.

Finally, the Parents contend that the IHO "went so far as to *'relieve the school of developing goals for related services by mandate from M.C.*[sic] *parents.'*" Pl. Br., p. 9 (citing AR 3944) (emphasis added). This excerpt is taken from the IHO's holding on Issue 9 that SACS failed to provide measurable goals and objectives. The relevant portion of this holding, to provide context, is: "First, the IHO will address whether [M.C.'s] IEPs contained a statement of annual goals in each area of [M.C.'s] identified needs that described what [M.C.] could have been expected to accomplish within a twelve (12) month period of time. Such was not the case. However, there are mitigating circumstances regarding the failure by the School to include an annual goal in each area of [M.C.'s] identified need. The School was effectively *relieved of developing goals or objectives in the area of related services by mandate from [M.C.'s] parents*. Thus, while [M.C.'s] IEPs did not contain certain goals in the area of related services the School should not be regarded as failing to comply with this mandate regarding related services." AR 3943-44 (emphasis added). In this instance, the IHO is excusing SACS for not including certain related services goals in the IEPs as a result of the Parents' decision to obtain related services from private providers; he is not assigning blame.

*3. Related Services*

Finally, and perhaps most central to the Parents' appeal, the main thrust of this burden-shifting argument rests in the Parents' recurring contention that correspondence reveals that they requested school therapies, that SACS did not offer or provide related services, and that there is no testimony that the Parents rejected services. SACS responds that the evidence of record demonstrates that proper related services were consistently made available to M.C. and that, during the years at issue, the Parents only allowed them to provide some educational and related services while choosing to obtain other services from private providers. SACS contends that now the Parents "seek to whipsaw the School" by alleging that SACS illegally failed to provide services the Parents chose to obtain privately, Def. Br., p. 28, and are trying to give the impression that they were required to seek outside services due to SACS' alleged failing.

In his decision, the IHO found that "[M.C.'s] parents unilaterally refused [the related services of speech, vision, and occupational therapies offered by SACS], choosing instead to seek private services at their expense." AR 3906 (findings #21-22). In his legal conclusion on Issue 13 that SACS did not fail to provide required or necessary educational services for M.C. in the least restrictive environment, the IHO wrote:

> The School was consistently prevented by [M.C.'s] parents from providing many of the services now being sought throughout this time period. As an example, at the insistence of [M.C.'s] parents, [M.C.] attended the public school during the 2004-2005 school year only for instruction in social studies and science. This instruction was delivered in general education classes at the request of [M.C.'s] parents. The goals and objectives attempted in this educational setting were aligned with state standards, also at the instance[sic] of [M.C.'s] parents. The remainder of the day [M.C.] was provided private educational and therapeutic services, also at the insistence of [M.C.'s] parents.
>     . . . That [M.C.] had only limited participation in the public school environment during the 2004-2005 [sic] was not only at the request of [M.C.'s] parents, it was a result of their insistence. While the 2005-2006 IEP, with

amendments, as compared to the IEP established for the 2004-2005 school year, provided for significantly more inclusion in the public school system [M.C.] was frequently removed from school during various parts of the school day at the request of [M.C.'s] parents for the purpose of receiving private educational and therapeutic services. Thus, any lack of participation in the public school was the result of parental choice. The School, throughout the 2004-2005 and 2005-2006 school years expressed a strong preference that the most appropriate LRE for [M.C.] was full-time placement in the public school with the necessary special education and related services being provided by the School therein. [M.C.'s] parents provided input, and on multiple occasions were primarily responsible for the formulation and content of [M.C.'s] IEPs and amendments thereto during the two year period under consideration. [M.C.'s] parents negotiated most strongly for the educational placements they preferred at each meeting of the case conference committee meeting. In each event the School acquiesced to their demands regarding the LRE for the Student.

In conclusion, it is well established that [M.C.] received her educational services through an array of educational arrangements, public and private. Each such arrangement was at the insistence of [M.C.'s] parents and was agreed to as attested by their signature on each of the IEPs constructed during the 2004-2005 and 2005-2006 school years. The School demonstrated, through testimony and documents submitted to the IHO in this matter, that [M.C.] received educational benefit, gains, and in some instances, considerable educational benefit from her individualized educational program, especially so when considering the limited time the School was allowed to work with [M.C.] during the 2004-2005 school year. As such, during the 2004-2005 and 2005-2006 school years, the School did not fail to provide required or necessary educational services for [M.C.] in the LRE[.]

AR 3949-51.

The Court first sets out the evidence of record and then addresses other evidence cited by the Parents that, when considered closely, does not support their position. Based on the record, the Court concludes that the IHO did not err in finding that the Parents chose to use private providers for related services in lieu of those offered through SACS.

a) Testimonial and documentary evidence of record

School personnel wrote in the 2004-05 agreed-upon IEP that "[M.C.] receives services and therapies outside of School, by parent determination for vision, speech and constraint induced therapy." AR 958, 2826. The November 2004 IEP addendum indicated that "[M.C.] will be

excused from school every other Friday to go to Indy by parents' choice to attend physical therapy and vision therapy." AR 1748. Neither of these documents was challenged as inaccurate.

At the hearing, M.C.'s TOR testified that she remembered a case conference note from the August 2005 case conference committee meeting that M.C.'s parents were providing services and therapies for M.C. privately:

> A:  . . . . I do believe there was a reference in case conference notes for this particular IEP that stated that parents would be – at parents' choice – I don't know the exact wording – would be using their outside related services.
>
> Q:  So to your knowledge, that – then there is some discussion of services that were offered to the [Parents] which were rejected in another document.
>
> A:  I'm not saying they were offered. I'm saying that there is a case conference note I believe related to the same type of this IEP that states by parents' choice they would be having outside services."

AR 1035. Carter (7th Grade learning center teacher) who was M.C.'s TOS, also testified:

> Q:  Have you ever heard any representative of the school make it known to the parents that certain therapies were available through the school?
>
> A:  Yes, I have.
>
> Q:  When did you hear that?
>
> A:  I specifically remember it at a conference in August of '05.

AR 1102-03. She further testified that, at the August 2005 case conference, M.C.'s TOR went through the IEP and "she simply said that Woodside had speech therapy and a vision therapist. But she said, 'I assume you'll still be using your private therapies.' And I remember that [M.C.'s mother] did ask for occupational therapy for word processing." AR 1102-03. She further testified that M.C.'s mother responded that "they would continue to use their private therapies, but did want the OT from Woodside involved for word processing." AR 1103. The Parents note that neither the IEP from August 2005 nor the case conference committee meeting notes mention an offer of services.

Likewise, the Director of Special Education told the school speech pathologist not to assess

M.C. because M.C.'s parents sought private speech therapy services. The Director testified:

> Q: Has the school ever offered the parents any therapy?
> A: Any what?
> Q: Any therapy that would fall under related services?
> A: Yes, we have. We have starting when [M.C.] was in elementary school.

AR 1134. Regarding the Parents' use of private providers, she testified:

> The major pattern in my opinion was that the parents, although they knew that we did have therapies available, chose for the most part not to use the school-based therapies for one reason because they didn't want her pulled out of academics to receive those. And then secondly because they had their own therapist that they had used for many years.

AR 1135. She was then asked about the process for the Parents to request services from SACS:

> Q: If [M.C.'s] parents had wanted services from, speech therapy from the school at that point, can you say whether she would have gotten one day a week or three days a week or five days a week or would that have been something that would have needed further investigation?
> A: What typically occurs is that we have an evaluation done by the expert, the therapist. We convene a case conference, and we talk to make that decision based on the members of the case conference committee.

AR 1137.

The 2005 psychoeducational evaluation provided: "At parent initiative and expense private

therapies associated with speech and language as well as physical-occupational skills were provided

in lieu of these services that are available through MSD of Southwest Allen." AR 2904. At the end

of the 2005-06 school year, as the School Psychologist was drafting the third psychoeducational

evaluation, she wrote to the Parents, "If there is any add[sic] information from the outside service

agencies you are presently accessing such as a report from the speech-language therapist,

occupational therapist or an updated vision report, please feel free to provide this information." AR

3077. In the 2006 psychoeducational evaluation, it is noted that the "parents continued to provide

private speech and language therapy at their own initiation and expense in lieu of this service that are[sic] available through MSD of Southwest Allen." AR 3087. At the hearing, M.C.'s mother acknowledged having read the reports and did not dispute or question them. AR 885-87.

M.C.'s mother testified that, during the school years at issue in this case, she never told the school that she would provide speech, vision, occupational, physical, and behavioral training and the school should provide academics. She testified that she did not know why SACS did not provide speech or occupational therapies to M.C. However, she also testified that SACS had previously offered related services of, at most, an hour a week. AR 906. She testified that she tired of the continual fight with SACS over M.C.'s educational programming.

The 2004 occupational therapy evaluation does not mention keyboarding, but it does provide that M.C.'s TOR said that "computer use was not allowed by [M.C.]'s parents." AR 2798. The TOR testified that she was unsure how much M.C. used the computer at school and admitted that M.C.'s parents had not actually prohibited computer use. The Parents consented to keyboarding instruction prior to the 2005-06 school year, and occupational therapy services for keyboarding were added to the IEP. The services were provided and fine-tuned during the first ten weeks of school and were consultative only. After that year, the Occupational Therapist wrote that occupational therapy should "continue to work with the teacher to determine effective methods for learning keyboarding skills or assistive technology options." AR 3073.

At the January 2006 case conference committee meeting, the Parents presented a report from their outside vision therapist, Dr. Van Hoy. SACS' summary notes reflect that M.C. was receiving treatment twice a month from Dr. Van Hoy and that, at the direction of Dr. Van Hoy, the Parents "requested that [SACS] work with [M.C.] on a 15 min. computer program." AR 2977. Dr. Van Hoy

recommended that the Track & Read program be used five days a week; SACS implemented the

program approximately three days a week for the rest of the school year and kept statistical data on

an almost daily basis.  Initially M.C. required supervision to use the program, but over the course

of a few weeks, she developed the ability to use the program independently.  When the Director of

Special Education asked M.C.'s mother if there were any changes in vision, M.C.'s mother

responded that she did not believe there were any changes but that "[w]e're just, you know,

changing the therapy and where it is done.  Could be . . . We'll just see how we can work it into her

schedule."  Pl. Mot. to Supp. Adm. Rec., Exh. C, p. 27.  There was also a discussion regarding

M.C.'s new bifocals and when they should be used during the day.

        SACS also coordinated services with M.C.'s private speech therapist:

> Q:     Let's start with speech and drooling. Did you ever help complete the speech
>         and drooling exercises?
> A:     Yes.
> Q:     What did that entail?
> A:     The first we did is the swallowing exercise, which is what is referred to as the
>         spoon process.  We did that two times a day, 15 minutes apiece.  I completed
>         one myself and then one of the nurses completed the other one.  So we did
>         that with the speech.  We also worked on speech cards Monday when they
>         were given to us.

AR 962 (testimony of M.C.'s TOR).  The TOR stated that this program arose because it "was

suggested to [the Parents] by her speech therapist, Anita Tom" and M.C.'s mother brought it up at

the case conference.  AR 963.[33]  SACS reasons that it is disingenuous for the Parents now to contend

---

[33]  For the first time in either the administrative proceedings or this federal case, the Parents argue in their
response brief that SACS violated an Indiana law governing the licensing of speech-language pathologists when M.C.'s
TOR and a school nurse performed the swallowing exercises with M.C.  The Court declines to address the Parents'
untimely allegations of criminal activity by SACS.  For the purpose of this litigation, the fact that SACS implemented
the swallowing technique at the request of M.C.'s mother on the recommendation of the private speech therapist goes
simply to demonstrate that SACS addressed M.C.'s drooling even in the absence of a formal BIP and that SACS was
willing to coordinate with M.C.'s private service providers.

that it turned its back on M.C. and her need for certain therapies given the documentary evidence, the prior course of dealing, and the testimony set forth above.

b) The Parents' proffered evidence and additional arguments

The Parents offer three pieces of "correspondence" to attempt to show that the record contradicts the IHO's findings on related services. None supports the Parents' position.

First, the Parents state that "[d]uring the 2002-2003 school year, M.C.'s mother pled for vision therapy from the school and requested services from the school pathologist." For vision, the cited correspondence is a 2002 letter to the Director of Special Education in which M.C.'s mother requested that SACS *integrate* what the Parents' privately paid-for optometrist recommended. She also indicated in the same letter that "we have not and do not anticipate requesting the school district . . . provide funding for vision therapy." AR 1588. Regarding speech therapy, the cited evidence reveals only that M.C. received consultative speech therapy services from SACS in 2003 and that M.C.'s mother requested that the school and the private speech pathologist work together on M.C.'s speech and drooling. This correspondence addresses a school year prior to the years at issue.

Second, the Parents state that they "requested school therapies again, at the *beginning* of the 2005-2006 school year, as [M.C.'s mother] attempted to secure school therapies as part of M.C.'s day." Pl. Br., p. 9 (emphasis added). However, the cited evidence is from March 21, 2006–almost the end of the 2005-06 school year–during an attempt to establish a schedule to include classes at Woodside and FWCL. In the correspondence, M.C.'s mother proposed a schedule such that "[s]ome speech, drooling therapy and/or visual spatial therapy can be done at both schools" and proposed another option that "from 10:40 – 12:10 on Red Days M.C. would receive a variety of therapies" at the public school and still be able to spend three hours in the afternoon at FWCL. AR 1865.

Third, the Parents assert that "at the January 2006 case conference, Connie C. requested occupational therapy . . . to assist M.C. with eating in the school cafeteria and sought an IEP addendum to provide M.C. with school speech services." Pl. Br., p. 9. The January 2006 case conference committee meeting transcript offered in support of this statement was not before the IHO but the Court has permitted the Parents to supplement the record with the transcript and to cite certain portions of it. In support of the statement, the Parents cite the following exchange that took place between the Director of Special Education, M.C.'s TOR, and M.C.'s mother:

| | |
|---|---|
| [Dir.]: | Does she have speech right now in her IEP? |
| [TOR]: | She does not have speech. |
| [Dir.]: | Then maybe a small group, but then we'll have to have an addendum for some of these goals added and adding speech to and[sic] addendum but you will need a case conference to do that. |
| [Mother]: | Okay[.] |
| [TOR]: | Then, if there is a good time for your speech pathologist to come in so we can coordinate that together and maybe she could even demonstrate some of this during that time we can get it all done. |
| [Mother]: | And also, you know, it may not appear that she's made good goals in speech but she has. Basically, she can do all the sounds. Um she can chain some of the sounds. But it is the rapid chaining of that – that is the level we are working at and so um. |

Pl. Mot. to Supp. Adm. Rec., Exh. C, p. 27. Although the transcript submitted by the Parents does not include what was being discussed immediately prior to this exchange because the cassette tape was being turned over, SACS' "summary notes" of the meeting indicate that the exchange is related to a discussion of the palette procedure exercise (the "spoon process") recommended by the private provider. AR 2990. At most, this exchange shows that the Parents wanted SACS to implement a specific therapy recommended by the private provider and that SACS proposed an IEP addendum.

As for occupational therapy, during a discussion about concerns regarding M.C.'s drooling related to serving herself from the cafeteria line, the following exchange ensued:

| [Mother]: | Would it be helpful if an occupational therapist came in and worked with her a few times. |
|---|---|
| [TOR]: | Um, the good thing is that they do have the serving part on the front that she could put her tray down and then she could scoop with her hands. |
| [Dir.]: | Onto her tray. |
| [Mother]: | I am kind of worried about her scooping with her hands because she is drooling and she is wiping her hands. |
| . . . . | |
| [TOR]: | So, that's why she'll pretty much tell us what she wants. She walks through the line with us, she's got her lunch card. She gets her drink out but that's okay but yeah everything the kids have to serve themselves. |

Pl. Mot. to Supp. Adm. Rec., Exh. C, p. 13 (January 20, 2006 case conference committee meeting transcript).[34] Again, this evidence is not persuasive. While M.C.'s mother's inquiry is a suggestion and not a direct request for services, it shows that M.C.'s mother was open to SACS providing occupational therapy. Nevertheless, the greater context of the conversation reveals that shortly after the suggestion, M.C.'s TOR explained that as M.C. walks through the lunch line, after she takes her drink, she indicates the food that she wants and an assistant takes it for her. The Parents have not cited any additional evidence that this issue was raised again.[35]

The Parents also make the following arguments that, despite their alleged "requests" addressed above, SACS did not offer or provide related services to M.C. during the years at issue.[36]

---

[34] Substantively, any question of whether M.C. required occupational therapy to assist her in the lunch line and whether SACS failed to provide M.C. with occupational therapy related to going through the lunch line was not raised before the IHO and is not before the Court.

[35] Acknowledging that there is little record evidence regarding the issue of the cafeteria line because it was not an issue before the IHO, SACS notes that in the June 2006 Occupational Therapy Re-evaluation, the Occupational Therapist indicated that independent set-up for cafeteria is a skill that M.C. does not perform that could be targeted and offered options for facilitating the lunch line process.

[36] For the first time in their response brief, in one sentence, the Parents invoke 34 C.F.R. § 300.347(a)(2), (3) (2004) (setting forth the contents of an IEP) (current version at 34 C.F.R. § 300.320(a)(1), (2) (2008)) and 511 Ind. Admin. Code 7-27-5(a) to argue that the failure of SACS to specify needed related services in the IEP violates the IDEA and Indiana law. Because the Parents did not raise this argument during the administrative proceedings, the issue is not before this Court.

SACS discontinued physical therapy after the 2002-2003 school year. SACS never recommended or provided direct occupational therapy services, instead offering only consultative occupational therapy services. Although speech consultation had been provided in the past, it was not provided during the 2004-05 and 2005-06 school years. SACS did not include therapies in M.C.'s school day in either 2004-05 or 2005-06. The Parents assert, without law, that SACS did not invite related service providers to her case conference committee meetings, arguing that this prevented the specialists from having an opportunity to explain the type and amount of services SACS could provide and from recommending goals.[37] The Parents argue that there is no testimony that M.C.'s parents rejected services, that there is nothing in the record that specifies what specific type and amount of services the school would offer, and that the only documentation in the record consists of self-serving statements by SACS staff.[38] In the context of their credibility arguments, the Parents offer M.C.'s father's testimony that, in years prior to those at issue, when M.C.'s mother had offered goals after consulting with the private speech therapist, the goals were not discussed or included in the IEPs.[39]

---

[37] To the extent the Parents are asserting a procedural violation of the statute, the argument was not made during the administrative process and thus is not before the Court. To the extent this argument alleges that the Parents were denied meaningful participation in the IEP process, that argument is addressed in Part E.4 below.

[38] The Parents also make the undeveloped statement, "For the 2006-2007 school year, Defendants did not even write an IEP for M.C." Pl. Br., p. 10. The issue of the 2006-07 school year is addressed in Part H below.

[39] The Parents also reason that it is clear that M.C.'s IEPs were deficient and that she was denied a FAPE because the IHO found that M.C. requires related services, a social skills intervention plan, specific strategies to address her drooling, self help skills, and progress reports on measurable goals and ordered those services. This argument is addressed thoroughly in Part E below.

c) Conclusion on related services

The Court finds that the Parents have not met their burden of demonstrating that the IHO erred in finding that the Parents chose to use private providers for related services rather than services available through SACS. The IHO, the trier of fact present at the hearing, was in the best position to evaluate the credibility of the witnesses and the evidence. The Court must afford the IHO's determination due weight unless other evidence in the record or the record as a whole requires a different conclusion. Given that the evidence related to the years prior to the 2004-05 school year was generally excluded, the testimonial and documentary evidence of record available to both the IHO and this Court is sufficient to support the IHO's finding based on his credibility determinations and weighing of the evidence. In so holding, the Court is cognizant of the indirect nature of the evidence presented to the IHO at the hearing. The Court also recognizes the absence of any evidence describing any related services that would have been provided by SACS had the Parents not chosen their private providers; however, this is logical given the arrangement between the parties.

d) Consent, Waiver, and Supplemental Services

As an argument raised for the first time in their response brief, the Parents invoke the definition of consent in 34 C.F.R. § 300.500(b) and 511 Ind. Admin. Code 7-17-18 (2004) to argue that they could not have consented to or rejected services or therapies about which they were given no information. The definition of consent requires that, in relation to the activity for which consent is sought, the parent be fully informed, agree in writing, and understand that consent is voluntary and may be revoked. As set forth above, while the Parents knew that services were available through SACS, they voluntarily chose to use private related services providers. The definition of

consent is not implicated in these circumstances.[40]  The Parents similarly argue that they could not

have waived a right to related services as waiver is a knowing and voluntary relinquishment of rights

and they did not know what services SACS was offering.  The evidence set forth above supporting

the IHO's determination defeats this argument.  Finally, the Parents argue in their response brief that

nothing prevents a parent from providing private tutoring or therapy to supplement services provided

by the school; the evidence of record supports the IHO's finding that the Parents chose to obtain

related services from their private providers *in lieu of* school services, not as supplemental services.[41]

*4.  Conclusion on Shifting the Burden*

The responsibility for ensuring that a disabled student receives a FAPE and that an IEP is

developed, reviewed, and revised for the student resides with the school district, not the parents.

*See* 20 U.S.C. §1412(a)(1), (4).  For all of the reasons set forth above, SACS did not illegally shift

this responsibility to the Parents.

The Parents cite a number of cases holding that a recalcitrant, uncooperative, or untimely

parent does not relieve a school district of its responsibility to provide a FAPE and that to do so

would be to improperly shift to the parents the burden of providing special education services.  *See*

*M.L. v. Fed. Way Sch. Dist.*, 394 F.3d 634, 649 (9th Cir. 2005) (parents failed to attend IEP

meetings); *A.W. ex rel. Wilson v. Fairfax County Sch. Bd.*, 372 F.3d 674, 683 n.20 (4th Cir. 2004)

---

[40]  The Parents invoke 34 C.F.R. § 300.505(e) (2004) to argue that a refusal to consent to any particular service in one year does not equate to a refusal to consent to all services in all years and cannot constitute a basis for the school to deny services.  However, this is not a case of parents refusing to consent to services; rather, the Parents chose to obtain services through private providers.

[41]  In a footnote to this argument, the Parents allege that it was a false assumption that the Parents would want the same services every year and cite 20 U.S.C. § 1414(d)(4) for the requirement that IEPs must be developed every twelve months to keep current with the student's educational needs.  This argument is misplaced.  The IHO's finding is not that SACS assumed the Parents would want to use the same services every year but rather that there was an ongoing understanding that the Parents would use their private service providers in lieu of SACS providers, which was reconfirmed by the Parents.

(parents trying to exercise "veto power" by refusing to sign an IEP); *Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 765 (6th Cir. 2001) (lack of parental cooperation with school officials); *Seattle Sch. Dist. v. B.S.*, 82 F.3d 1493, 1501 n.4 (9th Cir. 1996) (parent allegedly preventing a doctor from meeting with the student); *Justin G. ex rel. Gene R. v. Bd. of Educ.*, 148 F. Supp. 2d 576, 586 (D. Md. 2001) (delays by parents); *Matthew J. v. Mass. Dept. of Educ.*, 989 F. Supp. 380, 393 (D. Mass. 1998) (parents delayed returning forms to the school); *Briere v. Fair Haven Grade Sch. Dist.*, 948 F. Supp. 1242, 1254 (D. Vt. 1996) (school attempted to blame parent for failure of IEP team to meet); *A.D. ex rel. L.D. v. Sumner Sch. Dist.*, 166 P.3d 837, 847 (Wash. Ct. App. 2007) (school tried to blame the parents). In contrast with those cases, the Parents in this case were not *un*cooperative, dilatory, or untimely; rather, the Parents affirmatively implicated themselves in the education of their daughter and the IEP process to shape her education. SACS accepted the Parents' direct, affirmative involvement (as opposed to the negative impact in the cited cases) in M.C.'s education and accommodated many of their requests to provide M.C. with a FAPE.

### E.  Procedural Violations–Whether M.C. Received a Free and Appropriate Public Education at SACS During the Years at Issue

The Parents argue in their Motion for Summary Judgment that SACS failed to provide M.C. with a FAPE for academic years 2004-05 and 2005-06 because SACS did not include a written offer of services within the four corners of the IEP, SACS failed to develop appropriate IEPs with measurable goals, SACS failed to educate M.C. with scientifically based methodologies, and SACS denied M.C.'s parents meaningful participation in the IEP process. As set forth below, the Court finds that none of these arguments displaces the due weight to which the IHO's determination that M.C. received a FAPE is entitled.

*1. Four Corners*

The Parents argue that SACS failed to make a formal written offer of services within the four corners of the IEP. Citing *Union School District v. Smith*, 15 F.3d 1519, 1525-26 (9th Cir. 1994), the Parents assert that SACS must be held to the related services it formally offered within the four corners of the 2004-05 and 2005-06 IEPs and that M.C.'s IEPs contained only offers of consultative occupational therapy.

In *Union*, the Ninth Circuit held that "a school district cannot escape its obligation under the IDEA to offer formally an appropriate educational placement by arguing that a disabled child's parents expressed unwillingness to accept that placement. The IDEA explicitly requires written prior notice to parents when an educational agency proposes, or refuses, to initiate or change the educational placement of a disabled child." 15 F.3d at 1526 (citing 20 U.S.C. § 1415(b)(1)(C) (1994)).[42] Relying on the importance the Supreme Court in *Rowley* placed on the procedural components of the IDEA, the Ninth Circuit reasoned that the formal requirement of prior written notice should be enforced rigorously because it creates a clear record of when and what placements and related services were offered, if any. *Id.* at 1527. This clear record would, in turn, facilitate the presentation of arguments relating to the appropriateness of an educational placement. *Id.*

*Union* is distinguishable from the instant case because in *Union* the Ninth Circuit found that the program that had been offered in writing by the school was not appropriate and that a program

---

[42] During the years at issue, the cited code section provided:
The procedures required by this section shall include –
. . . .
(3) written prior notice to the parents of the child whenever such agency –
(A) proposes to initiate or change; or
(B) refuses to initiate or change;
the identification, evaluation, or educational placement of the child, in accordance with subsection (c) of this section, or the provision of a free appropriate public education to the child . . . .
20 U.S.C. § 1415(b)(3) (2004).

later asserted by the school to be appropriate had not been formally offered. *Id.* In this case, SACS offered M.C. an IEP and discussed the issue of related therapies at the case conference committee meetings at which the Parents confirmed their choice to obtain private therapies in lieu of the services available through the school. *Cf. N.R. ex rel. B.R. v. San Ramon Valley Unified Sch. Dist.*, No. C 06-1987 MHP, 2007 WL 216323, at *12 (N.D. Cal. Jan. 25, 2007) (differentiating that case from *Union* on the basis that in *Union*, there had been a failure to make any formal offer whatsoever whereas the school in *N.R.* had made every effort to include the parents in the formulation of the IEP and had provided previous written offers while working together). Based on the extrinsic evidence set out in detail in Part D above, the private related services that M.C. received (and that the Parents are now trying to replace with the unilateral placement) is the very program that the Parents sought in lieu of services available through SACS. *See John M. v. Bd. of Educ.*, 502 F.3d 708, 715 (7th Cir. 2007) (holding that under usual circumstances, it is unnecessary to go beyond the four corners of a document to determine whether a certain methodology is required but that if there is vagueness in the instrument, the court may turn to extrinsic evidence because it would exalt form over substance to ignore information known to parents simply because it was not contained in the four corners of the document) (citing *Doe v. Defendant I*, 898 F.2d 1186, 1190 (6th Cir. 1990)); *Z.F.*, 2005 WL 2373729, at *18 (noting that "[c]ourts have upheld IEPs where the IEP itself did not contain necessary information so long as all necessary parties possessed the required information" but declining to allow extrinsic evidence to modify the explicit terms of the IEP in that case).[43]

---

[43] To the extent the Parents are alleging a violation of the written notice requirement under 20 U.S.C. § 1415(b)(1)(C) (2004), 34 C.F.R. § 300.503(a) (2004), and 511 Ind. Admin. Code 7-22-2(a) (2004), as a procedural violation and to the extent the argument is even applicable to these circumstances, this argument was not raised in the administrative proceedings and is not before the Court. *See* Pl. Reply, p. 17.

In the unique circumstances of this case, the failure to include a written offer of related services that were available through SACS or to include in the IEP the services that would be provided to M.C. by her private providers did not impede M.C.'s right to a FAPE, did not significantly impede the Parents' opportunity to participate in the decision making process regarding the provision of a FAPE to M.C., and did not cause M.C. a deprivation of educational benefits. This holding in no way lessens the sound reasoning in *Union* that a written offer of services makes a clean record, which allows a hearing officer and a court to assess whether an offered educational program is appropriate, nor does it lessen the sound reasoning of *Z.F.* and *John M.* that the explicit terms of an IEP may not be modified by extrinsic evidence.

2. *Sufficiency of the IEPs–Present Levels of Performance, Measurable Goals and Objectives, and Statement of Needs*

In Count I of the Amended Complaint, the Parents allege that the IHO should have found that SACS' failure to write measurable goals and objectives in her IEPs denied M.C. a FAPE. An IEP is a written statement that includes, among other things, a statement of the child's present level of educational performance, a statement of measurable goals, and a statement of the special education and related services and supplementary aids and services to be provided to the child. *See* 20 U.S.C. § 1414(d)(1)(A)(i)-(iii) (2004) (current version at 20 U.S.C. § 1414(d)(1)(A)(i)(I)-(IV) (2008));[44]

---

[44] Specifically, the IDEA provided during the years at issue that the IEP must contain
(i) a statement of the child's present levels of educational performance, including--
    (I) how the child's disability affects the child's involvement and progress in the general curriculum; or
    (II) for preschool children, as appropriate, how the disability affects the child's participation in appropriate activities;
(ii) a statement of measurable annual goals, including benchmarks or short-term objectives, related to--
    (I) meeting the child's needs that result from the child's disability to enable the child to be involved in and progress in the general curriculum; and
    (II) meeting each of the child's other educational needs that result from the child's disability;
(iii) a statement of the special education and related services and supplementary aids and services to be provided to the child, or on behalf of the child, and a statement of the program modifications or

511 Ind. Admin. Code 7-27-6 (2004) (current version at 511 Ind. Admin. Code 7-42-6 (2008)). The Parents argue that M.C.'s IEPs do not satisfy the IDEA because they do not state her present level of performance for each goal, lack measurable objectives, and fail to address all her areas of need.

a) Areas of need–related services

Having just addressed the question of related services, the Court begins with the last argument first, that M.C.'s IEPs were inappropriate because they did not address all her needs. In one paragraph, the Parents note that the IHO found it "undisputable" that M.C. needs speech therapy and occupational therapy and then assert that M.C. requires not only speech therapy and occupational therapy but also physical therapy, vision therapy, social skills training, self-help skills, assistive technology, adapted physical education, scientifically-based methodologies, a behavioral intervention plan, and an intensive, year-round program. The Court addresses each in turn.

(1) Speech, occupational, and vision therapy

For speech, occupational, and vision therapy, the Court has already given due weight to the IHO's determination that SACS did not fail to provide these related services on the basis that SACS offered to provide the therapies during the school years at issue but that the Parents chose instead to utilize private practitioners. Although the IEPs should have included a written statement as to the private services that would be utilized, the failure to include this information did not deny M.C. a

---

supports for school personnel that will be provided for the child--
    (I) to advance appropriately toward attaining the annual goals;
    (II) to be involved and progress in the general curriculum in accordance with clause (i) and to participate in extracurricular and other nonacademic activities; and
    (III) to be educated and participate with other children with disabilities and nondisabled children in the activities described in this paragraph; . . . .
20 U.S.C. § 1414(d)(1)(A) (2004).

FAPE, did not deny her parents a meaningful opportunity to participate, and did not cause M.C. a deprivation of educational benefits.

(2) Self-help skills and social skills training

Grouping them together, the Parents contend that M.C. needs self-help skills and social skills training and that SACS provided neither.

Regarding self-help skills, the IHO found that SACS did not fail to provide self-help skills training as required for M.C. For 2004-05, the IHO noted the limited amount of time M.C. was in the public school; for 2005-06, the IHO found that "more attention was addressed toward developing improved self-help skills" and that interventions included instruction in the areas of daily living, organizational skills, monitoring swallowing, monitoring drooling, and following daily schedules. AR 3941-42. He also noted that there was some testimony that personal hygiene was addressed. However, the IHO did find that, although SACS did not fail to provide self-help skills, M.C. could benefit from increased self-help training.

In the 2004 evaluation, the Occupational Therapist reported that M.C. needed to work on developing independent work habits, using class time efficiently, organization, set up and clean up at lunch, clothing management, and awareness of her drooling. The 2005 evaluation indicated that M.C. should work on using adapted clothing fasteners, using memory assistance strategies, and independence within the school setting. The 2006 evaluation indicated that M.C. needs independence in the cafeteria, to maintain attention to task, to work on personal care and hygiene, social awareness regarding her drooling, and to write more neatly and learn keyboarding skills.

Independence was addressed in M.C.'s 2005-06 IEP as one of seven self-help goals or objectives. In her testimony, M.C.'s TOR noted goals in the 2005-06 IEP related to self-help,

stating, "attending all classes with needed materials, being on time to class, independently caring for her own belongings, personal hygiene, drinking the water, they all fall under self-help skills." AR 972. The TOR also testified that M.C. was taught "money skills" during functional math class and that she spent a lot of time assisting M.C. with her orthotic device and by "end of the school year" she was able to put it in and take it out "all on her own." AR 973, 978-79. Generally, the TOR testified that "self-help skills . . . were [taught] as they occurred all day long." AR 973-74. She then testified:

> So we went through the lunch line with her, worked on her locker, worked on her organizing her personal belongings. We worked on personal hygiene with her. Worked on wearing proper undergarments to school. Feminine products we needed to deal with [M.C.]. Some of the personal hygiene. There were times when, you know, just making sure that she had worn deodorant to school and different issues like that. It just happened throughout the day when things came up, we addressed those issues as we needed.

AR 974-75. She also testified that M.C. is a "very good self-advocate." AR 979. During the 2005-06 school year, although not a specific goal listed on the IEP, the self-help skill of opening her locker was addressed by SACS, but M.C. was never able to accomplish this. In April 2006, the Occupational Therapist reported that at SACS, M.C. had limited success using a keyboard, which was worked on with M.C. by the Occupational Therapist and M.C.'s TOR during the class period that M.C. spent in the special education classroom.

As for social skills training, the IHO concluded that this was an area of strength for M.C., finding that she was motivated to interact with her peers, received significant positive reinforcement from those interactions, and initiated social contact. He noted that the greatest detriment to her social interactions was her drooling.[45] The IHO held that it was apparent "that all school personnel

---

[45] Management of M.C.'s drooling is addressed in Part F, *infra*.

assisting with [M.C.'s] education were aware of her need for social interaction with others and provided such opportunities to the extent [M.C.'s] schedule and personal strengths and weaknesses would permit." AR 3947-48. He observed that there were no instances in which the Parents requested social skills training.

In the 2001 evaluation, the Occupational Therapist strongly recommended that efforts be made to improve other students' acceptance of M.C. and commented that M.C. is not aware that she is not accepted unless it is blatant. During the 2003-04 school year in elementary school, M.C. was excluded from eating with her classmates in the cafeteria because she drooled.

In the July 14, 2004 evaluation, the Occupational Therapist wrote: "[M.C.]'s areas of strength: Social participation–[M.C.] is a very charming girl. She was confident in talking with the psychologist whom she had just met the day before nor did she have difficulty relating to this therapist. She demonstrated dance steps without hesitation during one break." AR 2799. "Socially [M.C.] so wants to be accepted that she will be more affectionate with other students than is acceptable." *Id.* The Occupational Therapist also listed social skills as an area for M.C. to work on. On July 20, 2004, the School Psychologist wrote: "Overall, [M.C.] presented a cooperative and pleasant affect during the evaluation sessions. She appeared to enjoy engaging in conversational communication with the examiners and relating personal experiences and interests." AR 2816.

M.C.'s 2004-05 IEP indicated that M.C. "has a wonderful sense of humor. She also enjoys her peers, and also has very good relationships with teachers and other adults." AR 2826. A case conference committee meeting summary with the IEP Addendum from January 18, 2005, provided: "She gave her first presentation ever to the Soc. St. Class last week." AR 2858.

The following year, the Occupational Therapist wrote in June 2005 that "[M.C.] has been observed to like age-appropriate popular interests. Her attitudes were typical for her age group. She was socially selective and conversed with a few peers using gestures and one to two words at a time." AR 2870. "During this year, [M.C.] sought adult assistance when some boys on her bus teased her. Working with the school counselor, she confronted the boys face to face and the situation was resolved successfully." *Id.* She reported that, during the year, M.C. attempted to interact with students whom teachers perceived did not want to interact with her but M.C. rejected students who were more accepting of her.

On June 30, 2005, M.C.'s teachers made written observations. Barbara Beckman wrote, "[M.C.]'s strengths include a desire to be at school, to be independent, and a desire to learn. She is confident and wants to make friends." AR 2898. "[M.C.] wants friends and may work well with a student, a peer tutor, or a small group of carefully chosen students." AR 2899. Joan Ross wrote, "She loves to socialize and be around people her own age." AR 2902. "She wanted to relate to her classmates, but was unable to make herself understood." AR 2901. On July 27, 2005, the School Psychologist wrote in the psychoeducational evaluation that, because M.C. has an "increased level of motivation when working within a similar-aged peer group, in this writer's opinion, she is likely to be encouraged to develop and apply learned skills . . . that will increase her acceptance and involvement amongst her peers." AR 2919. The August 19, 2005 IEP provides: "[M.C.] has a good repoir[sic] with her teachers and staff. She is very sociable and loves to be around her peers. She does like to work in groups with her peers." AR 2926. The August 19, 2005 case conference committee meeting summary stated that M.C. had a "[s]trong desire to be social." AR 2940. Peer interaction was addressed in the 2005-06 IEP as a goal.

In the 2006 evaluation, the School Psychologist noted that M.C. had difficulty sustaining relationships with other students, although she continued to desire and be highly motivated by social interaction with others. She also indicated that M.C. had established some peer relationships. In June 2006, the Occupational Therapist reported:

> Positive interaction skills, following school rules, behavior regulation are areas of strength. She continues to improve social interactions and is actively working to improve her speech clarity when she interacts with peers at lunch. [M.C.] continues to work with the school counselor for assistance with social issues. During the past school year, [M.C.] has made attempts to interact with students who will be more likely not to reject her (improvement); she appears to have improved awareness for true friendships.

AR 3072. The Occupational Therapist recommended consultative occupational therapy services. She also wrote that M.C. should be dissuaded from permitting peers to know her locker combination. She indicated that "[w]hen M.C. wants to express affection toward a peer, she may attempt to hug and she is not always aware of how her drooling affects her social relationships." AR 3073. The TOR testified, "During the '05/06 school year we really saw the socialization come out with [M.C.]." AR 987.

In June 2006, M.C.'s teachers again made written observations. M.C.'s TOR wrote that "[s]ocial interaction is a definite strength for M.C. She enjoys group activities and being in classes with other students." AR 3081. She also wrote that M.C. "[l]ikes to be involved in different things. She likes music and soccer. She has attended most of the school dances offered this past school year." *Id.* "[M.C.]'s main focus at this time is her social interactions with other students." AR 3082. Carter (the mild disabilities teacher for basic language) wrote that M.C. "enjoys participating in class discussions and being involved with her peers" and that "[i]t is difficult for others to understand [M.C.]'s speech and to communicate with her." AR 3083. Kris Kirby (the mild

disabilities teacher for basic math) wrote that M.C. "is a people person and loves to interact with others," "loves to be around other people," and "is a pleasure to work with. She has a great sense of humor and is a hard worker." AR 3085-86.

At the hearing, M.C.'s TOR testified that M.C.'s "socialization was definitely a strength for her." AR 986. The School Psychologist stated that M.C.'s social skills are "at least commensurate and in some ways stronger than" her cognitive level. AR 1227. Specific examples of M.C.'s social interactions were presented such as passing notes to other kids (the teacher recalled that at least on one occasion another student passed a note back), sitting with the same group of students at lunch, attending almost every dance, giving presentations, wanting to ride the bus, walking arm in arm with another student, choosing to run for student council (which was her own idea), using a cellular telephone, using an iPod, and–as articulated by the School Psychologist–M.C.'s ability to "show interest in others as well as interest in herself" and be "socially aware and socially interactive." AR 1220.

The School Psychologist gave an example of a day after school when she was impressed by M.C. socially. M.C. made a phone call and then came over to a group of students and "moved back into the circle with her . . . sister. She was engaged, but not to a significant degree, but she was not turned away from the peer group." AR 1227. The School Psychologist indicated that M.C.'s brother had put phone numbers on her phone for her, that she did not know whether they were really people M.C. could contact or not, but that M.C. knew how to filter through the names. M.C.'s TOR considered a single exchange conversation (saying "hello") to be a reciprocal relationship.

M.C.'s mother testified that M.C. cried hysterically after each dance; her mother believed that it was because M.C. had come face to face with the fact that she was different. She testified that

M.C. told her that, in an attempt to get a boy to dance with her, M.C. wrote a note at school that she was "a whore, a slut, and a nigger." M.C. told her mother that the school guidance counselor took the note, but M.C.'s mother testified that the counselor did not contact M.C.'s parents about it. M.C. has been excluded by her regular education peers at social events and in the cafeteria. M.C.'s father testified that in many ways, M.C. lives in a make-believe world and fantasizes over friends, boyfriends, and true relationships.

The Parents' expert witnesses testified that, although M.C. wants friends, her social interactions with peers are unsuccessful. According to Swenson, the director of FWCL, M.C. fantasizes that she has friends, and Swenson testified that she is not aware of any specific reciprocal social interactions for M.C. in the public school. Swenson stated that M.C. would cry at FWCL because Woodside peers did not reciprocate her social overtures. Dr. Savage testified that M.C. is in danger in the community if she is not taught social skills, self advocacy, and safe people to be with and that she is also at risk for depression. Dr. Savage opined that neither IEP provides necessary social skills support. Both Dr. Fisher and Dr. Savage recommended that M.C. receive social skills training. The School Psychologist testified that no one to her knowledge from SACS worked with M.C. on facial expressions, facial cuing, body language, or interaction skills.

In his decision, the IHO held that M.C. did not require social skills training and that SACS provided effective assistance with self-help skills. He then ordered an informal evaluation regarding her social skills strengths and weaknesses to form the basis for interventions to be developed by the case conference committee and ordered SACS to establish goals and objectives for personal hygiene and self-help skills to be determined by the committee. Although more self-help skills should have been included in M.C.'s IEPs, the record supports the IHO's conclusion that the procedural

deficiency did not deny her a FAPE as she still received the training. However, there is support in the record for the Parents' position that M.C. requires social skills training even though this is an area of strength for her. Nevertheless, the failure to include specific goals for social skills training in her IEPs did not deny her a FAPE; the record evidence demonstrates that M.C.'s social strengths positively impacted her ability to receive educational benefit.

(3)  Assistive technology

The Parents argue that SACS failed to provide M.C. with assistive technology. An "assistive technology device" was defined as "any item, piece of equipment, or product system, whether acquired commercially, modified, or customized, that is used to increase, maintain, or improve the functional capabilities of a student with a disability." 511 Ind. Admin. Code 7-17-5 (2004) (current version at 511 Ind. Admin. Code 7-32-7 (2008)). It appears that the main issue regarding assistive technology is the use of a computer keyboard as opposed to writing by hand.

The 2004-05 IEP concludes that M.C. has no assistive technology needs, and the 2005-06 IEP indicates that she does have assistive technology needs but there is no indication of a review of those needs or a provision of services. The psychoeducational evaluation in the summer of 2005 noted that "an assistive technology evaluation and subsequent use of computer technology" had been recommended but was "not a direction wished to be pursued by [M.C.]'s parent." AR 2918. The 2004 occupational therapy evaluation provides that M.C.'s TOR said that "computer use was not allowed by [M.C.]'s parents," AR 2798, but the TOR testified that she was unsure how much M.C. used the computer at school and admitted that M.C.'s parents had not actually prohibited computer use. M.C. did use a dynavox, an assistive technology speech device that includes a keyboard, purchased by her parents in 2002. When the Parents consented to keyboarding instruction prior to

the 2005-06 year, occupational therapy services for keyboarding were added to the IEP and provided during the beginning of the year. Following that year, the Occupational Therapist wrote that she would "continue to work with the teacher to determine effective methods for learning keyboarding skills or assistive technology options." AR 970-71, 3073. The IHO found that "[t]he School wanted to teach keyboarding as an essential skill regarding the use of computer and other technology," but the "Students' parents, on advice from the staff at FWCL did not want keyboarding taught, but rather demanded that the Student be forced to use cursive handwriting instead." AR 3927. The IHO's findings are entitled to due weight.

    (4)  Adapted physical education, scientifically-based methodologies, behavior intervention plan, and intensive, year-round programming

Whether SACS failed to conduct an evaluation for adapted physical education or provide M.C. with adapted physical education was not an issue before the IHO and is not before this Court. Similarly, whether M.C. required physical therapy was not an issue raised before the IHO. Whether SACS failed to use scientifically based methodologies is addressed in Part E.3 below. Whether SACS should have developed a BIP is addressed in Part F below.

Finally, the Parents argue that M.C. requires intensive, year-round academic programming. Dr. Savage opined that M.C. requires a year-round program of a minimum of eleven months. For the years at issue, the only extended year program under consideration is summer 2005. In summer 2005, SACS paid for four weeks of extended year services for M.C. at FWCL, the provider requested by M.C.'s Parents. Other than Dr. Savage's opinion regarding M.C.'s education generally, the Parents have not offered any evidence or reasoning that the extended school year services M.C. received in summer 2005 were not adequate.

b) Goals and present levels of performance

As defined by the IDEA and required under Indiana regulations, an IEP includes, among other things, "a statement of the child's present levels of educational performance" (including how the student's disability affects the student's involvement and progress in the general education curriculum) and "a statement of measurable annual goals, including benchmarks or short-term objectives" (related to enabling the student to participate in the general education curriculum and meeting each of the student's other educational needs that result from the student's disability). *See* 20 U.S.C. § 1414(d)(1)(A)(i), (ii) (2004) (current version at 20 U.S.C. § 1414(d)(1)(A)(i)(I),(II) (2008)); 511 Ind. Admin. Code 7-27-6(a)(1), (2) (2004) (current version at 511 Ind. Admin. Code 7-46-6(f)(1), (2)(2008)).[46] The Parents argue that SACS failed to provide M.C. with a FAPE because the IEPs do not contain measurable goals and do not indicate present levels of performance for the listed objectives.

In his decision, the IHO held that SACS failed to provide measurable goals and objectives in M.C.'s IEPs in each area of identified need but that this procedural failure did not impede her right to a FAPE, significantly impede the Parents' opportunity to participate in the decision making process regarding the provision of a FAPE, and did not deny M.C. educational benefit. AR 3944-45. First, considering whether the IEPs contained a statement of annual goals in each area of identified need, the IHO found that they did not only as to the related services that M.C. was receiving through private providers. The IHO found that SACS was relieved of developing those goals and objectives for related services in the IEPs because the Parents had chosen the outside providers instead of

---

[46] The enactment of the IDEIA, effective July 1, 2005, did not change the language of 20 U.S.C. § 1414(d)(i), (ii). Similarly, the components of an IEP remained set out in 511 Ind. Admin. Code 7-27-6(1), (2) during the years at issue.

school-based services and did not request the inclusion in the IEPs of goals for the outside service providers. Second, the IHO addressed whether the goals that were included in the IEPs (goals for academics and self-help skills) were measurable. The IHO found that each included goal was capable of being measured and that SACS did provide some documentation that such measurement occurred. However, he also found that whether each of the goals or objectives could have been measured by an objective process was in question and several goals are in need of more specificity, including "the important conditions under which [M.C.'s] performance will be assessed, the performance or performances [M.C.] must demonstrate so that achievement can be adequately measured, the criteria for success that will be employed to measure relative attainment of the objective, and the methodology to be used to measure each goal or objective." AR 3945.

In arguing that the IHO should have found a denial of a FAPE, the Parents reason that, "[o]mitting present levels of performance, a statement of specific services to be provided, evaluation procedures for goals, and objective measurement criteria from an IEP is not a harmless or technical error, but goes to the heart of the IEP and is a violation of FAPE." Pl. Br., p. 18.

First, the argument that the IEPs did not contain a statement of the specific related services to be provided M.C. by her private providers is addressed above in Part D.

For present levels of performance, the Parents contend that the 2004-05 IEP does not indicate present levels of performance for any goal, and that the goals on M.C.'s 2005-06 IEP either state that pre and post testing will be done, without indicating any current level, or include no reference at all to a present level of performance. Although she was in the public school for only ninety minutes a day, M.C.'s 2004-05 IEP contains a two-page discussion of her performance under the heading "Present Levels of Performance," which lists her strengths and areas of concern and specifically

94

references the results of her ISTEP and NWEA scores as well as the July 2004 psychological report. AR 2825-27. The psychological report in turn incorporates the occupational therapy evaluation from July 2004. At the September 30, 2004 case conference committee meeting, SACS' Director of Special Education noted that the goals and objectives of FWCL "will not be added to the IEP since it is the responsibility of the Center for Learning to assist [M.C.] to master." AR 1741. In the 2005-06 IEP, the section entitled, "Present Levels of Performance" provides that "[M.C.] was tested this past summer to determine progress that was achieved with this educational placement that was followed during the 2004-05 [sic]. The testing that took place showed very little to no progress in many areas." AR 2927. The 2004 and 2005 occupational therapy and psychoeducational reports are lengthy and contain the results of a battery of evaluations conducted each summer along with detailed written opinions by the professionals. SACS' reliance on these reports is in keeping with the School Psychologist's warning against summing up M.C.'s abilities with standardized test scores and other courts' rejection of basing present levels of performance on a single "broad, composite score." *See Evans v. Bd. of Educ.*, 930 F. Supp. 83, 96 (1996) (noting also that the test score was ten months old).

Next, the Court considers the IHO's determination regarding the measurability of the IEPs' goals. The 2005-06 agreed IEP contained eight goals and a total of 59 objectives within those goals.[47] An example of one of the objectives for the Functional Language Skills goals was "Increase

---

[47] The goals were: (1) Increase Language Arts skills of reading and writing by nine months as shown by pre and post testing (eight objectives); (2) Increase Math skills by nine months as shown by pre and post testing (seven objectives); (3) Increase Functional Math skills by nine months as shown by pre and post testing (eight objectives); (4) Increase Functional Language skills by nine months as shown by pre and post testing (eight objectives); (5) Achieve success in general education classes with support from special education (eight objectives); (6) Increase personal management skills in all areas (seven objectives); (7) Achieve success in Social Studies by meeting the following modified state standards for 7th grade (seven objectives); and (8) Achieve success in Science by meeting the following modified state standards for 7th grade (seven objectives). AR 2930-37.

writing by maintaining a journaling activity at instructional level," AR 2933, and an objective for Functional Math Skills was "Increase math skill of number sense at instructional level," AR 2932. Every nine weeks, school personnel rated M.C. in all 59 areas with one of five evaluation codes: mastered, introduced, emerging, progressing, no opportunity. Most of the ratings were as "progressing" or "emerging" with a few "introduced" and a few "mastered" (in the personal management skills area). The IEP goals propose that M.C. will increase her reading, writing, math, and language skills by nine months in one school year. Some of the goals indicate that pre and post testing will be done, without indicating M.C.'s current level, or include no reference at all to a present level of performance.

The Parents argue that the five evaluation criteria are meaningless, asking what it means to be "emerging" at exploring use of technology programs at instructional level. *See* AR 2933. They also contend that goals for achievement at "instructional level" were vague rather than clearly stating the progress expected for M.C. by the end of the school year. Dr. Savage opined that the 2004-05 IEP was not sufficient to provide M.C. appropriate instruction in social studies and science and was not comprehensive enough to meet M.C.'s functional and learning needs. He also opined that many assignments M.C. completed, including an assignment about Newton's Law of Gravity, were inappropriate and should have been modified or not presented to M.C. at all. M.C.'s mother testified that some of the 2004-05 IEP goals were above M.C.'s level. M.C.'s test scores indicate that she understands math at an approximate first grade level. M.C.'s mother opined that a problem with the 2005-06 IEP is that it does not state how instruction will be delivered. No methodologies are written into M.C.'s IEP, nor is there incorporation of systematic research based programs. The Director of Special Education indicated that methodologies are not usually in an IEP.

As additional arguments, the Parents contend, without analysis, that M.C.'s 2005-06 IEP does not indicate what modifications will be made for her, does not state the number of special education minutes, and indicates both yes and no that diploma and certificate tracks were discussed. Pl. Br., p. 17. First, the IEP specifically sets forth "accommodations/modifications/special factors to consider" for each of the goals in her 2005-06 IEP. *See* AR 1806-13. Second, the IEP indicates that the LRE for M.C. is for a special education classroom for part of the day ("Resource Room (21-60%)"), with a regular classroom ("Regular Class (0-20%)") not providing enough support and a separate class ("Separate Class (61-100%)") or other more restrictive options being too restrictive. AR 2928.[48] Third, the Parents identify no harm resulting from the fact that both "yes" and "no" are checked next to the question, "Have diploma and certificate tracks been discussed." AR 1804.

The Parents also state that SACS wrote goals for nine months' progress in a year's time and wrote goals for algebra, data analysis, probability and other goals that M.C. would not attain. The Parents offer no analysis for the neutral observation that SACS wrote goals for nine months' progress in a year's time to demonstrate why this might be inappropriate for M.C. As noted by the Parents, it is advisable and in accordance with the law to set high expectations for a student with a disability. *See* 20 U.S.C. 1400(c)(5) ("Almost 30 years of research and experience has demonstrated that the education of children with disabilities can be made more effective by . . . having high expectations for such children."). As for the goals such as algebra, the state-wide Indiana

---

[48] More specifically, the IEP indicates she would have no general education classes with no support, she would have special education with pull-out support for "Basic LC Math," "Basic LC Language Arts," "Functional Math/Functional Language Arts," and "Study Hall," and that she would have general education with plug-in support in "science," "social studies," an "elective," and "Seventh Grade Rotations" (with a handwritten note stating "reflects parental requests for modification"). AR 2928.

kindergarten standards include most of those goals,[49] and the Director of Special Education testified that algebra, geometry, data analysis, and probability under the standard curriculum were not appropriate for M.C. but that a given topic can transcend many grade levels when using a different grade level standard such that a topic in geometry, for example, can be taught at different grade levels.[50]

Finally, the Court turns to the Parents' contention that the IHO only considered whether the procedural violation impeded parental participation without evaluating the IEPs' defects under the substantive prong of *Rowley*. Notably, the Parents do not revisit this argument in their reply brief. Although a violation of the IDEA, a failure to include measurable goals, like other procedural defects, does not amount to a denial of a FAPE unless it also significantly impedes the parents' opportunity to participate in decision making regarding the provision of a FAPE, impedes the student's right to a FAPE, *or* causes a deprivation of educational benefits to the student. *See* 20 U.S.C. § 1415(f)(3)(E)(ii); *see also Doe v. Defendant*, 898 F.2d 1186, 1190 (6th Cir. 1990) (finding that the statutory requirements for an IEP, such as present levels of performance, are procedural requirements but that to say that a technical violation renders an IEP invalid is to exalt form over substance); *Virginia S. v. Dept. of Educ.*, Civil No. 06-00128, 2007 WL 80814, at *3, 9 (D. Haw. Jan. 8, 2007) (noting that a lack of measurable goals and objectives would be a procedural violation that would require a denial of substantive rights to constitute a denial of a FAPE but finding that the

---

[49] The state-wide Indiana kindergarten math standard includes "Algebra and Functions" and "Geometry" and the learning skills of "Communication" and "Representation" address reading, comprehending, and understanding "data." There is no reference to "probability" in the kindergarten standard.

[50] At the hearing, the School Psychologist testified that M.C. would never pass the ISTEP math test and that algebra, data analysis, and probability are not relevant areas of instruction. SACS' expert, Dr. Couvillion, opined that it would be "cruel" and unsuccessful to expect M.C. to read, write, and do math at a level to pass the ISTEP and graduate and that it would be cruel to expect her to learn algebra. Dr. Fisher testified that M.C.'s 2005-06 IEP goals are not appropriate because instruction and objectives are not broken down in a manner M.C. can learn.

goals were measurable and appropriate); *G.N. v. Bd. of Educ.*, Civil Action No. 05-3325(JAG), 2007 WL 2265035, at *7 (D.N.J. Aug. 6, 2007) (holding that a complete failure to include goals and objectives violates the IDEA but that to equate the failing to a denial of a FAPE "would be elevating form over substance"); *Kevin T. v. Elmhurst Cmty. Sch. Dist. No. 205*, No. 01 C 0005, 2002 WL 433061, *8 (N.D. Ill. Mar. 20, 2002) (stating that whether procedural violations of vague and unmeasurable goals denies a FAPE turns on the "central question . . . whether . . . the IEPs were reasonably calculated to confer sufficient educational benefits" and whether other procedural violations such as failing to assess for assistive technology and offer extended school year services deny a FAPE turns on whether they resulted in a loss of educational opportunity).

In this case, the IHO applied the correct standard and explicitly held that the failure to include measurable goals not only did not significantly impede parental participation but *also* that it did not impede M.C.'s right to a FAPE or cause M.C. a deprivation of educational benefit. Other than addressing the alleged inadequacies of the goals (as discussed above) and making the broad statement that the failure to include the goals goes to the heart of the IEP, the Parents have not met their burden of demonstrating that this procedural defect amounts to a denial of educational benefit.

The evidence supports the IHO's determination that, although the IEPs contained goals with some level of measurability, the measurability was insufficient and lacked specificity in a number of ways. However, the IHO is entitled to deference in his determination that notwithstanding these noticeable procedural failures related to present levels of performance and goals, M.C. was not denied educational benefit. In this case, all of M.C.'s educational providers at SACS and her Parents worked together to develop and implement the IEPs for the programs and goals set forth therein. *See Leticia H. v. Ysleta Indep. Sch. Dist.*, 502 F. Supp. 2d 512, 518 (W.D. Tex. 2006) (finding that

procedural deficiencies in therapy goals did not deny a FAPE because the parents, teachers and therapists all worked collaboratively to develop and implement the Student's IEP). As noted earlier, SACS considered and implemented many of the Parents' suggestions and those of their outside providers. M.C.'s mother said that "Woodside is doing a very good job with [M.C.]." AR 2976. Therefore, the Court finds that the IHO's decision is supported by the record and that this is the sort of determination for which the IHO's educational expertise is entitled to deference. *See Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 382 (2d Cir. 2003) ("[T]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers.").[51] In light of the procedural defect, the IHO appropriately ordered that SACS

> ensure that specific, measurable goals and objectives are included in [M.C.'s] IEP that address each area of need as determined by the case conference committee. All goals and objectives shall include performance based terms that describe those behaviors and academic tasks [M.C.] is expected to perform, the conditions under which [M.C.] is expected to perform each goal or objective, and the criteria for measuring [M.C.'s] achievement toward mastery of each goal and objective contained in this revised IEP.

AR 3959.

Finally, throughout their briefing, the Parents repeat their rhetorical mantra of "How can the IHO find that [SACS] did not fulfill its obligations in crafting required components of the IEP, but still provide FAPE?" AR 4995 (Parents' brief to the BSEA); *see, e.g.*, Pl. Resp., p. 3 ("Without

---

[51] In support of their argument, the Parents cite *Cleveland Heights-University Heights Sch. Dist. v. Boss*, 144 F.3d 391, 398-99 (6th Cir. 1998), for the proposition that technical violations are not harmless and go to the heart of the IEP. However, in *Cleveland Heights*, the Sixth Circuit reaffirmed the findings of the state administrative officers and the district court that the violations *in that case* were far from technical and not harmless and that the omission *in that case* went to "the heart of the substance of the plan." *Id.* at 399. In contrast, the IHO in this case, affirmed by the BSEA, found that the technical violations did not deny M.C. educational benefit or her parents parental participation. Significantly, the Sixth Circuit in *Cleveland Heights* found the IHO's decision amply supported by the record and found no basis for reversing given the due weight standard which "militates against second guessing the educational expertise of the administrative officers and conclusions predicated upon these expertise." *Id.*

speech therapy, an occupational therapy intervention plan, vision therapy, a behavior plan and measurable goals, M.C.'s IEP clearly was not reasonably calculated to confer educational benefit on M.C."); Pl. Resp., p. 15 ("In this case, the IHO found that M.C. needed speech therapy, OT, a social skills intervention plan, a plan to address drooling and measurable goals. Clearly the substantive contours of M.C.'s 2004-05 and 2005-06 IEPs did not confer educational benefit, because these issues were not even addressed in M.C.'s IEPs"); Pl. Br., p. 28; Pl. Reply, p. 8. This ignores the law that a procedural violation that does not also deny the student educational benefit or deny parental participation does not, in and of itself, constitute a denial of a FAPE.

*3. Scientifically Based Methodology*

The provisions of the IDEA in place during the 2004-05 school year did not address peer-reviewed research related to the methodology used with a disabled student as part of the student's IEP. However, the 2005-06 academic year was governed by the reauthorized IDEA, which provides that an IEP must include

> a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child . . . .

20 U.S.C. § 1414(d)(1)(A)(i)(IV).[52] Various congressional findings underlying the reauthorized IDEA support the use of scientifically based instructional practices. *See* 20 U.S.C. § 1400(c)(5)(E), (F).

---

[52] *See supra* note 44 for the text of comparable section of the IDEA, 20 U.S.C. § 1414(d)(1)(A)(iii) (2004), for the 2004-05 school year.

At the administrative hearing, the IHO had before him the issue of whether SACS failed to use scientifically based, peer reviewed methods of instruction when implementing the goals and objectives contained in M.C.'s IEPs. Answering the inquiry in the negative, the IHO held that

> . . . the School . . . selected instructional materials that are respected throughout the special education fraternity, are in frequent use nationally, and which have a substantial research base. Additionally, these materials were appropriately modified by experienced, well trained, licensed teachers as deemed appropriate to meet the individual needs of [M.C.]. Additionally, the instructional methodologies used to instruct [M.C.] while using selected curricula were those known to be effective as supported by numerous national publications and the preponderance of research in the field.

AR 3934. He also found that "the School incorporated what is commonly referred to as 'best practices' as it instructed [M.C.] toward attainment of the goals and objectives contained in [M.C.'s] IEPs during the 2004-2006 and 2005-2006 school years." AR 3935. The BSEA upheld this determination. The BSEA also found that, to the extent the Parents are expressing a preferred methodology when SACS' methodology is appropriate to M.C.'s needs, there is no right to compel the parent-preferred methodology.

In Count VI of the Amended Complaint and on summary judgment, the Parents argue that SACS failed to use scientifically-based, peer reviewed methods with M.C. during the years at issue, the strategies used were not individualized, the IHO used an incorrect standard of scientifically based methodologies, and the BSEA's reliance on *Lachman v. Illinois State Board of Education* in support of its decision was misplaced.[53] SACS responds that the evidence demonstrates that it

---

[53] In support of this argument, the Parents invoke the definition of "scientifically based research" set forth in the No Child Left Behind Act. Despite the fact that the Parents never invoked this definition in their arguments to the IHO, the special education regulation adopting that definition of "scientifically based research" was not effective until October 13, 2006. *See* 34 C.F.R. § 300.35 (2006) ("Scientifically based research has the meaning given the term in section 9101(37) of the ESEA"); 71 FR 46540-01 (published August 14, 2006, indicating an effective date of October 13, 2006).

educated M.C. with scientifically based methodologies, specifically Project Read and Touch Math, by well trained professionals and that the authority cited by the BSEA is still good law.

a)  Scientifically based methods used by SACS

First, the evidence of record supports the BSEA's finding that M.C. was consistently provided scientifically based instruction, and the Parents have not met their burden of proving otherwise.  For litigation, SACS submitted a list of strategies used with M.C. that was created by M.C.'s TOR and other teachers and the Director of Special Education.  The Parents question the veracity of the list based solely on the fact that it was created in fall 2006 after litigation began; however, the Parents offer no evidence that any of the strategies were not actually used with M.C. other than to note that the list of accommodations prepared by the School Psychologist in her report written before the hearing was much more limited.[54]  This is a credibility issue best resolved by the IHO, and the Court will not overturn his findings.

According to M.C.'s TOR, who taught M.C. functional math and language, many of the strategies she used to teach M.C. were practical strategies already being used with most children.  From this, the Parents reason that the methods used with M.C. were not "individualized."  The issue of whether the methods used with M.C. were "individualized" goes beyond the scope of the issue at the hearing, which was whether SACS employed scientifically based, peer-reviewed methods.  However, M.C.'s TOR further explained that determining which strategy to employ "would have to be looked at on an individual basis" because "what would be considered a good strategy for one [student] may not be considered a good strategy or an approach for another student."  AR 1043.  At the hearing, she testified that, of about thirty strategies in a teaching reference used mainly for

_____

[54] The IHO questioned the TOR about this list at the hearing, and it appears that the list was originally created without the participation of the Director of Special Education.  *See* AR 947, 1046.

reading but other areas of academics also, she had used about ten or twelve of the strategies with M.C. She acknowledged that there is a difference between practical teaching strategies and scientific, research-based instruction. The TOR further testified that she was not in the best position to speak to the particular methodologies used in M.C.'s core classes, which were taught by Carter (basic language) and Kirby (basic math) because they "were licensed as learning disability teachers and have . . . the mild disabilities" training. AR 1013.

When the Parents' counsel suggested that M.C.'s instruction should have been provided in a one-on-one setting, Carter responded, "I don't think so. [ ] I think she felt very comfortable with what we were doing," and noted that it was an area of strength for M.C. AR 1108. Carter also acknowledged that a reading methodology she used allowed her to "present certain reading strategies at a reading level that is below grade level, but [ ] practice the same skill as other students at that grade level." AR 1099-1100. When questioned by counsel for SACS, school personnel confirmed "two types of scientific research-based instruction" had been used with M.C.–Project Read and Touch Math.

Carter testified that she used Project Read in a group of 6-7 students for fifteen to twenty minutes during each period they were in her class.[55] Swenson, the Director of FWCL, testified that it was important to employ a "sensory method" of instruction, confirmed that Project Read is such

---

[55] Cheryl Carter is a degreed teacher with both a master's degree and an endorsement in learning disabilities and mild mental handicaps and has been teaching for over a quarter-century. She is licensed as a director of special education in Indiana and has been trained in Project Read over the course of four days at an out-of-state conference. The Parents argue that it is unclear whether Carter was trained in the portion of Project Read used in M.C.'s class. Carter testified that she was trained in two parts of Project Read, one part for lower elementary students and the "linguistics section of Project Read." AR 1098. However, SACS' exhibit relates to Project Read's "phonology" section.

a method, and acknowledged that the program was both recognized and respected.[56]  The Parents question whether Project Read was used in a multisensory manner by SACS.  They also question whether Carter in fact used Project Read as it is not listed as a text or resource on the syllabus used in Carter's seventh grade basic language arts class; she did not mention Project Read when describing her language arts class at M.C.'s January 20, 2006 case conference; neither Project Read nor any scientifically based, peer-reviewed methodology is indicated in the communication notebook that SACS sent home with M.C (a spiral notebook containing handwritten notes from M.C.'s teacher regarding the work that M.C. is doing); and M.C.'s August 8, 2005 proposed schedule for the 2005-06 school year does not mention Project Read.  As a credibility determination and in the absence of any direct evidence that Carter did *not* use Project Read as she so testified, the question of whether Carter lied at the hearing about her use of Project Read is one left to the sound discretion of the IHO, whose acceptance of her testimony will not be overturned.

Regarding Touch Math, in her July 2004 evaluation, the School Psychologist recommended that a systematic math program that can offer mastery of basic skills be used to teach M.C.  She recommended Touch Math for mastery of basic skills through consistency in the approach and feedback as well as frequent drill and practice reinforcement activities.  She also recommended reducing visual presentation of materials, given M.C.'s visual processing difficulties.  At the hearing, testimony confirmed that Touch Math was used with M.C.  AR 945.  When questioned by counsel for Parents, the School Psychologist agreed that she noted during the June 2005 assessments that M.C. did not use touch points to do math problems; she later agreed with questioning by counsel

---

[56] *See also Galina C. v. Shaker Reg'l Sch. Dist.*, No. Civ. 03-34-B, 2004 WL 626833, at *1 (D.N.H. Mar. 30, 2004) (explaining "multi-sensory structured language-based teaching" and noting that Project Read, Orton-Gillingham, and Lindamood-Bell are examples of such methodologies using this approach).

for SACS that M.C. had been taught math at FWCL during the 2004-05 year and was not taught touch math until she was at SACS the year following those assessments. Kirby implemented Touch Math with M.C.[57] M.C.'s father explained in his testimony that Touch Math is a visual presentation of math using a system of dots and that it does not work for M.C. because of her visual problems. In M.C.'s math progress report for March 2006, her teacher stated that she does not consistently use touch points. Based on this evidence, the Parents cannot meet their burden of demonstrating that SACS did not use Touch Math with M.C. or that M.C. did not benefit from it.

In addition, SACS submitted into evidence before the IHO a "Reading Strategies Handbook" that it used with M.C. along with other materials; the Parents argue generally that this is used for general education at Woodside. They also note that one of the resources Carter used to teach M.C. was a general education textbook and that she attempted to cover one section of that textbook every nine weeks. However, the IDEA does not require that *only* scientifically based methodologies be used, and the Parents have not offered any evidence that the adapted use of this general education textbook along with other scientifically based methods was inappropriate for M.C.

The Parents argue that SACS' expert Dr. Couvillion agreed that it is important that research based, peer reviewed methods be used with M.C. However, Dr. Couvillion's cited testimony specifically addresses M.C.'s vision therapy and provides that before any further vision therapies are attempted, documented research and publications regarding efficacy based on peer review journals should be provided. He also testified that all interventions and therapies must be consistent with known research and literature, known effective technologies, and measurable in their impact on M.C.

---

[57] Kris Kirby is a degreed teacher who has taught for over fifteen years and holds a master's degree in mild mental disabilities, learning disabilities, and the seriously emotionally handicapped.

The evidence of record supports the BSEA's finding that M.C. was consistently provided scientifically based instruction and the Parents have not proven otherwise. Nor have the Parents established that the methods utilized by SACS with M.C. do not comply with the IDEA as implemented during the years it issue. The Supreme Court in *Rowley* noted that courts lack the "specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy" and that "once a court determines that the requirements of the [IDEA] have been met, questions of methodology are for resolution by the States." 458 U.S. at 208 (citations and internal quotations marks omitted); *see also Deal*, 392 F.3d at 865; *Johnson v. Olathe Dist. Schs.*, 316 F. Supp. 2d 960, 975 (D. Kan. 2003); 511 Ind. Admin. Code 7-27-4(e) (2004) ("It is not necessary for a case conference committee to be convened in order for public agency personnel to discuss issues such as teaching methodology . . . if those issues are not addressed in the student's [IEP].") (current version at 511 Ind. Admin. Code 7-42-5(b)(1) (2008)).

b) Law cited by the BSEA

In its decision, the BSEA held that "[t]o the extent the Student is expressing a preferred methodology where the School's methodology is appropriate to the Student's needs, there is no right to compel the school district to provide a specific, parent-preferred methodology." AR 6330 (citing *Lachman v. Ill. State Bd. of Educ.*, 852 F.2d 290, 297 (7th Cir. 1988), *cert. denied* 488 U.S. 925 (1988)). In their motion, the Parents argue that the citation to *Lachman* is misplaced because it was overturned by legislation, citing, in a footnote, the "Analysis of Comments and Changes" to IDEA regulations enacted in 1999. *See* Pl. Br., p. 19, n. 22 (citing 64 FR 12552 and 34 C.F.R. § 300.26). In the same footnote, the Parents also generally reason that *Lachman* is inconsistent with the 2004 IDEA reauthorization. The Parents assert that FWCL used scientifically based, peer reviewed

methods; sensory cognitive processing based methods; and remedial, one on one, individualized, explicit, systematic instruction with M.C., which Dr. Savage approved of and recommended. They argue that at some point, a difference in outcomes between two methods can be so great that a school's provision of the lesser program constitutes a denial of a FAPE. *See* Pl. Br., p. 21 (citing *Deal*, 392 F.3d at 861-62).

The Parents' argument fails because they have mischaracterized the BSEA's holding and because the principle in *Lachman* cited by the BSEA is still consistent with the versions of the IDEA in effect during the years at issue. First, in their brief, the Parents characterize the BSEA's Combined Findings of Fact and Conclusions of Law #13, quoted above, as citing "case law from 1988 for the proposition that a school is not required to provide specific methodology to a student." Pl. Br., p. 19. The BSEA essentially held that, while SACS may not have employed the methodology now preferred by the Parents, it was sufficient that SACS employed an appropriate methodology. *See Casey K. v. St. Anne Cmty. High Sch. Dist.*, No. 04-2128, 2006 WL 2361881, *9 (C.D. Ill. Aug. 14, 2006) (citing *Lachman*, 852 F.2d at 294); *J.P. ex rel. Popson v. West Clark Cmty. Schs.*, 230 F. Supp. 2d 910, 919 (S.D. Ind. 2002). The Parents argue that *Casey* was about a May 2004 IEP and thus was not covered by the amendments that became effective on July 1, 2005.

This Court finds that the underlying principle of *Lachman*, drawn from the Supreme Court's decision in *Rowley*, is still good law–that if a school's methodology is "appropriate," the student is not denied a FAPE simply because the parents prefer a different method. Following the 2004 amendments, courts continue to find that a parent-preferred methodology does not trump an acceptable school-proposed program:

> In *Rowley*, the United States Supreme Court expressed reluctance to interject itself into the methods and means of instruction used by a school system, stating

"courts must be careful to avoid imposing their view of preferable education methods upon the states."

. . . .

      Plaintiff contends that this Court should consider the *Rowley* standard in light of more recent Congressional language inferring that "peer review research" services are required. The Court declines to do so. It does not appear that congress intended that the service with the greatest body of research be used in order to provide FAPE. Likewise, there is nothing in the Act to suggest that the failure of a public agency to provide services based on peer-reviewed research would automatically result in a denial of FAPE."

*Joshua v. Rocklin Unified Sch. Dist.*, No. CV 07-01057, 2008 WL 906243, at *3 (E.D. Cal. Mar. 31, 2008). However, the Court finds that the determination of whether the school has implemented "appropriate" methodologies for a given student is affected by the 2004 amendments to the IDEA in that it encourages the use of scientifically based methodologies "to the extent practicable." As found earlier in this section, SACS utilized appropriate scientifically based methodologies with M.C. The Court also finds that the 1999 regulation cited by the Parents is not in conflict with *Lachman*, as it simply explains that in some instances, a particular methodology will be an integral part of what is individualized about the student's education and will need to be incorporated into the IEP. The BSEA did not err in citing *Lachman*.

    In addition, immediately after citing *Lachman*, the BSEA invoked the three-part test for evaluating methodologies set forth in *J.P. ex rel. Popson v. West Clark Community Schools* and concluded that SACS satisfied those criteria. AR 6330. In discussing the proper test of appropriateness or soundness of a given educational approach and noting that it is a fact-specific inquiry in each case, the court in *J.P.* wrote,

      The problem is: How does one even attempt to prove to a court that a particular educational approach is unsound, given that courts are bound by law to defer to the educational expertise of school districts, hearing officers, and other educational professionals? In this Court's view, the answer is as follows.

An educational approach proposed by a school district for teaching a disabled child meets the legal standard for soundness if: (a) the school district can articulate its rationale or explain the specific benefits of using that approach in light of the particular disabilities of the child; (b) the teachers and special educators involved in implementing that approach have the necessary experience and expertise to do so successfully; and (c) there are qualified experts in the educational community who consider the school district's approach to be at least adequate under the circumstances. Furthermore, the Court believes that, in light of the "due weight" standard, a finding by a Hearing Officer that the educational approach proposed by a school district is sound constitutes persuasive evidence that each of these three criteria has been satisfactorily met.

230 F. Supp. 2d at 935-36. Again, the Parents argue that the case is pre-2004 enactment. As with *Lachman*, the Court finds that the three-part test in *J.P.* is still good law, but that the analysis under the first prong must incorporate the 2004 amendment in that it encourages the use of scientifically based methodologies "to the extent practicable." Again, the BSEA did not err in finding that SACS had met this test.

Finally, the Parents argue that the IHO incorrectly believed that SACS did not fail to use scientifically based methodology because he believed there was no such definition, relying instead on a standard of "commercially available and nationally recognized" materials. *See* AR 3933-35, 3923.[58] However, the IHO found that SACS "selected instructional materials that are respected throughout the special education fraternity, are in frequent use nationally, and which have a substantial research base" and that "the instructional methodologies used to instruct [M.C.] while using selected curricula were those known to be effective as supported by numerous national publications and the preponderance of research in the field." The BSEA upheld the IHO's

---

[58] In support, the Parents cite the definition of "scientifically based methodology" in the No Child Left Behind Act, which was not applicable to the IDEA during the years at issue but was in effect at the time of the hearing, and citing the "U.S. Department of Education Practices Supported by Rigorous Evidence," which the Court permitted the Parents to add to the record.

determination that SACS did not fail to use scientifically based methodologies with M.C., and the record supports this finding.[59]

In sum, in the instant case, the BSEA and the IHO concluded that SACS used appropriate methods, which is supported by the record; they are simply not the methods preferred by the Parents. In contrast, the cases cited by the Parents are ones in which a school used an inappropriate methodology, a methodology the teachers were not trained to implement, or no methodology at all.

c) Teacher training

Finally, the Parents argue in one sentence in their summary judgment brief that none of M.C.'s teachers at SACS had any training regarding brain injuries, implying that they were not properly trained. The only evidence cited in support of this contention is the testimony of M.C.'s TOR that she believed her introduction to special education classes touched on different types of injury including brain injury. This evidence does not demonstrate that none of M.C.'s teachers had any training regarding brain injuries; on the contrary, if anything, it shows that one of her teachers did have some training regarding brain injuries. As SACS notes, the Director of FWCL, the program advocated by the Parents and their experts, testified that she has no education in regard to brain injuries and has no training in regard to teaching brain injured children. As noted above in footnotes 55 and 57, both Kris Kirby and Cheryl Carter were qualified teachers.

---

[59] The Parents also cite *Nein v. Greater Clark School Corp.*, 95 F. Supp. 2d 961, 968, 970, 976-77, 979 (S.D. Ind. 2000), for the holding that the school denied the student a FAPE because the IEP did not provide for the use of a direct teaching methodology to address his dyslexia and where school personnel did not have expertise or extended training in teaching dyslexic students. As discussed in the next subpart, the teachers at SACS were sufficiently qualified and trained.

*4. Parental Participation*

Finally, in Count II of the Amended Complaint, the Parents allege that the IHO misapplied the procedural requirements of a FAPE when he held that the procedural violations did not deny the Parents meaningful participation in the IEP process. As noted above, a procedural error can rise to the level of denying a FAPE if it significantly impeded the parents' opportunity to participate in the decision making process regarding the provision of a FAPE to the student. *See* 20 U.S.C. § 1415(f)(3)(E)(ii)(II); *see also Deal*, 392 F.3d at 859 (citing *Knable*, 238 F.3d 765; *Rowley*, 458 U.S. at 208). In general, the Parents assert that the most significant procedural violation is the lack of information given to them. Notably, the Parents do not revisit this "participation" argument in their reply brief. There was no issue before the IHO regarding parent participation or a lack of information given to the Parents other than issue 14 as to whether SACS failed to provide the Parents with progress reports. However, because the factual basis for this argument was presented to the IHO over the course of the hearing, the Court addresses each of the Parents' arguments in turn.

First, the Parents allege that they were given incomplete and/or differing versions of the School Psychologist's 2004 and 2005 psychoeducational reports. A thorough review of the record demonstrates that this allegation is unsupported. In the course of document production for the due process hearing in summer 2006, the Parents received from SACS a copy of the School Psychologist's working file that contained *drafts* of both the 2004 and 2005 psychoeducational reports. It appears that the Parents have compared these drafts with final versions of the reports and have identified differences. Notably, the Parents offer no evidence that they did not timely receive the final, complete, and accurate 2004 and 2005 psychoeducational reports during the summers of

2004 and 2005 respectively. Therefore, they were not denied any information related to these reports.[60]

Next, the Parents allege that, other than consultative occupational therapy, SACS never described what, if any, related services it recommended or could provide to M.C. This issue is fully addressed above in Part D. Because the Court holds that the IHO's finding that SACS offered the

---

[60] The Parents' suggestions that the School Psychologist withheld information related to the 2004 report or tampered with the 2005 report to conform to SACS' litigation position are baseless.

As for the 2004 report, the Parents argue that the School Psychologist recommended in 2004 that M.C. receive a neuropsychological evaluation but that the Parents did not learn of the recommendation until they requested documents for the due process hearing in the summer of 2006. In the course of document production for the due process hearing, the Parents were given the School Psychologist's working file that contained an early draft of her 2004 psychoeducational evaluation, which included a recommendation that a neuropsychological evaluation should be obtained for M.C. At the hearing, the School Psychologist testified that the recommendation in the draft was based on early contact with M.C., before she learned additional medical and background information that convinced her otherwise and she deleted it from the report. She further testified that the recommendation was never intended to be shared with the Parents or any member of the case conference, that she did not distribute the recommendation or draft to anyone, and that she never made such a recommendation to the Director of Special Education or any of her colleagues. *See* AR 1290-91.

As for the 2005 report, the Parents allege that three recommendations related to socialization and a comparative analysis of M.C.'s scores (AR 2919, 2907 respectively) were in the version of the 2005 psychoeducational report submitted by SACS to the IHO in 2006 that were not in a version allegedly given to the Parents in summer 2005 (AR 1779-1797). The Parents thus imply that the School Psychologist changed the report to conform to SACS' litigation position. As with the 2004 report, the Parents obtained a draft copy of the 2005 report from the School Psychologist's working file during the course of document production in summer 2006. AR 1259. The School Psychologist emphatically testified at the hearing that the version submitted by SACS to the IHO was the final version that she presented to the case conference committee in 2005. AR 1259 (*see* AR 1255-62 for the entire testimony on this issue). First, there is *no* citation to evidence of record in support of the bald representation in the Parents' statement of material facts that SACS gave them the draft rather than the final version in summer 2005; the evidence does support the Parents receiving the draft in summer 2006 during document production. Second, a *thorough* comparison of the draft 2005 report submitted by the Parents and the final 2005 report submitted by SACS reveals not only the four differences highlighted by the Parents but no less than twelve other revisions, both substantive and technical, as well as the addition of page numbers and the placement of M.C.'s name at the top of each page. *See* AR 2905-09, 2917, 2919. These differences reinforce the School Psychologist's testimony that the document offered by the Parents was a working draft. Third, the Parents make much of the fact that there is a bullet point in the final report referring to a comparative analysis of M.C.'s test results at pages 17 to 19 of the report, stating that it "contained . . . a comparative analysis of M.C.'s scores," implying that the comparative analysis was not in the draft. Pl. Br., p. 22. Although true that only the final version contains the bullet point referencing the comparison, *both* versions contain the full three pages of substantive comparative test results (pages 17-19 of the final, numbered copy).

Finally, applicable to both allegations of wrongdoing, when asked directly, the School Psychologist denied that she had ever falsified one of her psychoeducational reports, denied that she had ever made changes to a psychoeducational report after giving it to parents, and denied that she had been told by either the Director of Special Education or counsel for SACS to falsify documents.

Parents related services which they declined in lieu of private services is entitled to due weight, the Court finds that the Parents were not denied information regarding related services.

Third, the Parents argue that, in violation of both the IDEA and the Settlement Agreement, SACS failed to have a general education teacher present at the 2005 case conference in violation of the IDEA and its regulations. The IEP team must have "not less than 1 regular education teacher of such child (if the child is, or may be, participating in the regular education environment)." 20 U.S.C. § 1414(d)(1)(B)(ii);[61] 34 C.F.R. § 300.344(a)(2); *see also* 20 U.S.C. § 1414(d)(3)(C) ("A regular education teacher of the child, as a member of the IEP Team, shall, to the extent appropriate, participate in the development of the IEP of the child . . . ."). The Parents did not raise this alleged violation at the hearing and thus it is not before the Court. Nevertheless, a review of the record reveals that a general education teacher was present at the August 19, 2005 case conference committee meeting. *See* AR 2939.[62]

Fourth, the Parents note that no occupational therapist, speech therapist, social worker, behavior consultant or teacher of the visually impaired attended any of the case conferences for the 2004-05 or 2005-06 school years and argue that without these related service professionals, they were unable to obtain information about the type and amount of related services SACS could and would be willing to provide. They conclude that, as a result, they were required to privately pay for M.C.'s therapies. The statute and regulations provide that the IEP may include "[a]t the discretion of the parent or the agency, other individuals who have knowledge or special expertise regarding

---

[61] Although the Parents cite subsection (b) ("evaluation procedures") of 20 U.S.C. § 1414 in their brief, subsection (d) ("individualized education programs") is the applicable provision.

[62] Although the general education teacher did not sign the August 19, 2005 IEP, she did sign the case conference summary signature page, also dated August 19, 2005.

the child, including related services personnel as appropriate." 20 U.S.C. § 1414(d)(1)(B)(vi).

Again, the Parents did not raise the procedural issue of meeting participants at the hearing and it is

not before the Court. However, as fully discussed in Part D above, the Parents had rejected related

services available through SACS, and at the August 2005 case conference committee meeting, the

Parents confirmed their choice to obtain private services. Notably, in addition to M.C.'s mother, the

meeting was attended by the Director of Special Education, a general education teacher, M.C.'s

TOR, the School Psychologist, and Carter (mild disabilities teacher). The evidence does not support

the Parents' characterization that they "were unable to obtain information."

Finally, as argued before the IHO, the Parents contend that SACS failed to timely provide

them with meaningful progress reports on all of her objectives in violation of 20 U.S.C. §

1414(d)(1)(A)(i)(III) (providing that the IEP shall include "a description of how the child's progress

toward meeting the annual goals . . . will be measured and when periodic reports on the progress the

child is making toward meeting the annual goals (such as through the use of quarterly or other

periodic reports, concurrent with the issuance of report cards) will be provided"). They reason that

the five evaluation codes for each objective without any further explanation was meaningless, which

prevented them from fully assessing whether SACS' program was appropriate for M.C. However,

these IEP-based evaluations were not the sole communication between SACS and the Parents.

First, the evaluation codes of Mastered, Introduced, Emerging, Progressing, and No

Opportunity were used to evaluate each of the 59 objectives of each goal every nine weeks, as set

forth in the IEP.[63] The TOR testified that she filled in the ratings after consulting with the

---

[63] The Parents argue that progress was not assessed on each objective every period. A review of the objectives in the IEP reveals that the following ratings were missing for the indicated grading periods: a rating for spelling for periods 2 and 3; a rating for the math skill of measurement for period 1 and 2; reading, following written directions, daily sight word vocabulary, using correct capitalization, writing complete sentences for period 3, and various social studies

appropriate teacher, whether math, language art, science, or social studies and that she herself did the personal management goals since she focused on those. However, M.C.'s father testified that they did not receive a copy of the progress reports at the time they were completed each nine weeks and did not receive them until May. *See* AR 1406.

In addition to the ratings of IEP goals, M.C. took home almost every day a schedule book known as a "VISA," which the TOR confirmed provided a written communication to the Parents and the opportunity for them to provide a written response on a daily basis. AR 1002. The TOR testified that she typically spoke to or corresponded with the Parents a few times each month and sometimes as often as once a week. The Parents regularly received report cards every nine weeks as well as M.C.'s standardized testing. The Parents had constant access to SACS' "Centerpoint" internet website, which displayed M.C.'s grades and assignments throughout the semester. The Parents received the comprehensive psychoeducational and occupational therapy reports during the summers of 2004, 2005, and 2006. The Parents participated in the case conference committee meetings, and the notes from those meetings show that M.C.'s progress was discussed at those meetings.

In his decision, the IHO found that the Parents had been kept fully informed as they

> . . . received a multiplicity of documentation of [M.C.'s] progress throughout the 2004-2005 and 2005-2006 school years through a variety of means. These included daily notes, phone calls, electronic mail, multiple case conference meetings with written reports that followed each, reports of progress related to the goals and objectives on [M.C.'s] IEP on a scheduled basis, along with multiple reports from psychologists, occupational therapists, physical therapists and other related services personnel.

---

and science objectives. AR 2983. For the social studies and science goals, it appears that there are no ratings during certain periods because specific topics were rated in the grading period in which they were covered in the curriculum.

AR 3952.  With the exception of testimony that the Parents did not receive quarterly updates on

M.C.'s IEP goals, the evidence of record supports the IHO's finding, which is entitled to due weight.

### F.  Behavioral Intervention Plan

When developing an IEP, the IEP team, "[i]n the case of a child whose behavior impedes his

or her learning or that of others," shall "consider, if appropriate, strategies, including positive

behavioral interventions, strategies, and supports to address that behavior."   34 C.F.R. §

300.346(a)(2)(i) (2004) (current version at 34 C.F.R. § 300.324(a)(2)(i)).  Under the Indiana special

education regulations in effect during the two years at issue, a "behavioral intervention plan"

("BIP") was defined as

> a plan, agreed upon by the case conference committee and incorporated into a
> student's individualized education program, that describes how the student's
> environment will be altered, identifies positive behavioral intervention strategies, and
> specifies which skills will be taught in an effort to change a specific pattern of
> behavior of the student. The plan shall be linked to information gathered through a
> functional behavioral assessment. To ensure transference, the behavioral intervention
> plan seeks to maximize consistency of implementation across people and settings in
> which the student is involved.

511 Ind. Admin. Code 7-17-8 (2004) (current version at 511 Ind. Admin. Code 7-32-10 (2008)).

A "functional behavioral assessment" ("FBA")  is defined as a

> systematic collection and analysis of data that will vary in length and scope
> depending on the severity of a student's behavior. Results and analysis of the data
> collection are used in developing the student's behavioral intervention plan. A
> functional behavioral assessment shall identify patterns in the student's behavior and
> the purpose or function of the behavior for the student.

*Id*. at 7-17-38 (2004) (current version at 511 Ind. Admin. Code 7-32-41 (2008)).

In Count III of the Amended Complaint and on summary judgment, the Parents argue that

an IEP must respond to all significant facets of a student's disability, both academic and behavioral,

that M.C.'s drooling and distractibility interfere with her ability to learn and with her social skills

such that she requires a BIP for each, that the IHO applied an incorrect standard for behavior planning, and that SACS' untimely behavior planning denied M.C. a FAPE. SACS responds that the BSEA appropriately corrected the IHO's misapplication of the standard, that the IHO correctly found that M.C. did not require a BIP and that her behaviors were addressed through goals, and that the Parents have waived any claim for a BIP as to M.C.'s distractibility.

First, the IHO found that the purpose of a FBA is to address behavior that "constitut[es] a disruption of the educational process or which constitute[s] a danger for the student or other students." AR 3936. The Parents appealed this finding to the BSEA, which upheld their objection, disagreeing with the IHO that an FBA and a BIP relate solely to disciplinary matters. The BSEA then held that a BIP would be "necessary any time an eligible student demonstrates an untoward behavior that adversely affects educational performance." AR 6313, n. 12; *see also* AR 6331. As the final administrative decision, the BSEA correctly overruled the IHO's decision on the standard for an FBA and a BIP; thus the Parents' argument that the IHO erred must fail.

Substantively, the Parents argue that, although the BSEA corrected the IHO's error, the BSEA failed to provide them any relief, reasoning that the error colored the IHO's decision that M.C. does not require a BIP for drooling and attention and that the BSEA failed to find that M.C. requires a BIP.[64] SACS largely agrees with the Parents' assessment of the impact M.C.'s drooling has on her daily life but argues that the impact is irrelevant to this issue because her drooling is not a behavior and thus requires no FBA or BIP. Based on the following evidence, the Court affirms the BSEA's decision that, despite the IHO's error regarding the scope of a BIP, "[M.C.] did not require and does not require a BIP" because her drooling behavior is involuntary and that while

---

[64] In their Statement of Material Facts, the Parents note that the IEP also does not contain a BIP or goals for rocking. However, the question of rocking as a behavior was not raised before the IHO and thus is not before the Court.

certain interventions within M.C.'s IEP "may not have been labeled as an FBA or a BIP, the same function [was] being served." AR 6331.[65]

First, the evidence and testimony of record from both parties supports the BSEA's conclusion that M.C.'s drooling was not a behavior to replace but rather was involuntary as a result of damage to her brain from her stroke. The following is from the testimony of Dr. Fisher, the Parents' expert:

> Q:      So, is drooling not appropriate for a behavior plan?
> A:      Not when it is due to something that she has no control over.
> THE HEARING OFFICER: Excuse me, point of clarification. You said she has no control over her drooling?
> THE WITNESS: She –
> THE HEARING OFFICER: I mean, is that what you just said? That is all I need.
> THE WITNESS: Correct, in that respect.
> THE HEARING OFFICER: Thank you.

AR 258-59. Dr. Savage, the Parents' expert, opined that M.C. could not control her drooling now, but that it is something she could control in the future. Dr. Savage opined that M.C.'s drooling interferes with her ability to learn social skills and possibly with writing if she drools onto her paper, but not with her ability to learn mathematics or reading. Both Dr. Fisher and Dr. Savage opined that M.C. needs a BIP. The School Psychologist testified that in terms of drooling as a neurological component, accommodations can be made but it is not a behavior to replace. Similarly, M.C.'s TOR testified:

---

[65] SACS cites the School Psychologist's notes that, in July 2004 and June 2005, the Parents elected not to do a survey known as the Vineland Adaptive Behavior Scale even though the psychologist requested it. The School Psychologist testified that this would have given SACS greater insight into M.C.'s behavior. However, the Parents argue that the parties agreed to specific testing in the Settlement Agreement and that the Vineland was not one of those tests. Because the issue of the Vineland Adaptive Behavior Scale is not critical to the Court's decision (e.g. there is no evidence that SACS did not implement a BIP because the Parents did not complete the Scale), the Court declines to rely on this evidence.

> Q:     . . . areas of concern were not initially addressed by FBA because they were worked on through goals and objectives. Is that a fair assessment?
>
> A:     Yes. . . I would not consider attention and drooling as typically behaviors you would address for a functional behavioral assessment. Those are goals.

AR 1047. To the extent that the IHO was required to weigh this evidence with the recommendations of Dr. Savage and Dr. Fisher that M.C. requires a BIP, the Court affords due weight to the IHO's determination as the trier of fact and an education expert uniquely qualified to make such decision.

Second, the record supports the BSEA's holding that SACS consistently addressed M.C.'s drooling and did so in accordance with the Parents' changing approach to the issue. In her July 2005 report, the School Psychologist noted that M.C. demonstrates increased swallowing with certain techniques but that the swallowing is not yet automatic. She then wrote that "potential use of a systematic approach at school and at home that can assist in transitioning this process to an automatic retrieval level should be discussed at the case conference." AR 2918. M.C.'s TOR explained at the hearing how the approach to M.C.'s drooling changed over time:

> [M.C.] was with us during the '04/05 school year, she carried a cloth with her and we were to cue her on when to wipe. During the '05/06 year, [M.C.'s mother] stated they were trying to look at [M.C.] automatically swallowing. Therefore we should cue her to swallow, and she no longer carried the cloth with her, but we did use tissues when necessary.

AR 955. SACS also implemented certain swallowing exercises for 15 minutes twice a day in the 2005-06 school year at the request of M.C.'s mother. These exercises were suggested by M.C.'s private speech therapist, Anita Tom, and were designed to promote automatic swallowing and alleviate drooling.[66] During the school day, M.C.'s TOS would work with her by using a mirror to show her if something was on her face. M.C.'s IEP for 2005-06 included a goal for "increased personal management skills in all areas" and objectives of "will monitor own need to drink water

---

[66] See supra note 33 regarding the Parents' argument that SACS may have violated state law.

to assist in swallowing" and "self monitor need for personal hygiene when related to drooling on 5 out of 5 trials." AR 2935. Again, the BSEA's determination that the steps taken by SACS served the same purpose as a BIP and that the IHO's conclusion that "the School did address the drooling behavior throughout the two school years in question by means of specific interventions, several of which were a result of considering[] input from the private practitioners employed by [M.C.'s] parents," AR 3937, will not be disturbed. *See J.K. ex rel. Kraft v. Metro. Sch. Dist. Southwest Allen County*, No. 1:04-CV-293, 2005 WL 2406046, at *19 (N.D. Ind. Sept. 27, 2005) ("However, the mere absence of a BIP is not evidence that the CCC did not 'consider' strategies to address [the student's] behavior, which is all the statute requires.").

Finally, as SACS notes, although the BSEA did not address this basis for supporting the IHO's decision, initially the Parents indicated to SACS that they did not necessarily want a BIP, which was consistent with SACS' understanding that drooling was not a behavior to be addressed in a BIP. Once the Parents indicated in April 2006 that they would like a BIP for drooling, SACS was hesitant to approach the issue of drooling through this type of plan, but did so at the Parents' request. SACS performed the FBA in May 2006, and in October 2006, the District held a case conference and prepared a draft BIP based on the FBA. By that time, M.C. had been removed from Woodside, and SACS never implemented the BIP.[67]

Although the Parents raised the issues of a BIP for drooling and attention before the IHO, the Parents appealed only the issue of a BIP for drooling to the BSEA. Thus, the Parents have not exhausted their administrative remedies as to M.C.'s distractibility and the issue is not before the

---

[67] The Parents argue that the October 2006 BIP was not appropriate. However, the October 2006 BIP was not before the IHO as part of the school years at issue and is not before the Court.

Court.  Nevertheless, were the issue of a BIP for M.C.'s distractibility before this Court, the analysis would be similar to that for drooling.

M.C.'s distractibility is noted throughout the record, with teachers at SACS indicating that one of M.C.'s biggest weaknesses is an inability to maintain attention and that they consistently expressed a concern about M.C.'s attention difficulties and distractibility.  M.C. is easily distracted and needs constant reminders of the task at hand.  There are many distractions in the classroom, but even when working one-on-one with an assistant, with no one else in the room, M.C. is distracted. Based on the reports of teachers, Dr. Fisher testified that M.C.'s distractibility impedes her academic learning.  However, as with drooling, the record shows that M.C.'s distractibility is not the type of behavior to be addressed by a BIP.  For example, Dr. Fisher, the Parents' expert, explained that, because some of M.C.'s behaviors are "brain driven," she does not have control over some aspects of her ability to focus and pay attention.  AR 163.  The School Psychologist testified that she believes that some attentional difficulties can be addressed through a BIP if it is "more of a developmental construct," but "[i]f it becomes more of a condition of neurological function, then I have to look at it more as a goal."  AR 1200.  For attention, she indicated that she would recommend a BIP or a goal depending on the particular student.  And, as with drooling, M.C.'s IEPs set out goals to address her distractibility such as allowing "extended time," using "[c]ontinuous feedback and cueing strategies," employing "[q]uestioning strategies that prompt [the Student] to attend to and follow through with whole group instruction," reading texts and tests to M.C., providing M.C. with "[c]opies of teacher notes" and "[s]tudy guides for tests," allowing M.C. to "move to an area to read softly aloud to [her]self," presenting color coded material in a larger font

on graph paper, and remaining aware of the amount of material being presented to M.C. at one time. AR 2930-34, 2936-37.

Therefore, the BSEA did not err in modifying and then affirming the IHO's decision that SACS did not fail to conduct an FBA or devise a BIP for drooling. M.C. did not require a BIP, and even if she did, her "behaviors" were properly addressed via her IEP goals.

## G. Breach of the Settlement Agreement

In Count VIII of the Amended Complaint, the Parents allege that the IHO ignored SACS' failure to follow the Settlement Agreement. The Parents first assert in their summary judgment motion that SACS cannot argue that the Settlement Agreement relieved them of their responsibility to provide related services, research based methodologies, and appropriate, measurable goals because SACS cannot contract out of its obligation to provide a FAPE. SACS has not argued that the Settlement Agreement relieved it of any of these responsibilities. The Parents also argue that SACS breached the Settlement Agreement by failing to provide transportation, to invite relevant and required individuals to M.C.'s case conferences, to write measurable goals, to communicate weekly with FWCL, and to pay for a promised independent evaluation of M.C. by convincing M.C.'s mother to enroll M.C. in a full day at Woodside on the eve of the 2005-06 school year. The Court addresses each in turn.

### 1. Transportation

The Parents state, without argument or analysis, that SACS failed to provide transportation to FWCL for M.C. The Indiana special education regulations in effect during the years at issue provided that transportation is a related service to be paid for by the public school corporation. *See* 511 Ind. Admin. Code 7-21-7(b) (2004) (currently at 511 Ind. Admin. Code 7-36-8 (2008)). The

regulations also provided that "[i]f the parent [although not required to] does transport the student, pursuant to a written agreement with the public agency, the public agency shall reimburse the parent at no less than the per mile rate at which employees of the public agency are reimbursed." *Id.* at 7-21-7(d). The issue before the IHO was not whether SACS failed to *provide* transportation, but rather whether SACS failed to *reimburse* the Parents for the costs of the transportation they provided.

The Settlement Agreement provides: "Transportation will be available for [M.C.] at 2:15 p.m., though mother will likely transport [M.C.] from school to home." AR 2820. M.C.'s August 18, 2004 IEP indicates that M.C. may take the regular bus home. In 2005-06, M.C. rode the bus to school and her mother picked her up to take her to FWCL. M.C.'s mother testified at the hearing that for the 2005-06 school year, she initiated conversation with the transportation department to get transportation for M.C. from Woodside to FWCL in the afternoons but then, out of frustration, did not pursue the request. *See* AR 822-23. She also testified that she was never compensated for transporting M.C. daily to FWCL from Woodside after school. *See* AR 824. However, the Parents have not identified any evidence of record that they requested reimbursement from SACS for transportation. The evidence of record supports the IHO's finding that SACS agreed to provide transportation but that transportation was in fact provided by the Parents at their choice and supports the IHO's legal conclusion that SACS did not fail to offer transportation or to reimburse the Parents for the costs of transportation. *See* AR 3920, 3955.

## 2. Case Conference Participants

The Parents argue that SACS breached the Settlement Agreement by failing to invite relevant and required individuals to M.C.'s case conferences. This was not an issue before the IHO and is not before the Court. The Settlement Agreement provides that "the case conference committee . .

. shall include Olive Swenson and Anita Tom as participants and Dr. Van Hoy via written report, in addition to the usual other participants." AR 2820. There is no provision in the Settlement Agreement for who would initiate the contact with Swenson and Tom. The notes of the case conference committee meetings demonstrate that Swenson frequently attended the meetings. Tom testified that she had never been invited to a case conference committee meeting by either SACS or the Parents, but that the Parents had consulted with her in advance of meetings. AR 542-43.

*3. Measurable Goals*

The Parents assert, without analysis or citation to fact, that SACS breached the Settlement Agreement by failing to write measurable goals. This issue was not before the IHO and is not before the Court. However, the Settlement Agreement provides that the case conference committee will meet to, among other things, "Write measurable goals and objectives." AR 2820. There is no allegation that the case conference committee did not meet to write goals or that when it met, goals were not written. Thus, it appears the issue again relates solely to the measurability of those goals, which the Court addressed in Part E.2 above, affirming the IHO's determination that the procedural violation of failing to include measurable goals in M.C.'s 2004-05 and 2005-06 IEPs did not deny her a FAPE. Accordingly, to the extent the failure to include measurable goals may constitute a breach of the Settlement Agreement, the alleged breach did not deny M.C. a FAPE. *Cf. Reid v. Sch. Dist.*, No. Civ. A. 03-1742, 2004 WL 1926324, at *4 (E.D. Pa. Aug. 27, 2004) (holding that the breaches of the settlement agreement in that case did constitute a denial of a FAPE).

*4. Weekly Communication with FWCL*

The Parents assert that SACS breached the Settlement Agreement by failing to communicate weekly with FWCL, which denied them meaningful participation in M.C.'s educational plan. This

issue was not before the IHO and thus is not before the Court.  However, the Settlement Agreement

provides, "The school shall cooperate with a weekly written communication between the FWCL and

the school in a notebook.  The parents shall be provided copies of all communications between

FWCL and the school on at least a weekly basis."  AR 2821.  M.C.'s mother testified that, in relation

to this term of the Settlement Agreement, there was not weekly written communication between

FWCL and SACS.[68]  As set forth above in Part E.4, the Court finds that the IHO's determination that

the Parents had been kept informed by SACS and that the Parents had not been significantly

impeded from participating in the decision making process is entitled to due weight.  The Parents

have not offered any analysis, and thus have failed to meet their burden, regarding how the failure

of SACS and FWCL to cooperate in weekly communication denied them participation in the

development of M.C.'s education.

*5. Payment for an Independent Evaluation*

The Parents argue that SACS breached the Settlement Agreement by failing to pay for an

independent evaluation of M.C.  The issue before the IHO was whether SACS failed to evaluate

M.C. "within the timelines" by the Settlement Agreement and the regulations, which the IHO

answered in the negative.  AR 3901.[69]  However, within that context, the Parents presented

---

[68] The Parents also offer a fact related to a portfolio that Swenson brought to a case conference committee meeting.  M.C.'s father testified that, at a case conference prior to June 9, 2006, Swenson brought a portfolio containing information concerning M.C. and that no one from SACS *asked* to look at it.  However, the Parents cite no evidence that Swenson *offered* to share the portfolio.  M.C.'s TOR testified that, if FWCL personnel referred to documents they brought and passed them around, she would look at them but that if they did not refer to the documents, she did not ask to look at them on her own.  AR 1061-62.  The import the Parents assign to this testimony is misplaced.

[69] As to the presented issue, the IHO found that SACS did not fail to evaluate M.C. within the established timelines.  First, he noted that M.C. received psychoeducational evaluations and occupational therapy evaluations from SACS annually.  As to the independent evaluation, he found that the testimony revealed that the additional assessment was never conducted but that the Parents "failed to initiate the necessary follow-up to ensure this evaluation was completed.  No documentation of a written request for this evaluation was not [sic] provided in the documents and exhibits provided by the Student."  AR 3955.

testimony regarding the related Settlement Agreement provision, which read: "The school agrees to pay for the cost of additional assessment by a mutually agreed upon individual educational evaluator in the areas of phonological processing, phonics, fluency, comprehension/vocabulary, spelling, math, writing, and visual motor. The parents agree to submit the bill first to their insurance company and seek any reimbursement thereafter." AR 2820. Therefore, the Court addresses the argument. There is no evidence of record that an evaluation was completed and that SACS failed to pay for it.

M.C.'s father testified at the hearing that, although the Parents recommended an evaluator in 2004-05, they never got a response to the suggestion and the evaluation was never completed. However, he also affirmed that SACS' notes from a May 2006 case conference committee meeting indicated that the Director of Special Education did not remember that they had suggested the name of an evaluator and that when the Director asked M.C.'s mother if they still wanted an independent evaluation, she responded, "I am not interested in having that done at this time," clarifying that their point had been that the Parents wanted the evaluation done by someone else other than the School Psychologist. AR 1424, 3042; *see also* AR 1134 (Director of Special Education confirming the conversation). The Settlement Agreement does not place the burden on SACS to identify the evaluator.

*6. Full Day at Woodside in 2005-06*

Finally, the Parents argue that SACS breached the Settlement Agreement by convincing M.C.'s mother to enroll M.C. in a full day at Woodside on the eve of the 2005-06 school year with the intention of ceasing payment for M.C.'s instruction at FWCL. This issue was resolved in a separate due process hearing. In fall 2005, SACS requested a due process hearing against the

Parents in an attempt to avoid its obligation to pay for FWCL under the Settlement Agreement based on M.C.'s full-day attendance at Woodside. On December 12, 2005, the IHO found in favor of M.C.'s parents, denying SACS' request to discontinue paying for up to fifteen hours a week of services through FWCL as originally set forth in the Settlement Agreement. As a result, SACS continued to pay for up to fifteen hours per week of instruction at FWCL for the 2005-06 school year. In addition, the record demonstrates that SACS did not withhold any funding and that all payments were made in full.

## H. Unilateral Placement

The Parents contend that, forced into self-help, they sent SACS a unilateral placement notice on September 29, 2006, and subsequently placed M.C. at FWCL for instruction and at Lutheran Hospital for intensive therapies.[70] The parties agree that a school district must reimburse parents for a child's unilateral placement in a private program if the court determines (1) that the private placement desired by the parents was proper and (2) that the school district's proposed IEP was inappropriate. *Burlington v. Dep't of Educ.*, 471 U.S. 359, 370 (1985); *see also Patricia P.*, 203 F.3d at 468. However, the parties dispute which private and public programs are being compared in this case.

In Part III of their motion, the Parents argue that SACS failed to provide M.C. a FAPE during the 2004-05 and 2005-06 school years and that the IHO failed to order an appropriate placement based on their experts' recommendations. In Part X of their brief, arguing that their

---

[70] Pursuant to the IDEA, parents may receive reimbursement for a private placement if either (a) they reject the school's proposed placement at an IEP meeting and state their intent to enroll their child in a private school at public expense or (b) they give written notice to the school of their intent to privately place their child at least ten business days before the placement is made. *See* 20 U.S.C. § 1412(a)(10)(C); 34 C.F.R. § 300.403 (2006) (current version at 34 C.F.R. § 300.148 (2008) (effective date Oct. 13, 2006)). The Parents provided this notice.

unilateral placement is appropriate, the Parents note that SACS did not develop an IEP for 2006-07, assert the merits of the education provided at FWCL, and then again argue that the 2004-05 and 2005-06 IEPs were not appropriate. In response to SACS' motion and in their reply in support of their own motion, the Parents assert that, because SACS did not develop an IEP for the 2006-07 school year and relied only on the instruction provided during the 2004-05 and 2005-06 school years, SACS did not propose an alternative to the Parents' unilateral placement for the IHO to consider. The Parents reason that, combining the two-year statute of limitations[71] and the unilateral placement standard, the Parents' unilateral placement in September 2006 should be compared with a non-existent IEP from SACS for the 2006-07 school year.[72]

In its motion, SACS argues that the Parents have failed to demonstrate that the special education and related services provided to M.C. in the public school, as reflected in the agreed-upon IEPs for 2004-05 and 2005-06 were not appropriate. In their reply in support of summary judgment, SACS argues that the Parents' unilateral placement is not at issue and that the only placement at issue is that of M.C. for the 2004-05 and 2005-06 school years; SACS asserts that it only addressed the inappropriateness of the unilateral placement in its motion for summary judgment to confirm that it would be an improper remedy even if the underlying claims for 2004-05 and 2005-06 were meritorious.

---

[71] The IDEA has a two-year statute of limitations. *See* 20 U.S.C. § 1415(f)(3)(C). In addition, the parties Settlement Agreement prevented litigation regarding prior school years.

[72] In a footnote on page 8 of their summary judgment brief, the Parents state with no analysis that, along with failing to implement an IEP for 2006-07, SACS failed to implement a transition plan. This issue was not before the IHO and is not before this Court.

The Court finds that the 2006-07 academic year is not at issue and that the Parents are not entitled to reimbursement or compensation for their unilateral placement because they have not demonstrated that M.C.'s IEPs for 2004-05 and 2005-06 were not appropriate.

*1. The 2006-07 Academic Year*

The parties dispute whether the development of an IEP for the 2006-07 academic year is at issue in this case. It is not. The Parents' initial due process request of June 5, 2006, challenged the education M.C. received during the 2004-05 and 2005-06 school years. On September 14, 2006, the Parents sent a second due process hearing request, asking to add the issue of "[w]hether [SACS] failed to devise an appropriate and timely IEP for [M.C.] for the 2006-07 school year." AR 4385. Following briefing by the parties, the IHO denied the request, reasoning that it would have been inappropriate for SACS to attempt to provide M.C. a new IEP until the matter was heard and a decision was issued by the IHO, given that the IHO had already issued three stay-put orders since the original due process request. AR 4539.

Indiana has a two-tier administrative process for special education matters in which a complaint must first be heard before an IHO after which either party may make an administrative appeal to the BSEA prior to seeking judicial review. *See* 511 Ind. Admin. Code 7-30-3, 7-30-4 (2007) (current version at 511 Ind. Admin. Code 7-45-7, 7-45-9). The party petitioning the BSEA must be "specific as to the reasons for the exceptions to the independent hearing officer's decision, identifying those portions of the findings, conclusions, and orders to which exceptions are taken." *Id.* at § 7-30-4(d). The final step of judicial review is normally not available until the party has exhausted his or her administrative remedies. *See* 20 U.S.C. §§ 1415(i)(2), 1415(l); *Honig v. Doe*, 484 U.S. 305, 326-27 (1988).

One purpose of exhaustion of administrative remedies is to ensure that "the appropriate agency has a chance to remedy the problem before it becomes a litigation issue in the courts." *M.O. ex rel. Ondrovic v. Ind. Dept. of Educ.*, No. 2:07-CV-175, 2008 WL 4056562, at *17 (N.D. Ind. Aug. 29, 2008) (citing *Cave v. East Meadow Union Free Sch. Dist.*, 514 F.3d 240, 245-46 (2d Cir. 2008) ("The purpose of the exhaustion rule is to channel disputes related to the education of disabled children into an administrative process that could apply administrators' expertise in the area and promptly resolve grievances.")); *see also Brett v. Goshen Cmty. Sch. Corp.*, No. 3:97 CV 426, 1998 WL 792186, at *3 (N.D. Ind. Oct. 6, 1998) ("A plaintiff is bound by the exhaustion of remedies requirement, which serves several purposes: (1) to permit an agency to exercise its discretion and expertise; (2) to develop technical issues and a factual record prior to judicial review; (3) to prevent circumvention of agency procedures; and (4) to avoid unnecessary judicial review by allowing agencies to correct errors.").

In its summary judgment briefing, SACS argues that the Parents failed to raise before the BSEA the IHO's denial of the second due process hearing request. In their Petition for Review to the BSEA, the Parents do not mention either the September 14, 2006 request to add the issue of the 2006-2007 IEP or the IHO's ruling denying their request. *See* AR 4974-5001. Similarly, the Amended Complaint does not mention the IHO's ruling. Nevertheless, in their summary judgment motion, the Parents contend that SACS should have developed an IEP at the beginning of the 2006-2007 school year, citing 20 U.S.C. § 1414(d)(2)(A), and that this requirement applies even when litigation is pending, citing *Burlington*, 736 F.2d at 794.[73] Because the second due process request

---

[73] 20 U.S.C. § 1414(d)(2)(A) provides that the school district shall have in effect at the beginning of each school year an IEP for each child with a disability. In *Burlington*, the First Circuit noted that the IDEA makes no reference to whether IEPs are to be revised during the pendency of review and held that "[w]e think that pending review of an earlier IEP, local educational agencies should continue to review and revise IEPs in accordance with applicable law, at least

was not appealed in the administrative proceeding, the BSEA did not have an opportunity to consider the IHO's ruling, and the Parents have not exhausted their administrative remedies.  *See, e.g., Weyrick v. New Albany-Floyd County Consol. Sch. Corp.*, No. 4:03-CV-0095, 2004 WL 3059793, at *19 (S.D. Ind. Dec. 23, 2004) (finding failure to exhaust administrative remedies when an issue was not appealed to the BSEA); *L.M. ex rel. Mauser v. Brownsburg Cmty. Sch. Corp.*, 28 F. Supp. 2d 1107, 1110-11 (S.D. Ind. 1998) (explaining that exhaustion of "all" administrative remedies under the IDEA in Indiana includes appealing the IHO's decision to the BSEA).  Although the Parents cite a number of cases regarding exhaustion, none of them involves Indiana's two-tier administrative process nor do any concern a procedural history in which an issue that was raised by the parties and actually decided by the IHO was then not raised before the state administrative board of appeals prior to the civil lawsuit.[74]

---

in the absence of a stipulation between the parties providing for how the outcome of the suit will affect later years." 736 F.2d at 794.  In this case, M.C.'s educational placement at the outset of the 2006-07 year was subject to the IHO's stay-put orders through his hearing decision.

[74] In a footnote to their summary judgment brief, the Parents assert that they have exhausted their administrative remedies on this issue because they asked the IHO to add the issue, the IHO denied the request, and they "subsequently argued in favor of their unilateral placement arising from Defendants' failure to develop an IEP."  Pl. Br., p. 16 n. 17 (citing, without analysis or explanation, *H.B. v. Las Virgenes Unified Sch. Dist.*, 239 Fed. Appx. 342 (9th Cir. 2007); *Taylor v. Vermont Dep't of Educ.*, 313 F.3d 768 (2d Cir. 2002)).  Neither case applies to whether administrative remedies have been exhausted when an issue raised before the IHO is not raised before the administrative appeals body.  In *H.B.* the school challenged whether a certain issue ruled on by the district court had been before the IHO when the IHO had refused to address the issue.  239 Fed. Appx. at 334.  The Ninth Circuit held that the parents had exhausted their administrative remedies because both sides questioned witnesses on the issue and argued the issue in their closing briefs, which had given the hearing officer an opportunity to consider the issue.  In contrast with *H.B.*, the Parents in this case did not raise the issue of the 2006-2007 IEP before the BSEA.  *Taylor* is a § 1983 action applying the IDEA's exhaustion requirements, in which the Second Circuit applied the recognized "futility" exception to hold that the plaintiff was entitled to proceed notwithstanding the failure to exhaust remedies when the plaintiff did not seek a due process hearing.  313 F.3d at 789.  The Parents do not argue a futility exception in this case, and it is inapplicable as the Parents did file a due process request and an appeal with the BSEA.

In their response brief, the Parents argue that administrative remedies are exhausted regarding those issues raised in a due process hearing, even if they are not ruled on.  Pl. Resp., p. 20, p. 20 n 19 (citing *R.G. v. Glen Ridge Bd. of Educ.*, No. 05-CV-3017(WJM), 2005 WL 3274857, at *3 n. 5 (D.N.J. Dec. 2, 2005); *D.R. v. East Brunswick Bd. of Educ.*, 838 F. Supp. 184, 194 (D.N.J. 1993); *Escambia County Bd. of Educ. v. Benton*, 406 F. Supp. 2d 1248, 1258 (S.D. Ala. 2005); *Anders v. Indian River Sch. Dist.*, CS05-02707, 2007 Del. Fam. Ct. LEXIS 42, at *33 (Del. Fam. Ct. Jan. 19, 2007)).  The question before the Court is not whether the Parents raised the issue in a hearing request–they did; rather it is whether the failure subsequently to raise the issue to the BSEA is fatal.

In their reply brief, the Parents even suggest that the 2004-05 and 2005-06 school years may be the proper basis of comparison with their proposed private placement by asking for compensatory services: "If this Court does not believe that intensive therapy is necessary for FAPE, intensive therapy, or reimbursement therefor, should be ordered as compensatory services for M.C. to make up for Defendants' failure to provide M.C. any therapy in 2004-2005 and 2005-2006 and for failure to write an IEP."  Pl. Reply, p. 25 (citing *M.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 396 (3d Cir.1996)).

## 2.  *Unilateral Placement Analysis*

This case addresses the provision of special education to M.C. for the 2004-05 and 2005-06 school years.  *See* AR 18, 27.  This is not a case in which the parents proposed a private placement at a case conference committee meeting, withdrew the student to enroll in the private placement, and then instituted the due process proceedings to seek reimbursement.[75]  Rather, the Parents' decision

---

[75]  In their reply brief, the Parents cite two cases to support their argument that their preferred placement for 2006-07 should be compared to a non-existent 2006-07 IEP.  Both are distinguishable from the instant case on the facts in that the due process hearing in each case was not requested until *after* the school had refused to adopt the preferred parental placement.

In *Fermin ex rel. Fermin v. San Mateo-Foster City School*, an IEP for the 1997-98 school year was developed in May 1997 with placement in the public school.  No. C 99-3376, 2000 WL 1130070, at *1 (N.D. Cal. Aug. 4, 2000).  Subsequently, the parents unilaterally placed the student in a private program for the 1997-98 school year.  *Id.*  In July 1998, the IEP team again offered a public placement for 1998-99, but the parents asked for reimbursement and current funding for the private placement.  *Id.* at *2.  In late 1998, the parents requested a due process hearing to determine whether the student had received a FAPE for the 1997-98 and 1998-99 school years.

In *Roland M. v. Concord School Committee*, the parents unilaterally moved the child to a private placement in June 1986, after the child had been in the public school for six years.  910 F.2d 983, 988 (1st Cir. 1990).  Just prior to the school year, the parents rejected the proposed 1986-87 IEP, which called for the student to remain in the public school.  *Id.*  Subsequently, the parents filed a due process hearing to review the placement for 1986-87.  *Id.*

The parents also cite *Deal v. Hamilton County Board of Education*, stating that past violations of a FAPE are relevant to the efficacy of a placement going forward and to whether relief is necessary for the past denial of FAPE.  392 F.3d 840 (6th Cir. 2004).  In *Deal*, the first IEP was developed in 1997 when the child was three years old.  *Id.* at 845.  When the IEP team met in May 1998 to consider extended school year services, the parents asked for a full-time home-based program, which the school refused.  *Id.* at 846.  In October 1998, the IEP meeting was held to develop the 1998-99 IEP, and the parents filed a request for the school to fund their preferred full-time, home-based program.  During 1998-99, the student attended the public school approximately 16% of the time.  *Id.*  At a May 1999 IEP meeting, the parents requested extended school year services in their home-based program.  *Id.*  In August 1999, the IEP team met to develop a 1999-2000 IEP.  *Id.*  In early September 1999, the student began attending a private preschool, and five days later, the parents informed the school that they were rejecting the proposed IEP in favor of the private preschool.  *Id.*  Shortly

to withdraw M.C. from SACS and unilaterally place her at FWCL and Lutheran Hospital did not occur until well into the due process hearing proceedings that had already been initiated to challenge the provision of her placement during the 2004-05 and 2005-06 school years. Under the unilateral placement standard, a consideration of whether the Parents' preferred unilateral placement is appropriate arises only if the Parents have first met their burden of showing that the IEPs and education in place for M.C. for the 2004-05 and 2005-06 school years were not appropriate. As set forth in detail in Part B above, the Parents have not met this burden. Although the Parents argue the benefits of FWCL and intensive therapies, the standard is not whether the placement requested by the parents is a better or even the best placement but rather whether the placement offered by the school is not appropriate. *See Heather S.*, 125 F.3d at 1057; *see also Kerkam v. McKenzie*, 862 F.2d 884, 886 (C.A.D.C. 1988) (citing *Rowley*, 458 U.S. at 189, 197, n. 21, 198, 199) (holding that "proof that loving parents can craft a better program than a state offers does not, alone, entitle them to prevail under the Act"); *Shaw v. District of Columbia*, 238 F. Supp. 2d 127, 139 (D.D.C. 2002) (citing *Kerkam*, 862 F.2d at 886) ("Although the IDEA guarantees a free appropriate education, it does not, however, provide that this education will be designed according to the parent's desires."); *J.R. ex rel. W.R. v. Sylvan Union Sch. Dist.*, No. CIV S-06-2136, 2008 WL 682595, at *10 (E.D. Cal. Mar. 10, 2008) (citing *Kerkam*, 862 F.2d at 886; *Shaw*, 238 F. Supp. 2d at 139). Nor have the Parents demonstrated that the difference in outcomes between their proposed program and that provided through SACS is so great that the provision of education through SACS amounts to a

---

thereafter, the parents requested a due process hearing. *Id.* at 847. In *Deal*, the Sixth Circuit found that the school had committed procedural violations in relation to the May 1997 IEP meeting and the August 1999 meeting that denied the student a FAPE and granted reimbursement. Again, *Deal* is a case in which the parents did not request the due process hearing until *after* the unilateral placement. Nevertheless, the analysis is informative to the instant case in that the Parents' proposed placement for M.C. going forward is only relevant if they can establish a past violation of a FAPE during the 2004-05 or 2005-06 school years. The Parents have not met this burden.

denial of a FAPE. *See Deal*, 392 F.3d at 861-62. Again, the response to the Parents' rhetorical question asking why the IHO ordered so many modifications to M.C.'s IEPs if they were not appropriate is that the procedural deficiencies he identified did not rise to the level of denying M.C. a FAPE.

## I. Attorney Fees

In an IDEA case such as this, a "court, in its discretion, may award reasonable attorneys' fees as part of the costs . . . to a prevailing party who is the parent of a child with a disability." 20 U.S.C. § 1415(3)(B)(i)(I). A party can seek attorney fees in federal district court if the party prevails in a civil action or administrative proceeding brought under the IDEA. *See Linda T. v. Rice Lake Area Sch. Dist.*, 417 F.3d 704, 707 (7th Cir. 2005). However, where a party does not prevail or prevails in only a de minimis fashion, the party is not entitled to any award. *Monticello Sch. Dist. No. 25 v. George L.*, 102 F.3d 895, 907 (7th Cir. 1996).

In its summary judgment motion, SACS argues that the Parents are not the prevailing party in the administrative proceedings and thus are not entitled to attorney fees because they lost on their core claims and the IHO only ordered greater specificity in M.C.'s IEP. *See* Def. Br., p. 54 (citing *Linda T.*, 417 F.3d at 708). In the Amended Complaint, the Parents do not seek an award of attorney fees as the prevailing party in the administrative proceeding, and the Parents do not move for attorney fees in their summary judgment motion. Accordingly, the Court denies as moot SACS' motion for summary judgment as to attorney fees arising out of the administrative proceedings. However, in each count of the Amended Complaint, the Parents do ask the Court generally to "[a]ward Plaintiffs reasonable attorney fees." Because the Parents have not prevailed on any of their claims before this Court, their request for attorney fees is denied.

**CONCLUSION**

Based on the foregoing, the Court hereby (1) **DENIES** Plaintiffs' Motion for Summary Judgment [DE 114]; and (2) **GRANTS in part and DENIES as moot in part** Defendants' Motion for Summary Judgment [DE 117], denying as moot the motion as to attorney fees and granting the motion in all other respects.

SO ORDERED this 29th day of December, 2008.

s/ Paul R. Cherry _____
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:  All counsel of record